# United States Court of Appeals

*for the*

# Third Circuit

---

Case Nos. 11-2577 (L) and 11-2576 (CON)

In re: Petition of Frescati Shipping Company, Ltd., as Owner of the M/T Athos I and Tsakos Shipping and Trading, S.A., as Manager of the Athos I for Exoneration from or limitation of liability

---

APPEAL FROM AN ORDER ENTERED BY THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## BRIEF FOR APPELLANTS
## FRESCATI SHIPPING COMPANY, LTD. AND
## TSAKOS SHIPPING AND TRADING, S.A.

MONTGOMERY, MCCRACKEN,
  WALKER & RHOADS, LLP
123 South Broad Street, 28th Floor
Philadelphia, Pennsylvania 19109
(215) 772-1500

BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, New York 11050
(516) 767-3600

*Attorneys for Appellants Frescati Shipping Company, Ltd.
and Tsakos Shipping and Trading, S.A.*

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and**
**Statement of Financial Interest**

No. 11-2576

Frescati Shipping Co., Ltd., et al.

v.

Citgo Asphalt Refining Company

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, **Tsakos Shipping & Trading, S.A.** makes the following disclosure:

(Name of Party)

        1) For non-governmental corporate parties please list all parent corporations:

None.

        2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None.

        3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

        4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

//s// Jack Greenbaum
_____

(Signature of Counsel or Party)

Dated: June 30, 2011
_____

(Page 2 of 2)

*rev: 11/2008*

United States Court of Appeals for the Third Circuit

**<u>Corporate Disclosure Statement and</u>**
**<u>Statement of Financial Interest</u>**

No. <u>11-2576</u>

Frescati Shipping Co., Ltd., et al.

v.

Citgo Asphalt Refining Company

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, **Frescati Shipping Co., Ltd.** makes the
following disclosure:
(Name of Party)

       1) For non-governmental corporate parties please list all parent corporations:

None.

       2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None.

       3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

       4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

//s// Jack Greenbaum             Dated: June 30, 2011
(Signature of Counsel or Party)

(Page 2 of 2)

*rev: 11/2008*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Plaintiffs-Appellants Frescati Shipping Company Ltd. certifies that:

1) M/T ATHOS I is wholly owned direct subsidiary of Frescati Shipping Company Ltd. a public company.

2) Frescati Shipping Company Ltd., through one or more intermediaries, owns 100% of M/T ATHOS I.  No publicly held company owns 10% or more of M/T ATHOS I.

3) No publicly held corporation has a financial interest in the outcome of the proceeding before this court.

4) This is not a bankruptcy appeal.

REQUEST FOR ORAL ARGUMENT BY:

JACK A. GREENBAUM

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTION ................................................................................. 1

OTHER CASES ................................................................................. 1

ISSUES .............................................................................................. 1

STATEMENT OF THE CASE ........................................................... 2

FACTS ............................................................................................... 6

    A.    CARCO's berth and the approach .......................................... 6

    B.    The casualty ........................................................................... 11

    C.    CARCO never inspected for hazards anywhere .................... 13

    D.    The accident would not have happened if CARCO had found and reported the anchor. ........................................................... 15

    E.    CARCO's excuses for not inspecting in the Anchorage .......... 17

SUMMARY OF THE ARGUMENT .................................................. 19

ARGUMENT ...................................................................................... 23

    POINT I    THE DISTRICT COURT ERRED IN LIMITING THE DEFINITION OF AN APPROACH AND HOLDING THE ANCHOR THEREFORE WAS NOT WITHIN THE APPROACH ......................................................... 23

    SCOPE OF REVIEW. ................................................................. 23

    ARGUMENT ............................................................................. 23

    POINT II    THE DISTRICT COURT ERRED IN HOLDING CARCO HAD NO DUTY TO INSPECT FOR HAZARDS IN THE ANCHORAGE ................................................ 28

    SCOPE OF REVIEW .................................................................. 28

i

ARGUMENT ......................................................................................29

A.    The Opinion's grounds for excusing CARCO are erroneous. ............29

B.    CARCO had no valid excuse for not inspecting in the Anchorage. ...34

C.    The circumstances required a high degree of care. ...........................36

D.    CARCO's failure to inspect was causal. ...........................................40

POINT III    THE DISTRICT COURT ERRED IN HOLDING CARCO
             DID NOT MISREPRESENT A MATERIAL FACT AND
             THIS WAS NOT A CAUSE OF THE CASUALTY ...............41

STANDARD OF REVIEW ...................................................................41

ARGUMENT ......................................................................................41

POINT IV    THE DISTRICT COURT ERRED IN HOLDING OWNER
            WAS NOT A THIRD-PARTY BENEFICIARY  OF THE
            SAFE PORT AND BERTH WARRANTIES .........................49

STANDARD OF REVIEW ...................................................................49

ARGUMENT ......................................................................................49

POINT V    THE DISTRICT COURT ERRED IN HOLDING THE
           SAFE BERTH AND PORT WARRANTIES WERE NOT
           GUARANTEES AND WERE NOT TRIGGERED .................54

STANDARD OF REVIEW ...................................................................54

ARGUMENT ......................................................................................55

A.    The safe port and berth clauses are warranties ................................55

B.    The "named port exception" does not apply. ....................................59

C.    The warranties were breached. .........................................................61

CONCLUSION ....................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agni v. Wenshall (In re New York)*,
522 F.3d 279 (2d Cir. 2008) ........................................................29, 37

*American President Lines, Ltd. v. U.S.*,
208 F. Supp. 573 (N.D. Cal. 1961) ..............................................61

*Berretta v. Tug Vivian Roehrig, LLC*,
259 Fed. Appx. 343 (2d Cir. 2007) ..............................................34

*Berwind-White Coal Mining Co. v. City of New York*,
135 F.2d 443 (2d Cir. 1943) ........................................................29

*Berwind-White Coal-Mining Co. v. Bush Terminal Co.*,
296 F. 475 (2d Cir. 1924) ............................................................25

*Bouchard Transp. Co. v. Tug Gillen Bros.*,
389 F. Supp. 77 (S.D.N.Y. 1975) ................................................25

*Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*,
985 F.2d 323 (7th Cir. 1993) ......................................................37

*Bunge Corp. v. M/V FURNESS BRIDGE*,
558 F.2d 790 (5th Cir. 1977) ......................................................59

*Butler v. Acme Mkts., Inc.*,
445 A.2d 1141 (N.J. 1982) ..........................................................31

*The Calvin P. Harris v. Lynn Gas-Light Co.*,
33 F. 295 (D. Mass. 1887) ..........................................................26

*Caravel/Woodwind Charters, Inc. v. Tahoe Keys Marina, LLC*,
Civ. No. S-05-1435 (FCD) (KJM), 2008 U.S. Dist. LEXIS 1308 (E.D.
Cal. Jan. 7, 2008) ........................................................................25

*Carleton v. Franconia Iron and Steel Co.*,
99 Mass. 216 (1868) ....................................................................31

iii

*Chainey v. Street*,
　523 F.3d 200 (3d Cir. 2008) ...............................................................52

*Cities Service Transp. Co. v. Gulf Refining Co.*
　79 F.2d 521 (2d Cir. 1935) ................................................................56

*Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*,
　826 F.2d 424 (5th Cir. 1982) .............................................................45

*Colliers Lanard & Axilbund v. Lloyds of London*,
　458 F.3d 231 (2d Cir. 2006) ..............................................................54

*Conway v. O'Brien*,
　111 F.2d 611 (2d Cir. 1940), *rev'd on other grounds* 312 U.S. 492 (1941) ......36

*Crumady v. The Joachim Hendrik Fisser*,
　358 U.S. 423 (1959)..................................................................52, 53

*Daly v. New York Dock Co.*,
　254 F. 691 (2d Cir. 1918) .................................................................25

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*,
　333 F.3d 383 (2d Cir. 2003) ..............................................................60

*In re Frescati Shipping Co.*,
　Civ. No. 05-cv-00305, 2011 U.S. Dist. LEXIS 40020 (E.D. Pa. April 12,
　2011) ....................................................................................2

*The GAZELLE*,
　128 U.S. 474 (1888)..........................................................33, 38, 62

*Gill v. Hango Ship-Owners A/B*,
　682 F.2d 1070 (4th Cir. 1982) ...........................................................38

*Grand Trunk RR Co. v. Richardson*,
　91 U.S. 454 (1876).........................................................................36

*Guardian Life Ins. Co. v. Weisman*,
　223 F.3d 229 (3d Cir. 2000) .........................................................36, 37

*Hartford & N.Y. Transp. Co. v. Hughes*,
　125 F. 981 (S.D.N.Y. 1903)...............................................................25

iv

*Hess v. The ARIZONA*,
  149 F. Supp. 733 (S.D.N.Y. 1955), *aff'd* 242 F.2d 706 (2d Cir. 1957) ............45

*Humble Oil & Refining Co. v. Philadelphia Ship Maintenance Co.*,
  444 F.2d 727 (3d Cir. 1971) ...............................................................53

*In re Kinsman Transit Co.*,
  338 F.2d 708 (2d Cir. 1964) ...............................................................47

*In re Paducah Towing Co.*,
  692 F.2d 412 (6th Cir. 1982) ..............................................................37

*In re Tug Ocean Prince, Inc.*,
  584 F.2d 1151 (2d Cir. 1978) .......................................................34, 38

*Johnson v. Kosmos Portland Cement Co.*,
  64 F.2d 193 (6th Cir. 1933) ...............................................................48

*Kleinknecht v. Gettysburg College*,
  989 F.2d 1360 (3d Cir. 1993) ............................................................48

*Kunz v. Utah Power & Light Co.*,
  526 F.2d 500 (9th Cir. 1975) .............................................................38

*Lydle v. U.S.*,
  635 F.2d 763 (6th Cir. 1981) .............................................................28

*Marant v. Farrell Lines, Inc.*,
  550 F.2d 142 (3d Cir. 1977) ..............................................................59

*In re McAllister Bros., Inc.*,
  609 F. Supp. 616 (E.D. Pa. 1985)......................................................56

*Merritt v. Sprague*,
  191 F. 627 (D. ME 1911)...................................................................62

*Monaco v. Hartz Mountain Corp.*,
  415, 840 A.2d 822 (N.J. 2004) ..........................................................31

*MS Tabea Schiffahrtsgesellschaft MBH & Co. v. Board of Commissioners*,
  Civ. No. 08-3909, 2010 U.S. Dist. LEXIS 103171 (E.D. La. Sept. 29,
  2010), *aff'd* 636 F.3d 161 (5th Cir. 2011) ........................................26

v

*Mulraney v. Auletto's Catering*,
320, 680 A.2d 793 (N.J. App. Div. 1996), *cert. denied* 686 A.2d 764
(1996) ................................................................................................ 32

*In re Nautilus Motor Tanker Co.*,
85 F.3d 105 (3d Cir. 1996) .............................................................. 24

*In re Nautilus Motor Tanker Co.*,
862 F. Supp. 1260 (D.N.J. 1994), *aff'd* 85 F.3d 105 (3d Cir. 1996) ................ 48

*New Jersey Bank, N.A. v. Bradford Securities Operations, Inc.*,
690 F.2d 339 (3d Cir. 1982) ............................................................ 41

*Orduna S.A. v. Zen-Noh Grain Corp.*
913 F.2d 1140 (5th Cir. 1990) ................................................... 56, 57

*Orvis v. Higgins*,
180 F.2d 537 (2d Cir. 1950) ............................................................ 28

*Osprey Ship Mgmt. Inc. v. Jackson County Port Authority*,
Civ. No. 05-390-HSO-RHW, 2007 WL 4287701 (S.D. Miss. Dec. 4,
2007) ................................................................................................ 26

*P. Dougherty Co. v. Bader Coal Co.*,
244 F. 267 (D. Mass. 1917) ............................................................. 26

*Paragon Oil Co. v. Republic Tankers, S.A.*,
310 F.2d 169 (2d Cir. 1962), *cert. denied sub nom, Yacimientos
Petroliferos Fiscales v. Paragon Oil Co.*, 372 U.S. 967 (1963) ....................... 53

*Park S.S. Co. v. Cities Service Oil Co.*,
188 F.2d 804 (2d Cir. 1951) ....................................................... 56, 58

*Pastore v. Taiyo Gyogyo K.K.*,
571 F.2d 777 (3d Cir. 1978) ............................................................ 47

*Pease v. Sinclair Refining Co.*,
104 F.2d 183 (2d Cir. 1939) ....................................................... 39, 40

*Pierce Associates, Inc. v. Nemours Foundation*,
865 F.2d 530 (3d Cir. 1988), *cert. denied* 492 U.S. 907 (1989) ................ 49, 50

vi

*Presbyterian and Reformed Publishing Co. v. Commissioner*,
  743 F.2d 148 (3d Cir. 1984) ............................................................... 23

*Redhead v. U.S.*,
  686 F.2d 178 (3d Cir. 1982) ............................................................... 29

*Rodriguez v. Brunswick Corp.*,
  364 F.2d 282 (3d Cir. 1966) ............................................................... 36

*Rohm and Haas Co. v. Adco Chemical Co.*,
  689 F.2d 424 (3d Cir. 1982) ............................................................... 23

*Rossville Salvage Corp. v. S.E. Graham Co.*,
  319 F.2d 391 (3d Cir. 1963) ............................................................... 57

*Sea-Land Service, Inc. v. Director, Office of Workers' Compensation
  Programs*,
  552 F.2d 985 (3d Cir. 1976) ............................................................... 59

*Serbin v. Bora Corp.*,
  96 F.3d 66 (3d Cir. 1996) .................................................................. 48

*Slater Fireproof Storage Co. v. Nicholson Transit Co.*,
  47 F.2d 734 (7th Cir. 1931) ............................................................... 25

*Smith v. Burnett*,
  173 U.S. 430 (1899) ........................................................ 24, 29, 30, 31

*Smith v. Havemeyer*,
  36 F. 927 (S.D.N.Y. 1888) ................................................................. 39

*Sonat Marine Inc. v. Belcher Oil Co.*,
  629 F. Supp. 1319 (D.N.J. 1985), *aff'd* 787 F.2d 583 (3d Cir. 1986) ............... 25

*SPM Corp. v. M/V MING MOON*,
  965 F.2d 1297 (3d Cir. 1992) ............................................................. 53

*Suchomajcz v. Hummel Chem. Co.*,
  524 F.2d 19 (3d Cir. 1975) ................................................................ 48

*Swanson v. Baker Industries, Inc.*,
  615 F.2d 479 (8th Cir. 1980) ............................................................. 28

vii

*The T. J. HOOPER*,
   60 F.2d 737 (2d Cir. 1932) ................................................................34

*Tokio Marine Management Inc. v. M/V Zim Tokyo*,
   91 Civ. 0063 (BN), 1995 U.S. Dist. LEXIS 7803 (S.D.N.Y. June 8, 1995) ..........
   ...........................................................................34, 36, 39, 40

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
   925 F.2d 566 (2d Cir. 1991) ......................................................28, 41

*Tullgren v. Amoskeag Mfg. Co.*,
   133 A. 4 (N.H. 1926) ......................................................................39

*United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*,
   683 F.2d 1022 (7th Cir. 1982) ........................................................37

*United States v. Carroll Towing Co. Inc.*,
   159 F.2d 169 (2d Cir. 1947) ..........................................................37

*Venore Transportation Co. v. Oswego Shipping Corp.*,
   498 F.2d 469 (2d Cir. 1974) ..........................................................56

*Waterman Steamship Corp. v. Dugan & McNamara, Inc.*,
   364 U.S. 421 (1960)..................................................52, 53, 54

*West v. City of St. Paul*,
   936 P.2d 136 (Alaska 1997) ..........................................................26

*Western Bulk Carriers, K.S. v. U.S.*,
   Civ. S-97-2423, 1999 U.S. Dist. LEXIS 22371 (E.D. Cal. Sept. 41, 1999).......27

## STATUTES

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1333(1) ............................................................................1

## OTHER AUTHORITIES

*The CALLIOPE*, [1891] APP. CAS. 11 (House of Lords 1890) ...................................24

J. COOKE, *VOYAGE CHARTERS* (3d ed. 2007) .......................................passim

viii

M. STURLEY, 2A *BENEDICT ON ADMIRALTY* (7th ed. 2011)........................................55

*Moorcock*, 14 P.D. 64 (1889 L.R.) (Court of Appeal 1889)...................................30

*The MOORCOCK*, 13 P.D. 157 (1888 L.R.) (Probate, Divorce and Admiralty Division 1888) ..................................................................................................29

*RESTATEMENT (SECOND) OF CONTRACTS* § 302(1)(b) (A.L.I. 1965)...........................50

*RESTATEMENT (SECOND) OF TORTS*, § 291(A.L.I. 1965) ...........................................27

*RESTATEMENT (SECOND) OF TORTS* § 435(1) (A.L.I. 1965) .................................46, 48

693379.00608/7110898v.1

## JURISDICTION

The District Court had admiralty jurisdiction under 28 U.S.C. § 1333(1). This Court has jurisdiction of this appeal from a final decision after trial, under 28 U.S.C. § 1291. The judgment was entered on April 12, 2011. Appellant filed its Notice of Appeal on June 10, 2011, having been granted 60 days because the United States is a party.

## OTHER CASES

This case has not previously been before this Court, and counsel are not aware of any related case.

## ISSUES

1.    Did the District Court err in defining an approach to a berth as the immediately adjacent area or the immediate access, and holding, therefore, the place where M/T ATHOS I struck an uncharted anchor a ship-length away was not within the approach?

2.    Did the District Court err in holding Defendants/Appellees owed no duty to invited vessels to inspect for dangerous obstacles in a part of the federal anchorage through which those vessels approached their berth, because they did not control the use of the anchorage, and no custom or regulation put them on notice to inspect?

1

3.     Did the District Court err in holding Defendants/Appellees did not misrepresent a material fact when they advised ATHOS I the maximum allowable draft at their facility was 38' and failed to warn that, before ATHOS I arrived, they reduced it to 36', and this was not a cause of the accident, despite the fact that the vessel would not have approached early in the rising tide had the Master known?

4.     Did the District Court err in holding the vessel and ship-owner were not third-party beneficiaries of the safe port and berth warranties in the sub-voyage-charter-party between the time-charterer and Defendants/Appellees?

5.     Did the District Court err in holding safe port and berth warranties are merely promises to exercise due diligence, were waived because the Master knew generally of debris on the riverbed, and were satisfied because the port was "generally safe?"

## STATEMENT OF THE CASE

This is an appeal from a Judgment and Opinion after bench trial by Hon. John P. Fullam of the Eastern District of Pennsylvania, which held an oil terminal was not liable for damage to a tanker and "devastating ecological results" JA-6(Op.) when a cargo tank was pierced by an uncharted anchor protruding above the Delaware River bottom as the ship approached the jetty. *In re Frescati Shipping Co.*, Civ. No. 05-cv-00305, 2011 U.S. Dist. LEXIS 40020 (E.D. Pa. April 12, 2011) JA-6-23(Op.).  The decision should be reversed and the case remanded for

2

findings regarding Defendants/Appellees' allegation the vessel was negligent, and the ship-owner's damages.

On November 26, 2004, M/T ATHOS I ("ATHOS") was approaching Defendant/Appellee Citgo Asphalt Refining Company's ("CARCO") berth, pushed sideways by tugs through a federal anchorage, and only about one ship-length away, when she suddenly listed and oil was seen in the water. It was later ascertained a cargo tank was holed by an uncharted 7'3" long anchor, which had been there more than three years. JA-10-11(Op.).

ATHOS' owner and manager, Plaintiffs/Appellants Frescati Shipping Co. and Tsakos Shipping & Trading, S.A. (collectively "Owner"), incurred $180 million in clean-up costs and damages. The Coast Guard found Owner complied with all regulatory requirements and limited its strict liability for clean-up costs. The Oil Spill Liability Trust Fund reimbursed Owner $88 million.

Owner filed a Petition for Exoneration from or Limitation of Liability, in which CARCO asserted a cargo claim. JA-7(Op.). Owner asserted counterclaims in tort for CARCO's failure to exercise a berth-owner's duty of care, and for negligently misrepresenting the maximum allowable draft at its facility, which it reduced without warning the ship. ("Draft" is the distance from the water's surface to the ship's bottom.) Owner also claimed in contract as third-party beneficiary of the safe port and berth warranties in the sub-voyage-charter between Owner's

3

time-charterer and CARCO.  The Government also sued in contract, as Owner's subrogee. JA-7-8, 11-12, 18(Op.).

CARCO disclaimed responsibility because the accident occurred in a federal anchorage. The Court held CARCO was not liable, but not because it happened in federal waters.  It held CARCO had no duty to inspect for hazards in the anchorage because it limited the definition of "approach" as a matter of law to the area immediately adjacent to or the immediate access to the berth. JA-13-15(Op.). Additionally, it excused CARCO because, based on the volume of traffic that used the anchorage, CARCO did not control its use, and no custom or regulation put CARCO on notice it should inspect there. JA-14-15(Op.).

The Court also noted the Government had no statutory or regulatory duty to and did not inspect for hazards, absent notice of a specific hazard, for lack of a Congressional mandate and funding. JA-11, 13(Op.).

CARCO's witnesses admitted anchorages are known to be scattered with debris, including anchors, and that ATHOS was in the normal approach to its berth.  However, CARCO never inspected for such hazards in its own declared "area of responsibility," *infra*, much less in the approach through the federal anchorage.  Had the anchor been discovered, the Government would have removed it, or warned docking pilots and mariners of its presence. JA-11(Op.).  Forewarned, ATHOS would have awaited a higher tide and/or insisted CARCO off-load some

4

cargo into a barge to reduce ATHOS' draft, and sailed over the anchor. JA-12(Op.).

The result of the Opinion is that *no one* has a duty to ensure the actual geographic approaches to marine terminals through public waters in the United States are safe from uncharted hazards to navigation. Marine terminals, however, are the only ones with the wherewithal—and duty—to inspect their approaches, given the Government's lack of duty and funds, and the impracticability of ship-owners conducting underwater inspections everywhere charterers order their ships to go. The importance of an oil terminal's duty in particular, and of this appeal, is to prevent oil spill catastrophes, not just to allot the costs after the damage is done.

The Court denied the misrepresentation claim because CARCO's reduction in the maximum allowable draft was "factually irrelevant," notwithstanding that ATHOS would not have approached when she did had the Master known of the change. JA-16(Op.). The Court reasoned the depth of the berth alongside the jetty did not change, the stage of tide at which ships could safely approach did not change, and the reduction in maximum allowable draft did not cause the casualty. JA-17(Op.). There was no mention of the shallow bottom directly in front of the berth, through which ATHOS would have been pushed, *infra*.

The Court rejected the contract claim, holding Owner was not a third-party beneficiary, the warranties were only a promise to exercise due diligence, any

5

warranty was waived because the Master knew of a general risk of debris on the riverbed, and the anchorage was "generally safe" in view of the volume of vessels that used it, without regard to where those ships were located in the 2.2 mile long anchorage, and whether ships that went to CARCO approached at higher tide than ATHOS. JA-19-22(Op.).

CARCO argued the vessel's draft was excessive, she was unseaworthy, and the pilot and crew were negligent. Those issues are not before this Court.

## FACTS

On October 1, 2001, Owner time-chartered ATHOS into Star Tankers, Inc.'s Tanker Pool. JA-8(Op.); JA-1114-1154(P-354/Pool-Agreement); JA-1156-1187/P-355/Time-Charter). On November 12, 2004, Star Tankers sub-voyage-chartered the vessel to CARCO for one voyage from the Caribbean Sea to any of several geographic ranges. JA-8-9(Op.); JA-1219-1239(P-357/Voyage-Charter). CARCO subsequently ordered the ship to transport a cargo of heavy crude oil from Venezuela to its asphalt refinery in Paulsboro, N.J. JA-9(Op.).

## A. CARCO's berth and the approach.

CARCO is located on the New Jersey side of the Delaware River, near the entrance to Mantua Creek, about 80 miles from the river's mouth. The jetty comprises a pier between two mooring dolphins. It was designed to accept ships up to 1,000' long. JA-1552(D-196/Guide to Port Entry); JA-1106(P-61/Terminal

Data Sheet); JA-1092(P-5/CARCO Operations Manual).  ATHOS is 748' long.

JA-8(Op.)**.**

Ships navigate up the river through a dredged channel ("the Channel"), which, opposite CARCO's berth, is on the Pennsylvania side.  The Channel is divided into "ranges" as the Channel changes direction.

The jetty and waterway are seen on navigation charts and aerial photographs.  The ranges near CARCO (Tinicum, Billingsport, and Mifflin) are identified on the navigation charts. JA-1248(P-461(b)/BA chart-excerpt); JA-2091(D-1918/NOAA chart-excerpt).  Mantua Creek is indicated by a red "6" and CARCO's berth by an arrow and a red "8" on chart 2604. JA-1248(P-461(b)); JA-1028:4-1029:6, JA-1030:25-1031:6(Teal).  The Mantua Creek Anchorage, also known as Federal Anchorage No. 9 ("the Anchorage"), is in green on chart 12313.  The red triangle is CARCO's self-declared "area of responsibility." JA-2091(D-1918); JA-894:2-6, JA-924:5-12(Rankine).

An aerial photograph shows the jetty and waterway, with the boundaries of the Anchorage and Channel superimposed, along with ATHOS' to-scale outline in the berth**.**  The yellow lines mark the grid followed by CARCO's depth surveyor, ST Hudson Engineering, Inc. ("Hudson"). JA-1258(P-992).

7

Another similar photograph has superimposed on it the culprit anchor, other subsequently-discovered large objects, and a representation of ATHOS. JA-1264(P-1153).

Tankers berthing during the flood (*i.e.* rising) tide, like ATHOS, approach from Mifflin Range by making a 180° turn to starboard into the southern end of the Anchorage with two tugs at the bows. The tugs then line up fore and aft on the starboard side and push the ship sideways to CARCO's jetty. JA-208:16-209:16, JA-214:5-215:3, JA-227:6-229:14(Bethel), discussing JA-1248(P-461(b)/chart-excerpt), JA-1256(P-990/aerial-photograph); JA-902:9-903:1(Rankine).

The Anchorage is 2.2 miles long, or nearly 12,000', but turning a tanker 180° uses only 1,000' of space at the southern end, marked by two red lines on chart 2604. JA-11 n. 2 (Op.); JA-818:7-10, JA-824:5-10(Myhre); JA-227:4-15, JA-228:4-18(Bethel); JA-1248(P-461(b)/chart-excerpt).

The Anchorage's boundary is less than 600' from CARCO's pier, and the Channel's boundary is another 1,400'. The Channel is less than 2,000' from the pier— two ship-lengths. JA-1258(P-992/aerial photograph); JA-1250(P-687/Channel Depth Statement). The outer edge of the berth is closer to the Channel and Anchorage by the breadth of a ship's beam. ATHOS' beam is 105'6". JA-8(Op.).

8

The somewhat triangular area CARCO calls its "area of responsibility" was too small to turn a tanker around, measuring about 100' to the Anchorage from the downstream end and 650' from the upstream end. JA-1258(P-992/aerial photograh); JA-2091(D-1918/NOAA chart-excerpt); JA-1660(D-757/Permitted Dredge Area); JA-922:20-23(Rankine); JA-487:13-23, JA-497:1-6, JA-497:24-498:10(Drager). Therefore, tankers calling at CARCO had to use the Anchorage as a turning basin.

CARCO's self-declared "area of responsibility" was based on a dredging permit obtained by the owner of the facility before CARCO bought it in 1991, and CARCO simply continued to inspect the same area for depth. JA-948:19-949:19(Rankine); JA-690:14-691:16, JA-695:25-696:16, JA-715:24-716:14, JA-724 at p. 26:21-27:5(Long); JA-488:6-10, JA-496:17-497:18(Drager); JA-1660(D-757/Permitted Dredge Area). The area in the dredging permit was designated by the terminal-owner itself, not the Government.  The permit is merely the Government's consent to dredge where the terminal-owner asked.  It is not a limitation on where CARCO could survey for depth or hazards. The Government does not designate any "area of responsibility." JA-445:18-446:7, JA-461:10-23 (DePasquale); JA-827:9-24, JA-829:19-830:23(Olson); JA-719:8-24(Long).

Since August 1999, the Docking Pilots Association's ("the Pilots") guidelines provided vessels having drafts from 35' to 37½', like ATHOS, should

9

approach CARCO's dock during a window between the beginning of flood tide and one hour after high water, and required they be turned around to face down-river into the flood current, port-side to the jetty. JA-861:7-863:22, JA-868:10-871:17, JA-872:11-873:24, JA-876:24-877:9(Quillen); JA-209:12-13, JA-224:17-22, JA-244:18-22(Bethel); JA-941:18-945:7(Rankine); JA-1102(P-51/Docking Pilots Memo), JA-1104(P-52/1999 Docking Pilots Guidelines). Owner contends ATHOS' draft was 36'7", although CARCO maintains it was greater, which is a matter for remand. JA-20-21(Op.).

Prior to August 1999, the Pilots had restricted berthing of vessels with 36'-40' drafts to high stages of tide, between two hours before and 1½ hours after high water. JA-941:18-JA-945:7(Rankine); JA-662:22-JA-663:16, JA-676:15-JA-677:9, JA-677:13-21(Kamat); JA-1696-1698(D-795/1998 Docking Pilots Guidelines); JA-1099(P-48/1998 Port Captain Summary). Thus, in 1999, the window was opened four hours earlier, near low water, reducing the available depth of water by four or five feet. JA-864:7-870:22; JA-874:8-10(Quillen); JA-331:21-332:14, JA-333:25-334:9(Brooking); JA-212:25-213:2, JA-244:18-245:15(Bethel); JA-192:16-198:3, JA-202:12-21(Bergin).  This change was made at CARCO's request, to save demurrage costs (charges for a ship's waiting time) by avoiding vessels over 36' draft having to wait for a later window. JA-1099(P-48/198 Port Captain Summary).

10

## B.  The casualty.

ATHOS sailed up-river under the guidance of Delaware River Pilot Captain Howard Teal. JA-1028:4-23, JA-1029:5-6, JA-1032:7-12(Teal). At the upstream end of Tinicum Range, the ship took on an experienced federally-licensed Docking Pilot, Captain Joseph Bethel. JA-208:16-209:16, JA-211:25-212:4(Bethel); JA-1033:3-8(Teal).     Bethel boarded at 8:30 p.m. and took the con at 8:40. (Bethel JA-215:19-24(Bethel).  It takes 20 to 40 minutes to get to CARCO's berth from when he took the con. JA-210:12-17, JA-217:1-3(Bethel).

Bethel proceeded into Mifflin Range shortly after the beginning of flood tide, pursuant to the Pilots' guidelines, then executed the 180° turn. JA-216:5-19, JA-217:25-219:8; JA-225:5-10, JA-244:18-22, JA-250:20-251:16(Bethel); JA-1034:11-1035:12(Teal); JA-354:9-22, JA-355:22-356:19(Capone).  At 9:02 p.m., 22 minutes after Bethel took the con, and *while being pushed sideways*, ATHOS suddenly listed to port. At that time, the ship was halfway through the Anchorage, in front of and only 900' away from the jetty, or 800' from the berth's edge—about a ship-length. JA-6, 10(Op.); JA-220:7-12, JA-247:10-13(Bethel); JA-779:3-11(Markoutsis); JA-1070:21-1071:25, JA-1079:16-22(Zotos); JA-507:22-508:15, JA-509:23-510:22, JA-512:5-12(Esplana); JA-1045at p. 12:8-13, JA-1047at p. 34:14-21(Thompson).

11

The crew was already on deck to heave the mooring lines, CARCO's line handlers were standing by, and the ship was close enough for the crew to be heard ashore. JA-910:7-17(Rankine); JA-1073:8-25(Zotos); JA-509:9-12, JA-509:23-510:22(Esplana); JA-247:10-16(Bethel); JA-856:4-8(Peck).

ATHOS followed the customary route and manner of approaching CARCO's berth from the Channel, as attested by pilots Teal and Bethel, the Pilots' Manager Quillen, and Owner's pilotage expert Betz. JA-1036:16-23(Teal); JA-228:4-18(Bethel); JA-875:5-12(Quillen); JA-253:12-259:12, JA-268:24-269:9(Betz).

CARCO's Terminal Manager Drager, Port Captain Rankine, and dock-men Peck and Thompson, all acknowledged the vessel followed the normal approach. Drager acknowledged all CARCO's invited tankers have to cross the Anchorage. Rankine said tankers turn around "[a]t the same spot where the ATHOS I apparently hit an anchor, just coming out of the channel into the anchorage," and "just about all" the ships that berth there go over the site where the accident occurred.[1] JA-902:9-18, JA-903:11-16, JA-951:1-5, JA-2320 at p. 43:18-44:3(Rankine); JA-505:4-11(Drager); JA-849:2-6, JA-850:18-851:1, JA-852:17-853:2, JA-854:7-855:17(Peck); JA-1046-1047 at p. 33:19-34:1, JA-1048 at p. 44:10-19(Thompson).

---

[1] Underscoring is added throughout this Brief.

12

It was later ascertained the ship contacted a 7'3" long uncharted abandoned anchor. JA-686:3-687:13, JA-688:13-17(Langford). The parties stipulated the anchor had been there over three years, because it appeared as a "target" on a side-scan sonar in an independent geophysical study by the University of Delaware in 2001. JA-514:22-516:24, JA-524:6-10(Fish); Traykovski JA-1050:14-1052:12, JA-1056:2-5; JA-1310-1312(P-1318/Stipulation).

The anchor tore holes in a cargo tank and a ballast tank. JA-1074:19-1075:7(Zotos); JA-1262(P-1090/Photograph-Hull Bottom Plate). The crew quickly stopped the oil leak by transferring cargo to other tanks, but not before "devastating ecological results." JA-6(Op.); JA-729:9-25, JA-744:6-745:10(Markoutsis); JA-1076:6-1078:3(Zotos); JA-221:23-222:14(Bethel).

The Coast Guard determined Owner complied with its regulatory obligations and could limit its strict liability for clean-up costs to $45.4 million. The Oil Spill Liability Trust Fund therefore reimbursed Owner $88 million. JA-787:8-794:10, JA-795:17-25, JA-797:10-800:7(Morrison); JA-640:10-642:10(Hellberg).

## C.  CARCO never inspected for hazards anywhere.

CARCO's Port Captain Rankine, who held that position since January 2002 JA-894:2-6(Rankine), and his predecessor, Ranjit Kamat JA-662:22-663:16(Kamat), as well as Technical Services Manager Williams, all acknowledged the Delaware River bottom, including in the anchorages, is known

13

locally to be scattered with potentially hazardous debris, including, specifically, lost anchors. JA-969 at p. 248:23-249:12(Rankine); JA-673:24-675:12(Kamat); JA-1068 at p. 139:9-12, JA-1068at p. 140:6-13(Williams); *See also* Capone JA-357:13-362:1(Capone). Yet, CARCO *never even considered* inspecting for potentially hazardous obstructions in its declared area of responsibility, or in the approach through the Anchorage, even after persuading the Pilots to bring ships in near low water. It only inspected for water depth in its so-called area of responsibility. JA-503:23-504:1(Drager); JA-962 at p. 148:8-18, JA-964at p.162:3-10, JA-965-966 at p. 172:12-174:5; JA-967at p.193:20-24(Rankine); JA-668:23-669:9, JA-670:14-672:3(Kamat); JA-711:11-13(Long).

The Opinion remarks that CARCO did inspect its berth, but omits to say this was only for depth, not obstacles. JA-13(Op.).

CARCO's surveyor, Hudson, ascertained depth by single-beam sonar, or echo sounder. This does not identify the nature of what the beam touches, or whether it is the river bottom or an obstacle. The grid lines followed by Hudson's boat conducting a single-beam survey were, at 50' intervals, too far apart to detect objects between the lines. JA-526:19-527:20(Fish); 368:8-369:13(Capone); JA-692:12-694:2, JA-697:8-23(Long). Hudson's annual depth surveys were not designed or intended to detect obstacles, as acknowledged by its Chief Operating

14

Officer, Richard Long, and CARCO's expert witness, George Cole. JA-696:19-698:5(Long); JA-392:22-397:21, JA-403:8-18(Cole).

## D. The accident would not have happened if CARCO had found and reported the anchor.

There are several ways to survey for underwater obstacles, including side-scan sonar, multi-beam sonar, and low-tech wire drag. JA-516:13-24; JA-538:10-539:1(Fish); JA-452:18-453:3(DePasquale); JA-834:12-835:6(Olson); JA-721:18-25(Long); JA-403:19-23(Cole). Hudson could conduct a side-scan survey, but Rankine never engaged it to do so, or even discussed it with Hudson. JA-949:20-950:3, JA-961at p. 143:17-144:4, JA-962 at p. 146:14-147:20, JA-962 at p. 148:8-18; JA-963at p. 154:17-24; JA-963at p. 156:20-24(Rankine); JA-711:11-13, JA-717:1-16; JA-725at p. 44:24-45:6(Long).

The cost of a side-scan survey two ship-lengths from CARCO's jetty to the New Jersey edge of the Channel would have been as little as $7,500 to $11,000. JA-362:22-363:9, JA-364:19-365:22(Capone), discussing JA-1256(P-990/Aerial photograph). Long estimated it would cost $25,000 to $30,000. JA-715:12-19, JA-717:8-24(Long).

All the experts agreed the anchor would have been easy to detect on a side-scan survey. JA-528:2-4(Fish); JA-1053:4-21, JA-1055:7-1058:6, JA-1063:10-25(Traykovski); JA-335:18-336:20(Brooking); JA-365:23-367:17(Capone); JA-

15

727 at p. 86:4-12(Long). It appeared on the 2001 University of Delaware scan and all the scans after the casualty. JA-524:2-10(Fish); JA-1055:23-1056:23(Traykovski); JA-836:15-25(Olson). A scan may not identify what an object is, but it would identify a sizeable, potentially hazardous "target." JA-1063:10-21(Traykovski); JA-517:9-518:18(Fish). The scans after the accident detected several sizeable objects in the approach, including a 15' pump casing and an 8' concrete block within 200' of the anchor. JA-523:15-21(Fish); JA-836:15-25(Olson); JA-1264(P-1153/Aerial photograph).

Upon seeing such an object on the scan, CARCO could simply have informed the Government, which would have sent divers to investigate, and removed the anchor, or charted it and warned the docking pilots and mariners in a Notice to Mariners. JA-11(Op.); JA-158:20-161:21, JA-183:16-24, 186:5-23(Barnum); JA-453:15-455:24(DePasquale); JA-103:10-104:15, JA-112:21-113:16(Adams); JA-1713 at ¶ 25(D-1108/Coast Pilot).

Forewarned, ATHOS would have waited until high water, when it would have had five feet more depth of water, and/or insisted CARCO discharge some of the cargo into a barge to reduce ATHOS' draft, and passed harmlessly over the anchor. When the ship struck the anchor, there remained four hours before high tide. JA-592:7-23(Hajimichael); JA-882:14-883:8(Quillen); JA-212:25-213:2, JA-244:18-245:15(Bethel); JA-202:12-25(Bergin).

16

**E.  CARCO's excuses for not inspecting in the Anchorage.**

Rankine labored under the unfounded assumptions that his responsibility was limited to the area in the dredging permit, and that CARCO was not legally permitted to survey in federal waters. JA-922:20-923:4; JA-924:5-24; JA-959 at p. 82:17-84:2, JA-965at p. 173:16-22(Rankine); JA-497:24-498:10(Drager); JA-1258(P-992/Aerial photograph); JA-2091(D-1918/NOAA chart-excerpt).

Rankine testified:  "I had no responsibility for the approaches to the berth. My responsibility is at the berth." JA-957 at p. 77:23-25(Rankine). "We had nothing to do with the approaches, the approaches are the Army Corps of Engineers." JA-938:15-19(Rankine).

Rankine was not correct in assuming CARCO could not survey in the Anchorage.  It could have surveyed the approach through the Anchorage for obstacles without a permit, as testified without contradiction by the Army Corps of Engineers' Chief of Operations Division, Philadelphia, Anthony DePasquale, Hudson's C.O.O. Long, and Owner's expert witness on hydrographic surveys, Vincent Capone. JA-445:18-446:7, JA-459:16-460:13(DePasquale); JA-690:14-691:16, JA-718:15-20(Long); JA-354:9-22, JA-363:10-15(Capone).

In fact, Hudson did survey for depth out to 800' from CARCO's jetty, or as much as 600' into the Anchorage at the downstream end, with no need for a permit. JA-1258(P-992/Aerial photograph); JA-706:19-708:5, JA-714:2-7, JA-

17

718:2-16(Long);    JA-369:1-8(Capone);    Brooking    JA-337:9-338:21(Brooking).

Rankine was aware of this, as he reviewed all Hudson's surveys back to 2001. JA-907:17-908:8(Rankine).

No one outside CARCO ever told Rankine he could not inspect in, or had no responsibility for, the approach within the Anchorage. His only conversation about surveying in federal waters was with an in-house lawyer, involving the Calcasieu River in Louisiana. JA-966 at p. 174:9-175:6, JA-966 at p. 176:21-177:8(Rankine).

As to CARCO's declared "area of responsibility," Rankine testified he relied on Hudson to tell him if any obstructions were found, but he only asked Hudson to survey for *depth*, never for obstructions. JA-961-962 at p.145:3-146:4, JA-972-973at p. 25:25-26:14(Rankine). Hudson did not even analyze the survey data, but just passed the soundings to Rankine. JA-698:6-14(Long).

Kamat and Rankine had no knowledge of underwater survey techniques or how to survey for obstacles, and received no such training from CARCO. JA-664:16-24;    JA-665:18-666:5;    JA-666:24-667:12;    JA-670:14-671:6;    JA-678:9-18(Kamat); JA-937:25-939:7, JA-954-955 at p. 41:17-42:9; JA-955at p. 43:7-12; JA-956 at p. 56:11-23, JA-960 at p. 116:1-7; JA-960at p. 116:21-117:6(Rankine).

Rankine, and before him Kamat, were in charge of Marine Safety, including the berth, but they had no such experience or expertise when they were hired, and received no training from CARCO. JA-894:21-24, 895:9-11, 937:15-939:7; JA-955

18

at p. 43:7-12, JA-957 at p. 75:3-23, JA-957at p. 76:13-20(Rankine); JA-489:5-492:14(Drager); JA-664:21-24, JA-666:24-667:12(Kamat).

## SUMMARY OF THE ARGUMENT

There is no dispute that the law imposes upon a berth-owner a duty to ascertain the condition of its berth and the approach thereto, and remove any hazards or warn invited vessels of their presence.  There is no dispute that ATHOS was in the usual approach to CARCO's berth when she struck the uncharted anchor.  There is no dispute that CARCO *never* inspected its berth or the approach for hazards.  It is CARCO's burden to show a sufficient excuse for its failure.

The Court erred in excusing CARCO by ignoring the undisputed *actual* approach and arbitrarily delimiting  "approach" to a point immediately adjacent to or the immediate access to the berth, and, additionally, because it lacked "control" over the use of the Anchorage, and no custom or regulation put it on notice it should inspect.

A berth-owner's duty to inspect is not conditioned on "control."  Further, the Opinion's remark about "control" was based on an erroneous characterization of the volume of traffic in the *southern end* of the Anchorage, for which there was no evidence.  Deep-draft vessels did not normally navigate through or anchor in the small area through which tankers are pushed sideways to CARCO's berth, and

vessels that went to CARCO may have approached at high stages of tide due to their size or draft, the berth's availability, or the time they arrived in the area.

The supposed absence of a custom or regulation notifying CARCO of a need to inspect in the Anchorage does not obviate its common law duty.

CARCO had no excuse for failing to inspect.  The cost was small and the approach route from the Channel was finite and measurable.  It was not legally prohibited from inspecting.  It knew or should have known the Government did not inspect for hazards.  It did not assume the Government did so, and never asked, because it admittedly paid no attention to what the Government did.

No other excuse was proffered by CARCO or the District Court.

As CARCO took no precautions whatsoever regarding submerged objects, it breached even the most minimal standard of care.  However, the degree of care reasonably required in the circumstances was anything but minimal, while the *effort* needed to satisfy that high standard was small.  In any situation, the required degree of care depends on the circumstances, and should be determined by the probability of a hazard and the magnitude of the potential injury, weighed against the burden of taking precautions.  There is no dispute that the foreseeable magnitude of damages was catastrophic and the cost of inspecting the approach was small.  The probability of hazardous obstacles was real, as CARCO's witnesses admitted they expect to find anchors and other objects in anchorages.

20

This is the very reason the law imposes on berth-owners a duty to ascertain the condition of their berths and approaches.  The need for care became even greater in 1999, when CARCO reduced its demurrage costs by persuading the Pilots to berth tankers at a low stage of tide.  Even that increase in risk did not wake CARCO from its complacence.

An additional cause of the accident was CARCO's erroneous representation of the maximum draft its facility could accommodate safely, and its failure to warn ATHOS that the allowable draft was subsequently reduced and there were shallow places in front of the berth through which the ship would be pushed.  Forewarned, ATHOS would not have approached so early in the rising tide and would have passed cleanly over the anchor. Therefore, the Court erred in holding this was not a material fact or a cause of the accident.  Depriving ATHOS of information that would have enabled her to avoid both shoals and submerged objects was a proximate cause of striking the submerged anchor.

The Court also erred in holding Owner was not the third-party beneficiary of the safe port and berth warranties in the sub-voyage-charter, given the absence of ambiguity in that contract, the Supreme Court's holdings that ship-owners are third-party beneficiaries of contractual warranties that stevedores owe to the cargo-owners who hire them, and the Second Circuit's similar holding regarding a safe berth warranty in a sub-charter-party.

21

The Court erred further in holding safe port and berth warranties are not guarantees, but promises to exercise a common law standard of care, and in applying the "named port exception" because the Master knew generally that debris may be found on a riverbed. The exception applies only to ports named in the charter-party, which was not the case here. A Master's general knowledge that there may be debris does not comprehend so dangerous an object as a 7'3" long anchor in front of the berth. Rather, a Master would expect a berth-owner to inspect for and remove or warn of such a hazard in the vessel's path.

The Court's conclusion that the Anchorage was "generally safe" is immaterial, because the approach was specifically unsafe.

# ARGUMENT

## POINT I

### THE DISTRICT COURT ERRED IN LIMITING THE DEFINITION OF AN APPROACH AND HOLDING THE ANCHOR THEREFORE WAS NOT WITHIN THE APPROACH

**SCOPE OF REVIEW**.  It was an error of law to ignore the undisputed actual approach to CARCO's berth, arbitrarily define "approach" as the immediate access to the berth, and hold:  "Under these definitions, the Anchorage was not within the approach to CARCO's berth, and CARCO did not have the legal obligation to survey there." JA-15(Op.). This application of the wrong standard is reviewable *de novo,* and findings based on it are clearly erroneous. *Presbyterian and Reformed Publishing Co. v. Commissioner*, 743 F.2d 148, 158 n. 9 (3d Cir. 1984); *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 432-33 (3d Cir. 1982).

**ARGUMENT.**  The Court recognized CARCO's duty to search for hazards, but limited it to CARCO's doorstep.  The question of law is whether or not a berth-owner's duty extends to the *actual* approach to its berth.  If so, each case entails a factual inquiry to determine the approach.  If not, the duty is a useless abstraction, because it leaves vessels at the peril of hazards that could have been discovered.

The seminal U.S. case regarding a berth-owner's duty is *Smith v. Burnett*, 173 U.S. 430, 433 (1899), where the Court's opening remark was:

> Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths . . . .

Regarding the approach to a berth, *Smith v. Burnett* quoted with approval, at 436, Lord Watson's reasoning in *The Calliope*, [1891] App. Cas. 11 (House of Lords 1890):

> I do not doubt that there is a duty incumbent upon wharfingers in the position of the appellants, towards vessels which they invite to use their berthage for the purpose of loading from or unloading upon their wharf; they are in a position to see, and are, in my opinion, bound to use reasonable diligence in ascertaining, whether the berths themselves <u>and the approaches to them</u> are in an ordinary condition of safety for vessels <u>coming to</u> and lying at the wharf. <u>If the approach to the berth is impeded by an unusual obstruction they must either remove it, or, if that cannot be done, they must give due notice of it to ships coming there to use their quay.</u>

This Court and many others have adhered faithfully to *Smith v. Burnett* regarding the safety of approaches. *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir. 1996) ("a vessel should be able <u>to enter, use and exit</u> a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by

24

reasonably prudent navigation and seamanship"); *Sonat Marine Inc. v. Belcher Oil Co.*, 629 F. Supp. 1319, 1327 (D.N.J. 1985), *aff'd* 787 F.2d 583 (3d Cir. 1986) (failure to inspect "was a serious breach of the terminal operator's duty to exercise reasonable diligence in ascertaining the condition of the berth <u>and its approaches</u> and to remove or warn of underwater obstacles <u>in the approaches</u>"); *Slater Fireproof Storage Co. v. Nicholson Transit Co.*, 47 F.2d 734, 735 (7th Cir. 1931) ("One of those implied duties devolving on the wharfinger is the making of reasonable inspection of the wharf <u>and its approach</u> to ascertain whether there are dangerous obstructions"); *Berwind-White Coal-Mining Co. v. Bush Terminal Co.*, 296 F. 475, 476 (2d Cir. 1924) ("The duty of a wharf owner as to his wharf is to exercise ordinary care and diligence and no more. (Citations omitted.) The same rule has been applied <u>to the approaches</u> to a wharf, pier or dock"); *Daly v. New York Dock Co.,* 254 F. 691 (2d Cir. 1918); *Caravel/Woodwind Charters, Inc. v. Tahoe Keys Marina, LLC*, Civ. No. S-05-1435 (FCD) (KJM), 2008 U.S. Dist. LEXIS 1308 (E.D. Cal. Jan. 7, 2008) (wharfinger liable for failing to determine the size and depth of a concrete cap halfway through a 650' channel used to approach the dock); *Bouchard Transp. Co. v. Tug Gillen Bros.*, 389 F. Supp. 77, 83 (S.D.N.Y. 1975) (wharfinger "had a duty to ascertain any imminent dangers to said barge as it approached"); *Hartford & N.Y. Transp. Co. v. Hughes*, 125 F. 981 (S.D.N.Y. 1903) (wharfinger liable for failing to ascertain and remove or warn of a

25

submerged rock 18' off its berth); *The Calvin P. Harris v. Lynn Gas-Light Co.*, 33 F. 295 (D. Mass. 1887) (wharfinger liable for damage caused by a shoal before ship reached the wharf); *West v. City of St. Paul*, 936 P.2d 136, 138 (Alaska 1997) ("a wharfinger must warn the ship captain about such hidden dangers as underwater obstacles <u>in the approach</u> . . . .").

In *P. Dougherty Co. v. Bader Coal Co.*, 244 F. 267, 270 (D. Mass. 1917), the wharfinger's duty "extended to <u>the approaches</u> to the dock, and to the water which would <u>naturally be traversed</u> or used by a ship discharging there." In *Osprey Ship Mgmt. Inc. v. Jackson County Port Authority*, Civ. No. 05-390-HSO-RHW, 2007 WL 4287701, at *10 (S.D. Miss. Dec. 4, 2007), the approach was defined as the area between the dock and the upriver channel. In *MS Tabea Schiffahrtsgesellschaft MBH & Co. v. Board of Commissioners*, Civ. No. 08-3909, 2010 U.S. Dist. LEXIS 103171, at *4 (E.D. La. Sept. 29, 2010), *aff'd* 636 F.3d 161 (5th Cir. 2011), the Court noted: "When the Dock Board uses this [sounding] equipment, it has the capacity to survey the area from the face of the wharf up to about 1,000 feet into the river. <u>This area includes the 'approach'—the area through which vessels travel in order to move from the main channel of the river to the berth</u>."

The approach to CARCO's berth falls squarely within the *Dougherty, Osprey* and *Tabea* definition. CARCO had the capability to survey the area from

26

its jetty to the Channel, namely a side-scan survey by Hudson, at a minimal cost compared to its $250 million annual revenues. JA-495:12-14(Drager).

There is no sound reason to differentiate between the actual approach and the legal definition, or to foreshorten "approach" arbitrarily. The District Court's concern was that Owner's definition could extend to the "entire Anchorage or to the entire Delaware River." JA-14(Op.). This reflects neither Owner's contention nor legal reality. The required standard of care is *reasonable* diligence in the circumstances.

> There is rarely an absolute duty to secure the other's protection. The duty is usually to take reasonable care to give protection. As in all cases where reasonable conduct is involved, the reasonable character of the care depends upon whether the interference with the actor's own affairs is warranted by the other's danger.

RESTATEMENT (SECOND) OF TORTS § 291 (A.L.I. 1965), comment g.

Few would think it reasonable to expect CARCO to survey 80 miles of river channel everyone used. The "entire Anchorage" is moot, because tankers approaching CARCO's berth traversed only the southern end. It is, however, reasonable to expect CARCO to spend $10,000 periodically to inspect two ship-lengths to ensure the actual approach from the Channel is safe.

The Court erred in relying upon *Western Bulk Carriers, K.S. v. U.S.,* Civ. S-97-2423, 1999 U.S. Dist. LEXIS 22371 (E.D. Cal. Sept. 41, 1999) as authority to

27

circumscribe the approach. JA-15(Op.). There, the ship stranded in a channel after it left the port, not between the channel and the berth.

There truly is no issue about the fact that when the accident occurred, ATHOS was in the usual approach. Regardless of the point at which the approach began, whether it was where the ship left the Channel to turn around, or where she was being pushed *sideways* by tugs, ATHOS necessarily was in the approach when she struck the anchor. Ships in navigation do not steam sideways.

This Court's task is made easy by the unanimity of the testimony that ATHOS was in the usual approach, and the absence of any credibility issue. "If a finding is directly contrary to the only testimony presented, it is properly considered to be clearly erroneous." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 571 (2d Cir. 1991). *See Lydle v. U.S.*, 635 F.2d 763, 765 n. 1 (6th Cir. 1981); *Swanson v. Baker Industries, Inc.*, 615 F.2d 479, 483 (8th Cir. 1980); *Orvis v. Higgins*, 180 F.2d 537, 539-40 (2d Cir. 1950).

## POINT II

### THE DISTRICT COURT ERRED IN HOLDING CARCO HAD NO DUTY TO INSPECT FOR HAZARDS IN THE ANCHORAGE

**SCOPE OF REVIEW.** The District Court held, even if the approach began in the Anchorage: "I thus conclude as a matter of law CARCO had no duty to scan for hazards within the Anchorage and is not responsible for the harm caused by the

28

anchor." JA-16(Op.). The applicable duty of care is an issue of law, reviewable *de novo*. *Redhead v. U.S.*, 686 F.2d 178, 182 (3d Cir. 1982); *Agni v. Wenshall (In re New York)*, 522 F.3d 279, 282 (2d Cir. 2008).

**ARGUMENT.**  There is no dispute that CARCO never inspected anywhere for hazards. If the approach includes the pathway through the Anchorage, the burden is on CARCO to show an adequate excuse.  *Berwind-White Coal Mining Co. v. City of New York*, 135 F.2d 443, 446 (2d Cir. 1943).  Neither CARCO nor the District Court presented such an excuse.

## A.  The Opinion's grounds for excusing CARCO are erroneous.

The Court excused CARCO, not because the Anchorage was in federal waters, but because the volume of traffic that used the Anchorage indicated CARCO lacked control of its use, and no custom or regulation put CARCO on notice it should inspect there. JA-14-15(Op.). There is no legal basis for either excuse.

No one contends CARCO controlled the Anchorage. Control is not a condition of a wharfinger's duty of care, as addressed in *Smith v. Burnett*'s discussion of the English decision in *The Moorcock*, 13 P.D. 157 (1888 L.R.) (Probate, Divorce and Admiralty Division 1888).  There, a wharfinger was liable because "[t]he vessel sustained injury from the uneven condition of the bed of the river adjoining the jetty.  Defendants had no control over the bed, and had taken no

29

steps to ascertain whether it was or was not a safe place for this vessel to lie upon."

173 U.S. at 435.

On the appeal of *Moorcock*, 14 P.D. 64, 69-70 (1889 L.R.) (Court of Appeal

1889), Bowen, L.J. articulated a rationale appropriate to this case:

> The <u>berth outside the jetty was not under the actual
> control of the jetty owners.</u> It is in the bed of the river,
> and it may be said that those who owned the jetty had no
> duty cast upon them by statute or common law to repair
> the bed of the river, and that they had no power to
> interfere with the bed of the river unless under the licence
> of the Conservators. * * * it may well be said that the law
> will not imply that the persons who have not the control
> of the place have taken reasonable care to make it good,
> but <u>it does not follow that they are relieved from all
> responsibility</u>. <u>They are on the spot</u>. They must know
> that the jetty cannot be used unless reasonable care is
> taken, <u>if not to make it safe, at all events to see whether it
> is safe.</u> No one can tell whether reasonable safety has
> been secured except themselves, and I think if they let
> out their jetty for use they at all events imply that they
> have taken reasonable care to see whether the berth,
> which is the essential part of the use of the jetty, is safe,
> and if it is not safe, and if they have not taken such
> reasonable care, it is their duty to warn persons with
> whom they have dealings that they have not done so.

While *Moorcock* involved the berth, Lord Watson's exposition in *Calliope*

makes clear the same reasoning applies to the approach. CARCO did not have to

"interfere with the bed of the river unless under the licence of the [Government],"

but only conduct periodic surveys, which required no "licence."

30

Only CARCO was "on the spot." "No one can tell [whether the approach is safe] except themselves," since the Government had no mandate or funding, and ship-owners cannot practicably engage in underwater inspections of every port and berth to which their charterers order their ships. Nor can port and berth operators be burdened with inspections by every ship ordered to go there.

*Smith v. Burnett* also relied upon a state decision regarding "control." In *Carleton v. Franconia Iron and Steel Co.*, 99 Mass. 216, 219 (1868), Massachussets' Supreme Court held a wharfinger liable for failing to disclose the presence of a submerged rock off its berth, notwithstanding that it did not own "the soil of the dock in which the rock was imbedded." It found the case for liability no different from that of a land-owner who fails to warn an invitee of a large rock between a highway and his gate.

Similarly, the law of New Jersey, where CARCO resides, recognizes "control" is not a condition of a property-owner's duty to approaching invitees. *Monaco v. Hartz Mountain Corp.*, 415, 840 A.2d 822, 831-32 (N.J. 2004) ("[I]n a long line of cases, [our] courts have extended a commercial landowner's duty, when warranted by the facts, to cases in which the landowner had no control over the dangerous condition and the condition was not located on its property."); *Butler v. Acme Mkts., Inc.*, 445 A.2d 1141 (N.J. 1982) ("The proprietor of premises to which the public is invited for business purposes of the proprietor owes a duty of

31

reasonable care to those who enter the premises upon that invitation to provide a reasonably safe place to do that which is within the scope of the invitation."); *Mulraney v. Auletto's Catering*, 320, 680 A.2d 793, 795 (N.J. App. Div. 1996), *cert. denied* 686 A.2d 764 (1996) ("this duty extends to a business proprietor providing reasonably safe passage for patrons who must cross a highway to reach its parking lot.")

Although "control" is legally immaterial, it should be noted as a point of fact that the finding CARCO lacked control was erroneously based on a supposed volume of traffic, without regard to where such ships were located in the 2.2 mile long Anchorage or the stage of tide when some of them approached CARCO. JA-14(Op.). The stage of tide when a ship may traverse the Anchorage depends on its length, beam and draft, the berth's availability, and what time the ship arrived.

The only deep-draft vessels that normally traverse the *southern end* of the Anchorage are those going to CARCO's berth, according to pilot Teal and ship agent Carroll. JA-1037:6-10(Teal); JA-380:22-381:6, JA-386:19-387:3(Carroll). Tankers bound for facilities below or above CARCO turn out of the Channel before reaching the Anchorage or further up the river. JA-1248(P-461(b)/chart-excerpt).

Additionally, deep-draft tankers do not normally anchor in the approach to CARCO's berth, according to the Operations Director of the Maritime Exchange,

32

Paul Myhre. JA-825:20-25(Myhre). Ships over 700' long and 37' draft should not anchor there, and ships under 350' long should use the northernmost ½ mile, according to the Mariners Advisory Committee and ship agent Carroll. JA-1252 at ¶ B2(P-762/MAC Transit Advisory); JA-387:4-14(Carroll).

The Coast Pilot warns against anchoring opposite Mantua Creek, which CARCO neighbors. "Vessels must not cast anchor in this anchorage in such manner as to interfere unreasonably with the passage of other vessels to and from Mantua Creek." JA-1760-1761 at ¶ 10 (D-1108/Coast Pilot). Only shallow-draft craft go to and from Mantua Creek, because the limiting depth is 11'. JA-1778(D-1108/Coast Pilot).

Ships over 700' long were required as of September 2004 to obtain the Captain of the Port of Philadelphia's permission to anchor in the Anchorage and to have one tug boat standing by, and ships over 750' were required to have two boats standing by. JA-1901 at ¶ 11 (ii) (a)-(d)(D-1358/Notice to Mariners). These expenses were avoidable by anchoring elsewhere.

In sum, no significant volume of vessels traversed or anchored in the Anchorage opposite CARCO.

The Court's observation that no custom or regulation put CARCO on notice it should scan within the Anchorage is immaterial. JA-15(Op.). Custom does not establish the required standard of care, or excuse negligence. *The GAZELLE*, 128

33

U.S. 474, 485-86 (1888); *In re Tug Ocean Prince, Inc.*, 584 F.2d 1151, 1156 (2d Cir. 1978); *The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932); *Tokio Marine Management Inc. v. M/V Zim Tokyo*, 91 Civ. 0063 (BN), 1995 U.S. Dist. LEXIS 7803, at *20-21 (S.D.N.Y. June 8, 1995).

Evidence of custom may be considered, but "a possible tortfeasor may not rely *solely* upon its adherence to industry standards, customs, or practices as a *per se* defense to a negligence claim." *Berretta v. Tug Vivian Roehrig, LLC*, 259 Fed. Appx. 343, 344-45 (2d Cir. 2007).  As CARCO's lack of control is immaterial, the alleged (absence of) custom stands alone and is an insufficient defense.

The implication that other marine terminals may not survey in federal waters does not consider their geographic situations, or establish the definition of "approach."  Some terminals *did* survey into federal waters.  JA-459:20-460:13(DePasquale). If there are terminals that do not inspect their approaches, this cannot alter the rule of law that they are required to do so.  Making this plain in an appellate decision may avert the next environmental disaster.

As to government regulation, clearly the *absence* of a regulation does not obviate a common law duty.

## B.  CARCO had no valid excuse for not inspecting in the Anchorage.

CARCO's proffered excuses were its unfounded opinion it had no responsibility outside the area of its dredging permit, and it was not *permitted* to

34

survey in federal waters.  The former is an issue of law for this Court.  The latter was wrong as a matter of fact. The Opinion did not even address these excuses.

Despite its argument that the Anchorage is in federal waters, CARCO did not rely on the Government to inspect for hazards, because it knew or should have known the Government did not do so absent a request.  CARCO was a member of the local harbor safety committee, the Mariners Advisory Committee ("MAC"), as are the relevant Government agencies. JA-105:16-106:14, 107:10-108:8(Adams). Kamat and Rankine attended the quarterly MAC meetings. JA-946:18-20, JA-968 at p. 206:14-207:13(Rankine); JA-679:10-18, JA-680:9-19(Kamat).

Former Captain of the Port of Philadelphia and MAC member Gregory Adams testified MAC *knew* the Government surveyed only for depth, *not* for obstructions, unless it received notice of a specific obstruction. JA-103:10-104:12; JA-105:11-108:8; JA-112:21-114:3(Adams). Therefore, Kamat and Rankine knew that as well.  Certainly, they could have asked about it.  Time was set aside at the meetings for questions and dialogue. JA-463:14-23(DePasquale).  Or they could have picked up the telephone and asked.

Instead, according to Rankine and Kamat, neither they nor anyone else at CARCO knew what the Government did. JA-670:14-671:6(Kamat); JA-939:10-14, JA-940:16-941:1, JA-969 at p. 246:24-247:3, JA-970 at p. 251:4-8(Rankine). They just "didn't pay any attention." JA-939:10-14, JA-940:16-22(Rankine).

35

Rankine could even have asked the Government to survey for obstacles. JA-447:3-15, JA-474:2-10(DePasquale); JA-183:16-24, JA-185:18-186:4(Barnum). However, he was content to let invited vessels take their chances.

## C.  **The circumstances required a high degree of care.**

CARCO did *nothing* to protect invited vessels against hazards in the approach to its berth, and so did not satisfy a duty of care of *any* degree.  Here, the reasonably required degree of care was high.  The burden of performing that duty by scanning the approach was slight.  CARCO did not satisfy its duty by complacently resting upon unfounded assumptions.

What level of care is reasonable always depends on the circumstances. *Grand Trunk RR Co. v. Richardson*, 91 U.S. 454, 469-70 (1876); *Guardian Life Ins. Co. v. Weisman*, 223 F.3d 229, 234 (3d Cir. 2000); *Rodriguez v. Brunswick Corp.*, 364 F.2d 282, 285 (3d Cir. 1966); *Tokio Marine Management*, 1995 U.S. Dist. LEXIS 7803, at *27-28.

That principle has been refined in maritime cases. "The degree of care demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice to avoid the risk." *Conway v. O'Brien*, 111 F.2d 611, 612 (2d Cir. 1940), *rev'd on*

36

*other grounds* 312 U.S. 492 (1941); *Agni*, 522 F.2d at284; *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 327 (7th Cir. 1993); *In re Paducah Towing Co.*, 692 F.2d 412, 422 n. 18 (6th Cir. 1982); *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1026 (7th Cir. 1982); *United States v. Carroll Towing Co. Inc.*, 159 F.2d 169, 173 (2d Cir. 1947).

In *U.S. v. Carroll,* Judge Learned Hand posited an algebraic equation to express this balancing test. A defendant is negligent if the burden of precaution is less than the probability of injury multiplied by the magnitude of damages.

The Opinion remarked that the Third Circuit has not accepted the "Hand formula," overlooking *Guardian Life Ins.,* and that it would not be "useful" in this case. JA-13, 15(Op.). It is difficult to envision a case where those principles would be more useful, because the relative weight of each factor is so manifest. The magnitude of the potential harm was catastrophic, the cost of scanning was small, and the probability a tanker would strike a submerged object was very real. CARCO acknowledged the presence of anchors and other objects, and such hazards are the reasons the law imposes on a wharfinger a duty to inspect.

The risk, and the need for care, were heightened in 1999, when CARCO persuaded the Pilots to open the berthing window four hours earlier, near low water, reducing the water depth four or five feet. CARCO should have been

37

wakened from its complacence by this drastic increase in risk. (JA-339:3-10(Brooking); JA-226:7-9(Bethel). CARCO was happy to retain the demurrage charges it saved, and should have borne the small cost of the precaution its requested change made more imperative than ever.

The Court's remark that a large number of vessels used the Anchorage begs the question of the probability of injury in the balancing of factors. JA-14, 20(Op.). As previously explained, the Opinion fails to distinguish irrelevant ships that used the other 92% of the long Anchorage from those that traversed just the southernmost 1,000' to berth at CARCO, and to consider the record's silence regarding the latter ships' size and whether they approached at high tide, unlike ATHOS.

Further, it is quite possible that ships approaching CARCO unknowingly *did* strike the anchor at an angle that did not cause it to penetrate their hulls. JA-302:6-305:1, JA-328:2-329:21(Bowman); JA-239:21-240:6(Bethel).

If the anchor did not hole another ship, that does not prove improbability. *The GAZELLE*, 128 U.S. at 485. As stated in *Gill v. Hango Ship-Owners A/B*, 682 F.2d 1070, 1074 (4th Cir. 1982):

> However, an accident that is unprecedented or extraordinary is not necessarily unforeseeable. *Kunz v. Utah Power & Light Co.*, 526 F.2d 500, 504 (9th Cir. 1975). Nor is proof of adherence to an industry practice or custom dispositive on the issue of negligence. *Tug*

38

> *Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1156-1157 (2d Cir. 1978), *cert. denied*, 440 U.S. 959, 59 L. Ed. 2d 772, 99 S. Ct. 1499 (1979).

In *Smith v. Havemeyer*, 36 F. 927 (S.D.N.Y. 1888), a ship became hung up on a ledge at the pier's foundation, which had never happened in the ten years similar vessels used it.  Nevertheless:

> It was not necessary for the libellant to show that the appellants were aware of the vices and defects in the structure which occasioned the injury to the vessel.  It suffices to charge the appellants with negligence that they could have discovered them if they had exercised proper care to inform themselves of the condition of the structure.

36 F. at 927-28.

As aptly stated in *Tokio Marine Management*, 1995 U.S. Dist. LEXIS, at *27:

> The question of foreseeability may not be conclusively resolved by measuring the frequency of harm; <u>if the risk is more than merely conceivable (even if mathematically slight) and the gravity of the potential harm is of sufficient magnitude, the law will still place upon defendants a duty to provide against the contingency.</u>

The Second Circuit stated in *Pease v. Sinclair Refining Co.*, 104 F.2d 183, 186 (2d Cir. 1939), quoting *Tullgren v. Amoskeag Mfg. Co.*, 133 A. 4, 8 (N.H. 1926):

> it is not necessary that damage as a more rather than less probable result should be anticipated. * * * Danger

39

> consists in the risk of harm, as well as the likelihood of it, and a danger calling for anticipation need not be of more probable occurrence than less.    If there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it, then failure so to do is negligence. * * * the test is not of the balance of probabilities, but of the existence of some probability of sufficient moment to induce action to avoid it on the part of a reasonable mind.

A berth-owner's duty to inspect exists because the risk of injury from obstructions is "more than merely conceivable," *Tokio Marine Management*, at *27.  Here, there most certainly was "some probability of sufficient moment to induce action to avoid it. . . ."  *Pease* 104 F.2d at 186.  The risk was magnified when CARCO obtained an earlier berthing window in 1999.

The foreseeable gravity of the potential harm if a laden tanker strikes an obstruction is plain, and, due to CARCO's negligence, sadly was realized.

**D.  CARCO's failure to inspect was causal.**

The District Court wrongly blamed *only* the unknown anchor-dropper. JA-23(Op.). This ignores the reality that some human hand is always involved when a man-made object is left on a riverbed, and the berth-owner's duty is to search out such man-made hazards to begin with.  CARCO's negligence thus superseded that of the anchor-dropper.

The District Judge wrote he was "not convinced" a side-scan survey before the accident would "perforce" have found the anchor. JA-15(Op.). If this was

40

intended as a finding of fact, it was clearly erroneous because it is contrary to the

unanimous testimony of the experts and the fact that the anchor *was* detected in

every side-scan survey.  A finding that is contrary to the only evidence is clearly

erroneous. *Trans-Orient Marine*, 925 F.2d at 566.

### POINT III

### THE DISTRICT COURT ERRED IN HOLDING CARCO DID NOT MISREPRESENT A MATERIAL FACT AND THIS WAS NOT A CAUSE OF THE CASUALTY

**STANDARD OF REVIEW.**    CARCO negligently misrepresented to

ATHOS that a vessel with a draft up to 38' could safely call at its facility, and

failed to warn this was reduced to 36' before the ship arrived.  The Opinion said

the reduction was "factually irrelevant" because the shallow area was downstream

of the berth, did not affect the stage of tide when the ship could berth safely, and

did not cause the casualty.  JA-21(Op.). Findings regarding negligence and

causation are reviewable for clear error. *New Jersey Bank, N.A. v. Bradford

Securities Operations, Inc.*, 690 F.2d 339, 347 (3d Cir. 1982).

**ARGUMENT.**    CARCO represented to ATHOS in the Port Manual

(formally: "Regulations for Vessels") it gave the ship through the agent that its

"facility" could safely accommodate vessels with a draft up to 38' at any stage of

tide.  JA-921:9-23(Rankine);  JA-493:7-19(Drager);  JA-736:18-739:6,  JA-741:6-

16;  JA-763:13-764:6(Markoutsis);  JA-272:7-276:14,  JA-279:9-280:7(Bolton);  JA-

41

270:15-21(Betz); JA-1095 at ¶2(P-14/Port Manual). This obviously meant the water was deeper than 38'. CARCO's "facility" encompassed the berth alongside its jetty, and the approach to its berth, at the very least to the extent it acknowledges an area of responsibility.

On November 1, 2004, based on Hudson's October 2004 depth survey, Rankine internally recommended reducing the allowable draft to 36', and exceptionally accepting deeper-draft ships at high stages of tide. On November 22—four days before the casualty—he formally announced that change *within* CARCO, but CARCO didn't tell anyone outside. JA-910:19-911:14; JA-912:11-13, JA-928:16-929:10, JA-975 at p. 110:18-23, JA-975 at p. 111:3-21, JA-975 at p. 112:13-113:5(Rankine); JA-1700(D-877/Berth Soundings E-mail 11/1/04); JA-1702(D-880/Maximum Draft E-mail 11/22/04); JA-1111-1112(P-69/CITGO letter to Docking Pilots 3/24/05).

ATHOS was to be accepted as an exception to the new 36' maximum allowable draft. JA-501:19-502:2(Drager); JA-116:13-121:18, JA-132:25-133:9(Anderson). It was Rankine's or his department's job to tell the ship of the change. JA-494:15-24(Drager). However, Rankine went away for Thanksgiving, and no one told ATHOS of the change or of the shallow places in front of the berth, or to wait for high tide. JA-952:17-19(Rankine).

42

Both sides' experts agreed mariners require a certain depth of water as a precaution against both grounding *and striking unknown submerged objects*. JA-128:6-130:19(Anderson); JA-557:24-563:6, JA-583:3-584:5(Grenier); JA-205:6-206:2(Bergin); JA-616:18-619:25, JA-622:13-19(Haley); JA-267:3-24(Betz).

No mariner would have foreseen a protrusion such as the anchor so close to a marine terminal. JA-226:10-227:2(Bethel); JA-746:5-15(Markoutsis); JA-282:3-9, JA-285:24-286:2(Bolton); JA-267:12-19(Betz); JA-582:2-18(Grenier).

If the ship's agent, Master, or Docking Pilot had been warned the maximum allowable draft at CARCO's facility was only 36', they would not have berthed a 36'7" draft ship so early in the flood tide. JA-385:19-24(Carroll)**;** JA-740:17-741:1, JA-742:9-743:14(Markoutsis); JA-212:25-213:2, 225:23-226:9(Bethel); JA-590:20-592:6(Hajimichael); JA-263:7-264:22(Betz); JA-882:3-883:8(Quillen).

The Docking Pilot, Master, Owner's General Manager, and both parties' experts, agreed the change in maximum allowable draft was crucial information the Master and Pilot needed and would rely upon to make navigational decisions. JA-225:20-226:9(Bethel); JA-737:10-741:1(Markoutsis); JA-589:13-18, 590:20-591:22(Hajimichael); JA-131:4-12, JA-132:25-133:5(Anderson); JA-557:24-563:10, 585:8-587:18(Grenier); JA-541:20-548:9, 555:18-22(Furlotte); JA-263:1-6(Betz); JA-277:6-281:7, JA-282:3-283:12, JA-287:5-292:21, JA-297:24-300:8(Bolton).

43

The Court found the change in the allowable draft was irrelevant, because there was no shallowing alongside the jetty where the ship would lay, but only downstream. JA-16-17(Op.). The Opinion, however, says nothing of the indisputable shallow areas within CARCO's declared area of responsibility *in front of the berth*, through which the ship would be pushed. Therefore, the finding that there was no misrepresentation or failure to warn of a material fact was clearly erroneous.

Hudson's October 2004 survey, which was the basis of Rankine's reduction of the allowable draft, shows depths of 36'3" to 36'9" directly in front of the berth. JA-1627(D-603). A more legible copy of the October survey highlights in red several (not all) of those areas, which were only 137'-175' in front of the jetty, within CARCO's self-proclaimed area of responsibility. JA-1260(P-995); JA-370:22-373:2(Capone). CARCO alone knew of these 36' soundings.

Failing to apprise the Master of this shallowing after telling him he would be safe with a draft up to 38' usurped a navigational prerogative that belonged to him, not CARCO, namely waiting until high tide and/or insisting CARCO off-load some of the cargo into a barge to reduce ATHOS' draft. JA-739:7-741:1(Markoutsis); JA-297:13-298:9(Bolton); JA-131:8-12(Anderson).

The importance of the approximately 36' soundings is proved by the facts that CARCO *did* change its Port Manual to reflect the 36' allowable draft *for the*

44

*very next ship*, at the beginning of the new crude oil season in March 2005, and the Pilots *closed* the early berthing window CARCO had persuaded them to open in 1999. JA-928:16-929:10, JA-947:3-19, JA-951:12-15(Rankine); JA-1092(P-5/CARCO Operations Manual); JA-878:11-881:22(Quillen); JA-1111-1112(P-69/CITGO letter to Docking Pilots 3/24/05). Unfortunately, ATHOS was the last ship of the 2004 season, was given the out-dated Port Manual and an out-dated berthing window, and sustained injury as a result. JA-16(Op.); JA-900:17-901:9(Rankine).

Negligent misrepresentation exists where a defendant who, for failure to exercise reasonable care, gives false information in the course of his profession, intended to influence the actions of another, upon which the latter justifiably relies and which causes it injury. *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 826 F.2d 424, 428-29 (5th Cir. 1982); *Hess v. The ARIZONA*, 149 F. Supp. 733 (S.D.N.Y. 1955), *aff'd* 242 F.2d 706 (2d Cir. 1957) (Wharfinger liable for negligent misrepresentation when vessel struck a shoal, relying on incorrect information in a chart it prepared indicating the depth of water in front of its dock.)

There is no question that CARCO, in the course of its profession, gave ATHOS a maximum allowable vessel draft that was not correct in front of its berth, knowing it would influence the Master's decision about the stage of tide on which to approach, and the vessel relied on that information to approach at the

45

beginning of flood tide, sustaining injury as a result. If CARCO thought the information was correct at the time it was given, it certainly knew better by November 22, and owed a duty to warn the ship its prior representation was wrong.

The fact that ATHOS would otherwise have waited for high water, and/or reduced draft by insisting CARCO off-load some cargo into a barge, and passed cleanly over the anchor, inarguably establishes *"but for"* causation-in-fact.

There would be no denying proximate causation if the anchor were at the depth of 36' that CARCO failed to disclose to correct its 38' misrepresentation. An argument arises, however, because the anchor lay deeper than 38', but nevertheless protruded above 38'. Proximate cause exists because CARCO's misrepresentation denied the Master his prerogative to take steps to avoid the risk of striking unknown submerged objects, which would in fact have avoided the anchor. The general manner and specific nature of the injury were the same as if they occurred in 36' of water. Numerous decisions have held defendants liable for wrongful conduct that brought about injuries of the same sort as would be foreseeable from that conduct, notwithstanding that the specific manner of occurrence may not have been foreseen.

*RESTATEMENT (SECOND) OF TORTS* § 435(1) (A.L.I. 1965) states:

> If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm

46

<u>or the manner in which it occurred</u> does not prevent him
from being liable.

In the classic case of *In re Kinsman Transit Co.*, 338 F.2d 708, 725 (2d Cir.

1964), an insecurely moored vessel broke away and set other vessels adrift. Those

vessels collapsed a bridge, which dammed the river and caused flooding ashore.

The Second Circuit rejected the ship-owner's argument that the shore-side damage

was unforeseeable:

> We see no reason why an actor engaging in conduct
> which entails a large risk of small damage and a small
> risk of <u>other and greater damage, of the same general
> sort</u>, from the same forces, and to the same class of
> persons, should be relieved of responsibility for the latter
> simply because the chance of its occurrence, if viewed
> alone, may not have been large enough to require the
> exercise of care.

In *Pastore v. Taiyo Gyogyo K.K.*, 571 F.2d 777 (3d Cir. 1978), a fireman

was injured falling off an unstable ladder fighting a shipboard fire started by

longshoremen. This Court wrote at 782: "The precise way in which the plaintiff

fell was, perhaps, not clearly foreseeable. Nonetheless, the possibility that a

fireman would fall because of unfamiliarity with conditions on the ship cannot be

said to be so unusual as to sustain the district court's ruling that there was no

proximate causation as a matter of law."

47

In *Serbin v. Bora Corp.*, 96 F.3d 66 (3d Cir. 1996), a longshoreman was injured trying to move a stuck block to an up position to get at cargo underneath. This Court wrote at 72:

> Because Serbin must show that the block posed a general hazard, he is entitled to the inference flowing from the many (i.e., general) ways a stuck block could injure someone. *See Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1369 (3d Cir. 1993) ("The type of foreseeability that determines a duty of care . . . is not dependent on the foreseeability of a specific event."); *Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19, 28 n. 8 (3d Cir. 1975) ("The concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury."); *Restatement (Second) of Torts* § 435(1) ("That the actor neither foresaw nor should have foreseen the . . . manner in which [the harm] occurred does not prevent him from being liable.").

In a frequently cited case, *Johnson v. Kosmos Portland Cement Co.*, 64 F.2d 193, 195-96 (6th Cir. 1933), the Court wrote:

> We think the true rule to be that when the thing done produces immediate danger of injury, and is a substantial factor in bringing it about, it is not necessary that the author of it should have had in mind the particular means by which the potential force he has created might be vitalized into injury.

The District Court erred in relying on *In re Nautilus Motor Tanker Co.*, 862 F. Supp. 1260 (D.N.J. 1994), *aff'd* 85 F.3d 105 (3d Cir. 1996), where there was no nexus between shoaling in the berth and a grounding *outside the approach*

48

*channel.* JA-17(Op.).    Here, the nexus was that ATHOS would not have approached at the beginning of flood tide had she known of the facility's reduction in allowed draft, the shallow areas in front of the berth, and CARCO's decision to berth ships over 36' draft only at higher tide.

## POINT IV

### THE DISTRICT COURT ERRED IN HOLDING OWNER WAS NOT A THIRD-PARTY BENEFICIARY OF THE SAFE PORT AND BERTH WARRANTIES

**STANDARD OF REVIEW.**    Regarding the contract claim, the District Court applied the wrong standard in citing a lack of testimony, and Owner's after-the-fact arbitration against Star Tankers, in deciding there was no intent for Owner to be a third-party beneficiary of the sub-charter safe port and berth warranties. Intent was clear from the sub-charter and the context, and the issue therefore is one of law, reviewable *de novo. Pierce Associates, Inc. v. Nemours Foundation*, 865 F.2d 530, 535 (3d Cir. 1988), *cert. denied* 492 U.S. 907 (1989)

**ARGUMENT.**    The sub-voyage-charter between Star Tankers and CARCO contains the following safe port and berth warranties:

SPECIAL PROVISIONS . . .

    2.  DISCHARGING PORT(S):  One (1) or two (2) <u>safe port(s)</u> . . . .

PART II

49

> 1. WARRANTY – VOYAGE – CARGO.  The vessel . . . shall . . . proceed as ordered to Loading Port(s) . . . and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may <u>safely</u> get (always afloat), and deliver said cargo. * * *

> 9.  SAFE BERTH – SHIFTING.  The vessel shall load and discharge at any <u>safe place or wharf</u>, or alongside vesselss or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the vessel can <u>proceed thereto, lie at, and depart there from always safely afloat</u>, any lighterage being at the expense, risk and peril of the Charterer.

<u>JA-1222</u>(P-357/Voyage-charter).

A third party may enforce terms of a contract between others if "appropriate to effectuate the intention of the parties" and "the circumstances indicate that the promisee [Star Tankers] intends to give the beneficiary [Owner] the benefit of the promised performance." *RESTATEMENT (SECOND) OF CONTRACTS* § 302(1)(b) (A.L.I. 1965).

"The intent to confer a third party benefit is to be determined from the language of the contract," construed in the context of the surrounding circumstances. *Pierce Associates*, 865 F.2d at 535.

Intent is formed at the time a contract is made, not after performance has begun.  The District Court erred in looking for evidence of intent extraneous to the unambiguous contract, and more so in considering the arbitration demand long after the contract was made.  There is no bar to alternative remedies against

50

different defendants, and the exercise of alternative remedies does not evince an intention to forego one of them.

The ATHOS was chartered to Star Tankers for use in a Pool of similar tankers. The revenues earned on the vessels' sub-charters were distributed to the Pool members, including Owner, according to a formula. JA-1114-1115, 1119-1122, Art. II(A)(1) and (6), Art. IX, XI.)(P-354/Pool-Agreement). Thus, the sub-charters were for the benefit of the ship-owners.

The time-charter was an integral part of the Pool Agreement. JA-1118, Art. IV(C)(P-354/Pool-Agreement). Although the time-charter provided for due diligence in designating safe ports JA-1157, Cl. 4 (Ex. 356/Pool-Guidelines), it was Owner's and Star Tankers' intent that the Pool would sub-voyage-charter on the printed ASBATANKVOY form, which contains safe port and berth *warranties*. JA-593:7-594:1, JA-595:13-597:12, JA-598:21-601:5(Hajimichael). Star Tankers' intent, as promisee of the sub-charter warranties, to give Owner the warranties' benefit, is confirmed in its *Guidelines to Masters*:

### 1.16.2 Safe berth Warrantee

The charterer is obligated to load and/or discharge from a "safe berth." JA-1216(P-356/Pool-Guidelines).

51

"Charterer" means Star Tankers' charterer, CARCO. When CARCO assumed that obligation from Star Tankers, it became contractually liable to Owner. *Chainey v. Street*, 523 F.3d 200, 210-211 (3d Cir. 2008).

The Supreme Court has *twice* applied these principles to hold ship-owners are third-party beneficiaries of stevedores' warranties to the charterers and consignees who hire them to perform the latters' obligation to discharge the cargo. In *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 428 (1959), the Court held *the vessel* was a third-party beneficiary of the warranty of workmanlike service implied in maritime contracts between stevedores and charterers:

> The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. That is enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries. *Restatement, Law of Contracts* § 133.

That holding was extended to ship-owners personally in *Waterman Steamship Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421 (1960).

The warranty in *Crumady* and *Waterman* was not expressed, but it was nonetheless implied as a matter of *contract*. The Court explicitly found the ship-owners were entitled to a *contractual* third-party benefit, not a tort or quasi-contractual duty owed by the stevedores directly to the ship-owners. No testimony was required, because intent was manifest from the contract and context.

52

In *Humble Oil & Refining Co. v. Philadelphia Ship Maintenance Co.*, 444 F.2d 727, 731 n. 5 (3d Cir. 1971), this Court recognized a ship-owner is a third-party beneficiary of a stevedore's warranty. Similarly, it recognized a stevedore is a third-party beneficiary of a liability limitation in a bill of lading contract between a ship-owner and a cargo-owner. *SPM Corp. v. M/V MING MOON*, 965 F.2d 1297, 1305 (3d Cir. 1992). The limitation clause in *SPM* expressly cited unnamed "stevedores," just as the safe port and berth clauses herein cite "the vessel" or "the ship," which the sub-charter preamble identifies by name. JA-1222 at Part II, Clauses 1, 9(P-357/Voyage-Charter).

In *Paragon Oil Co. v. Republic Tankers, S.A.*, 310 F.2d 169, 173 (2d Cir. 1962), *cert. denied sub nom, Yacimientos Petroliferos Fiscales v. Paragon Oil Co.*, 372 U.S. 967 (1963), the Second Circuit held the same manifest third-party-beneficiary intent recognized in *Crumady* and *Waterman* exists with respect to a safe berth clause in a sub-charter-party. Paragon chartered its vessel to Republic, who used the ship to carry cargo for YPF. There was no privity between Paragon and YPF. Nevertheless, the Court sustained judgment for Paragon against YPF, writing:

> Indeed, we see no reason why libellant's [ship-owner] direct claim against YPF should not have been sustained, on a theory akin to the liability to the ship-owner of a stevedoring company that contracts with a charterer, *Crumady v. The Joachim Hendrik Fisser*, 358 US 423,

53

428, 79 S. Ct. 45, 3 L. Ed. 2d 413 (1959) or even with a consignee, *Waterman S.S. Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 423-425, 81 S. Ct. 200, 5 L. Ed. 2d 169 (1960).

CARCO's logistics manager, Herbert Whitney, and its Chartering Manager who negotiated the sub-charter, Robert Taylor, acknowledged the manifest intent of the safe port and berth clauses to benefit the vessel. JA-1065:10-25, JA-1066:16-24(Whitney); JA-1022:6-9, 1023:3-14; 1024:23-1025:6, 1026:10-17(Taylor).

## POINT V

### THE DISTRICT COURT ERRED IN HOLDING THE SAFE BERTH AND PORT WARRANTIES WERE NOT GUARANTEES AND WERE NOT TRIGGERED

**STANDARD OF REVIEW.** The Court held the safe port and berth clauses were not guarantees, were in any event waived by the "named port exception," and were not triggered because "as a matter of law [] the port and the berth were safe . . . ." JA-20(Op.). The safe port and berth clauses are unambiguous, and their construction, as well as the definition of safe port and berth, are issues of law, reviewable *de novo*. *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231 (2d Cir. 2006).

54

# **ARGUMENT**

## **A.  The safe port and berth clauses are warranties.**

The Court erred in holding the safe port and berth warranties were not unconditional guarantees (setting aside affirmative defenses such as intervening negligence). There is nothing ambiguous about these clauses.  Special Provision 1 provides *without qualification* for discharging at "safe ports." Printed Clause 9 in Part II, titled "SAFE BERTH—SHIFTING," provides *unconditionally* the vessel "shall load and discharge at any safe place or wharf . . ., which shall be designated and procured by the Charterer, provided the Ship can proceed thereto, lie at, and depart there from always safely afloat . . . ." It was therefore CARCO's obligation to designate a berth the ship could reach safely, and its responsibility if the approach through which the ship had to proceed was unsafe.

The Opinion acknowledged these clauses are "commonly known as safe port and safe berth warranties." JA-18(Op.).  Those warranties are "widely accepted in the shipping industry as a custom of the trade." J. COOKE, *Voyage Charters*, p. 136 at ¶ 5.126 (3d ed. 2007).  In holding these clauses are *not* unconditional guarantees, the Opinion upsets the expectations of the international parties who rely on that common knowledge and trade custom.

As explained in M. STURLEY, 2A *BENEDICT ON ADMIRALTY*, p. 17-24-25 at § 175 (7th ed. 2011):

693379.00608/7110898v.1

> Charter parties frequently state that the vessel shall only be delivered or ordered to proceed to a safe port or berth where the vessel may lie always afloat. A safe port or berth is one in which the ship's physical safety is not threatened and where the vessel will not be exposed to forfeiture, penalty or other political sources of danger. A safe port includes safe approach waters for exit and entry. <u>The obligation to furnish a safe port or berth is considered a warranty, breach of which</u> justifies the master's refusal to enter the port or <u>entitles the shipowner to sue for damages.</u>

The Second Circuit has consistently held similar clauses are contractual warranties, imposing a non-delegable duty on the charterer to provide a safe port and berth. Fault is not an element of a charterer's liability. *Venore Transportation Co. v. Oswego Shipping Corp.*, 498 F.2d 469, 470, 472 (2d Cir. 1974); *Park S.S. Co. v. Cities Service Oil Co.*, 188 F.2d 804, 805 (2d Cir. 1951); *Cities Service Transp. Co. v. Gulf Refining Co.* 79 F.2d 521 (2d Cir. 1935).

At least one of the trial judge's Eastern District colleagues has accepted the Second Circuit's reasoning. In *In re McAllister Bros., Inc.*, 609 F. Supp. 616, 619-20 (E.D. Pa. 1985), Judge Shapiro wrote a charterer has "a non-delegable duty to provide a safe berth" under the safe berth warranty, which "is a separate <u>express warranty,</u> not a warranty implied by law."

"The settled waters of the safe port warranty, however, have been disturbed by the decision of the Court of Appeals for the Fifth Circuit . . . in *Orduna S.A. v. Zen-Noh Grain Corp.* [913 F.2d 1140 (5th Cir. 1990)]." VOYAGE CHARTERS at ¶

56

5.124, p.135.   The Fifth Circuit held a safe berth clause is merely a promise to exercise due diligence.   The District Court sided with the Fifth Circuit. JA-19-20(Op.).

*Orduna* was incorrectly decided for several reasons. Where, as here, the charterer is the berth-owner, *Orduna* would mean that a contractual diligence standard adds nothing to the berth-owner's common law duty of care.   However, rules of contract construction hold all clauses should be given effect; none should be surplus. *Rossville Salvage Corp. v. S.E. Graham Co.*, 319 F.2d 391, 395 (3d Cir. 1963).   As previously noted, contracts are construed in the context of the surrounding circumstances. One of the important circumstances is that CARCO was the berth-owner, not some distant oil trader.

The shipping community knows how to articulate a diligence standard if that is what was agreed.   As recognized in *VOYAGE CHARTERS*, p.136 at ¶ 5.127:   "The warranty can be and often is modified by contract by the inclusion of language which reduces it to a due diligence standard."   Such clauses were drafted deliberately to distinguish those contracts from the Second Circuit's holdings.

*Orduna* cited supposed policy considerations that a ship's Master is on the spot and better able to judge the safety of the berth and exercise discretion not to go in, and a warranty would discourage the Master from exercising diligence. Those concerns were not valid on the facts of that case, much less on the facts

57

here.  In *Orduna*, a grain elevator's loading arm fell on the ship because of a design defect and cracking, which the Master could not have ascertained.  Here, CARCO is the berth-owner and the unsafe condition is one CARCO, not the Master, could have discovered.  Its safe berth warranty implies it had investigated and found conditions were safe.  If it did not investigate, it is nonetheless liable under its warranty.

The warranties are merely contractual allocations of risk.  There is no policy justification for construing an unambiguous commercial contract contrarily to its plain words.  The Second Circuit observed in *Park S.S. Co.*, 188 F.2d at 806:

> The charterer wishes to control the manner and place of discharging its cargo . . . Hence the charterer bargains for the privilege of selecting the precise place of discharge and the ship surrenders that privilege in return for the charterer's acceptance of the risk of its choice.

*VOYAGE CHARTERS* states, p. 136 at ¶ 5.126:

> We disagree with the Fifth Circuit, particularly in its emphasis on "legal or social policy."  The charterer's undertaking to provide a safe port or berth is a matter of contract and has long been widely accepted in the shipping industry as a custom of the trade.  It is difficult to comprehend what policies are offended by the safe port warranty since, based as it is on the commercial reality that it is the charterer rather than the owner who is selecting the port or berth, in the usual case it can hardly be said to have arisen from other than an arms length bargaining.

\*                    \*                    \*

58

> Moreover, courts and arbitrators have consistently held that the safe port/safe berth warranty does not relieve the master of his duty to exercise due care in navigating the vessel.

This Court has acknowledged the need for national uniformity of maritime law, and given weight to Second Circuit precedent because of its maritime stature and the fact that the Circuits share jurisdiction over the Ports of New York and New Jersey. *Marant v. Farrell Lines, Inc.*, 550 F.2d 142, 150 (3d Cir. 1977); *Sea-Land Service, Inc. v. Director, Office of Workers' Compensation Programs*, 552 F.2d 985, 995 n. 18a (3d Cir. 1976). Here, weight should be given to the Second Circuit decisions for these reasons, and because those decisions are correct.

## B. The "named port exception" does not apply.

The Court erroneously held any warranty was waived by the "named port exception," because the Master was aware there could be debris on the river bottom. JA-21(Op.). As stated in the Opinion's quotation from *Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790 (5th Cir. 1977) JA-21(Op.), the exception applies where the port is named in the charter party. It does not apply where, as here, the charter party merely identifies a range of possible ports. As explained in *VOYAGE CHARTERS,* p. 135 at ¶ 5.123:

> voyage charters frequently give the charterer a broad range of loading or discharge ports to choose from, such that it would be impossible for the owner to make any advance determination of safety for the vessel.

59

The Opinion's actual thrust is that by approaching the berth with knowledge of general risks, the Master assumed those risks. However, general knowledge does not signify an assumption of the risk of a hidden hazard that the berth-owner should have discovered. Even if a charter names a specific port, "it relieves the charterer of liability for damage arising from conditions at that port <u>so long as those conditions were reasonably foreseeable.</u>" *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 387 (2d Cir. 2003).

The Opinion contradicts the District Court's Order denying CARCO's motion for partial summary judgment on the basis of the named port exception. JA-73-74(9/15/10 Order). That Order held the Master should not "shoulder[] the risk of any hazards" merely because he was familiar with the port. Rather, there was a triable issue "[w]hether the anchor was known or reasonably could have been known to lie at the bottom of the river." After trial, the Court found none of the parties "knew or had reason to believe that the anchor was in the river . . . ." JA-10-11(Op.). Therefore, the Master should not shoulder the burden of a hazard of which he could not reasonably have known.

A Master may not properly be handed a dilemma of possibly being held liable for disobeying a charterer's orders or else assuming the risk of debatable conditions or vague general risks. Only if the risk was unreasonable should the

60

Master be held to have assumed the consequences. *American President Lines, Ltd. v. U.S.*, 208 F. Supp. 573, 576-77 (N.D. Cal. 1961).

The Docking Pilot, Master, and both parties' expert witnesses testified the presence of a 7'3" anchor in front of the berth was not reasonably foreseeable to a mariner. JA-226:10-227:2(Bethel); JA-746:5-15(Markoutsis); JA-282:3-9, 285:24-286:2(Bolton); JA-267:12-19(Betz); JA-582:2-18(Grenier).

The anchor was unforeseeable to ATHOS because it was unforeseeable that CARCO would not exercise its duty of care, as its warranty implied it had done.

## C.  The warranties were breached.

The Court erred in holding "as a matter of law that the port and the berth were safe for commercial tankers with a draft of 36 feet, seven inches . . . ." JA-20(Op.).  This disregards the definition of a safe port and berth.

> As a general rule, it is well settled that a port or berth will be safe for purposes of the safe port clause if, during the relevant period of time, the particular chartered vessel can proceed to it, use it, and depart from it without, in the absence of abnormal weather or other occurrences, being exposed to dangers which cannot be avoided by good navigation and seamanship. . . .

*VOYAGE CHARTERS*, p. 138 at ¶ 5.137.

The anchor made the port and berth *ipso facto* unsafe for a ship with a 36'7" draft, approaching shortly after the beginning of flood tide in accordance with the

61

Pilots' guidelines.  If CARCO contends ATHOS' draft was greater, that is a matter for remand.

Contrary to what the Opinion suggests, safety is not proved by the fact that other ships called at CARCO's berth at different drafts or tides, perhaps even striking the anchor without injury. *The GAZELLE*, 128 U.S. at 485 ("A dangerous place may often be stopped at or passed over in safety.")  In *Merritt v. Sprague*, 191 F. 627, 630 (D. ME 1911), the Court noted evidence that other vessels used a dock safely;

> is valuable to show that under some circumstances the dock could be used without occasioning injury to vessels using it; but that such evidence is not of great probative value when it is proved that there were defects capable of producing mischief, and that such defects could have been readily discovered and remedied by proper examination.

Here, the presence of the mischief-making anchor is stipulated.  The fact that other vessels reached CARCO's berth without incident is not probative.  The presence of the anchor itself made the port unsafe for ATHOS.  The "generally safe" condition JA-20(Op.) of the other two miles of the Anchorage is immaterial.

62

## **CONCLUSION**

The decision should be reversed and the case remanded for findings on

CARCO's allegation Owner was negligent, and Owner's damages.

November 9, 2011

Respectfully submitted,

By:   /s/ Jack A. Greenbaum
BLANK ROME LLP
Attorneys for Plaintiffs/Appellants
405 Lexington Avenue
New York, New York 10174-0208
(212)-885-5000
John D. Kimball
Jack A. Greenbaum

Of Counsel:

Alfred J. Kuffler
John J. Levy
Eugene J. O'Connor

63

## CERTIFICATE OF BAR ADMISSION

Pursuant to Third Circuit Local Rule of Appellate Procedure 28.3(d),

Appellants Frescati Shipping Company, Ltd. hereby certifies that Jack A.

Greenbaum and John Kimball of Blank Rome LLP are members of the bar of this

Court.  Appellants further certify that Alfred J. Kuffler and John J. Levy of

Montgomery, McCracken, Walker & Rhoads, LLP and Eugene J. O'Conner of

Chalos, O'Connor & Duffy, LLP are members of the bar of this court.


Dated:      November 9, 2011          /s/ Jack A. Greenbaum
                                       Jack A. Greenbaum
                                       John Kimball
                                       Alfred J. Kuffler
                                       John J. Levy
                                       Eugene J. O'Conner

                                       Attorneys for Appellants
                                       Frescati Shipping Co., Ltd.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(c), I certify the following:

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,684 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and a virus scan was performed on the brief using version 1.99.265.0 of Microsoft Forefront Client Security and no viruses have been detected.

Dated:         November 9, 2011         /s/Jack A. Greenbaum
                                        Jack A. Greenbaum

**APPENDIX VOLUME I**

# TABLE OF CONTENTS

**<u>VOLUME I</u>**

Notice of Appeal by Plaintiffs Frescati Shipping Company, Ltd
and Tsakos Shipping and Trading, S.A., dated June 10, 2011,
Doc. 626, 05-305..........……………………………………………………………………..JA-1

Notice of Appeal by Plaintiff USA, dated June 10, 2011,
Doc. 345, No. 08-2898........................................................................................ JA-2-3

Judgment Order as to Plaintiffs Frescati Shipping Company, Ltd
And Tsakos Shipping and Trading, S.A., filed April 12, 2011, Appealed From,
Doc. 618, No. 05-305.......................................................................................JA-4

Judgment Order as to Plaintiffs USA, filed April 12, 2011, Appealed From,
Doc. 339, No. 08-2898...................................………………………..……………JA-5

Adjudication, filed April 12, 2011,
Doc. 617, No. 05-305 / Doc. 338, No. 08-2898................................................ JA-6-23

Certificate of Service

# UNITED STATES DISTRICT COURT
for the
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re Petition of Frescati Shipping Company, Ltd., as owner of the M/T ATHOS I, and Tsakos Shipping and Trading, S.A., as Manager of the ATHOS I, for Exoneration from or Limitation of Liability | ) ) ) ) ) ) ) ) ) ) | Case No. 05-cv-305<br><br>(THE HONORABLE JOHN P. FULLAM, Retired)<br><br>(THE HONORABLE JOEL H. SLOMSKY) |

**NOTICE OF APPEAL**

Notice is hereby given that Frescati Shipping Company, Ltd. and Tsakos Shipping and Trading, S.A., Plaintiffs in the above-named case, hereby appeal to the United States Court of Appeals for the Third Circuit from the Judgment Order entered in this action on April 12, 2011.

Date: June 10, 2011

Alfred J. Kuffler (ID No. 12868) (AKuffler@mmwr.com)
John J. Levy (ID No. 42377) (jlevy@mmwr.com)
MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109-1029
(215) 772-1500

Attorneys for Plaintiffs
Frescati Shipping Company and
Tsakos Shipping and Trading, S.A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No. 08-cv-02898-JF |
| ) | |
| CITGO ASPHALT REFINING COMPANY,  ) | |
| CITGO PETROLEUM CORPORATION, and  ) | |
| CITGO EAST COAST OIL CORPORATION,  ) | |
| ) | |
| Defendants.  ) | |

### NOTICE OF APPEAL

Notice is hereby given that the United States of America, Plaintiff in the above named

case, hereby appeals to the United States Court of Appeals for the Third Circuit from the

Judgment Order entered in this action on the 12th day of April, 2011, in favor of Defendants

Citgo Asphalt Refining Company, Citgo Petroleum Corporation, and Citgo East Coast Oil

Corporation, and against Plaintiff the United States of America.

Date: 10th June, 2011                    Respectfully submitted,

                                         TONY WEST
                                         Assistant Attorney General

                                         ZANE DAVID MEMEGER
                                         United States Attorney

                                         MARGARET L. HUTCHINSON
                                         Chief, Civil Division
                                         Assistant United States Attorney

                                         /s/ Stephen G. Flynn

**JA-2**

STEPHEN G. FLYNN
Assistant Director Admiralty
SHARON K. SHUTLER
Trial Attorney
Torts Branch, Civil Division
Department of Justice
Post Office Box 14271
Washington, D.C.  20044-4271
Telephone:   (202) 616-4070
Facsimile:    (202) 616-4002
Stephen.Flynn@usdoj.gov
Sharon.Shutler@usdoj.gov

*Attorneys for Plaintiff United States of America*

OF COUNSEL:

THOMAS VAN HORN
United States Coast Guard
National Pollution Fund Center
4200 Wilson Boulevard
Arlington, Virginia  22203

2

**JA-3**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PETITION OF FRESCATI | : | CIVIL ACTION |
| SHIPPING COMPANY, LTD., as | : | |
| Owner of the M/T ATHOS I and | : | |
| TSAKOS SHIPPING & TRADING, | : | |
| S.A., as Manager of the ATHOS I | : | |
| for Exoneration from or | : | |
| Limitation of Liability | : | NO. 05-cv-00305-JF |

**JUDGMENT ORDER**

AND NOW, this 12th day of April 2011, IT IS ORDERED:

That Judgment is entered IN FAVOR OF Citgo Asphalt Refining Company, Citgo Petroleum Corporation, and Citgo East Coast Oil Corporation and AGAINST Frescati Shipping Company, Ltd., as owner of the *M/T ATHOS I* and Tsakos Shipping & Trading, S.A., as manager of the *ATHOS I.*

BY THE COURT:

/s/ John P. Fullam
John P. Fullam,    Sr. J.

JA-4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA        :       CIVIL ACTION
                                :
          V.                    :
                                :
CITGO ASPHALT REFINING COMPANY, :
CITGO PETROLEUM CORPORATION, AND :
CITGO EAST COAST OIL CORPORATION :      NO. 08-CV-02898-JF
```

**JUDGMENT ORDER**

AND NOW, this 12th day of April 2011, IT IS ORDERED:

That Judgment is entered IN FAVOR OF the defendants,

Citgo Asphalt Refining Company, Citgo Petroleum Corporation, and

Citgo East Coast Oil Corporation, and AGAINST the plaintiff,

United States of America.

BY THE COURT:

/s/ John P. Fullam
John P. Fullam,      Sr. J.

**JA-5**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PETITION OF FRESCATI      :      CIVIL ACTION
SHIPPING COMPANY, LTD., as       :
Owner of the M/T ATHOS I and     :
TSAKOS SHIPPING & TRADING,       :
S.A., as Manager of the ATHOS I  :
for Exoneration from or          :
Limitation of Liability          :      NO. 05-cv-00305-JF

_____

UNITED STATES OF AMERICA         :      CIVIL ACTION
                                 :
         v.                      :
                                 :
CITGO ASPHALT REFINING COMPANY,  :
CITGO PETROLEUM CORPORATION, and :
CITGO EAST COAST OIL CORPORATION :      NO. 08-CV-02898-JF

**ADJUDICATION**

Fullam, Sr. J.                                    April 12, 2011


On November 26, 2004, the single-hulled tanker *ATHOS I*
was traveling up the Delaware River, nearing the end of a 1900-
mile journey from Puerto Miranda, Venezuela to Paulsboro, New
Jersey.  Approximately 900 feet from the dock of the refinery
where it was to discharge its cargo, the tanker struck a
submerged nine-ton object that ripped two holes in the hull.
Some 200,000 barrels of heavy crude oil spilled into the river,
with devastating ecological results.  The United States
government launched a multi-agency response to the disaster, at
great cost but with marked success.  The issue to be decided by
this Court, one explored in exhaustive detail during 41 days of a
non-jury trial, is whether the companies associated with the

refinery, CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation (collectively, "CARCO") may be held responsible for the clean-up costs and the losses associated with the damage to the ship.  For the reasons explained below, I conclude that they may not.  I have set forth in narrative fashion my findings of fact (as determined by a preponderance of the credible evidence) and conclusions of law.

<u>The Litigation</u>

On January 21, 2005, Frescati Shipping Company, Ltd., as owner of the *M/T ATHOS I,* and Tsakos Shipping & Trading, S.A., as manager of the *ATHOS I* (collectively, "Frescati") filed a "Petition for Exoneration from or Limitation of Liability" pursuant to 46 U.S.C. § 183, in connection with claims by the government or others affected by the spill.  In the limitation action, filed at Civil Action No. 05-305, CITGO Asphalt Refining Company filed a claim for damages associated with the spill (as did others), and Frescati filed a counterclaim against all three CARCO entities.  The United States government later filed a separate action against CARCO at Civil Action No. 08-2898. Frescati and the government resolved their differences, and many claims were settled through administrative proceedings.  The trial before the Court comprised all claims by Frescati and the government against CARCO.  As the government's claims are based

2

**JA-7**

upon its status as statutory subrogee to the contract-based claims raised by Frescati, they will not be discussed separately.

### The Ship, the Contracts, and the Cargo

The *ATHOS I* was a Panamax-sized tanker[1] with a beam of 105 feet, six inches, and a length of 748 feet.  It sailed under the flag of Cyprus and was chartered by Frescati to Star Tankers, Inc., as part of a pooling agreement or time charter.  Star Tankers chartered the ship to CARCO with the terms summarized on a "Fixture Recap" dated November 12, 2004.  The Fixture Recap incorporated the standard industry form known as "ASBATANKVOY" and included additional terms; it did not specify the port other than as a "safe port" in the United States or the Caribbean.  On November 15, 2004, the master of the *ATHOS I*, Captain Iosif Markoutsis, received a "Fixture Note" that confirmed the ship would discharge at a safe port in the United States.  The load port was designated as Puerto Miranda, Venezuela.

Star Tankers and CARCO executed a formal "Charter Party," dated November 12, 2004, with an addendum dated December 8, 2004 providing that the laws of the United States govern the contract.  The Charter Party (sometimes referred to as a "Voyage Subcharter") was prepared on the standard ASBATANKVOY form and

---

[1] A Panamax-sized ship is one that is the maximum size able to sail through the Panama Canal.

included warranties that the vessel would proceed to the discharging port "or so near thereunto as she may safely get (always afloat) and deliver said cargo," and that the vessel would discharge "at any safe place or wharf" designated by the Charterer, "provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat." Ex. P-357.

Upon arriving at Puerto Miranda, the *ATHOS I* loaded slightly more than 300,000 barrels of heavy crude oil from facilities owned by PDVSA Petroleo, S.A. (the parent company of CARCO). As loading was completed, Captain Markoutsis was presented with the bill of lading for the voyage. The front of the bill of lading form contained spaces for certain information to be filled in for the specific voyage. In the spaces available for the insertion of information concerning the Charter Party, the word "NIL" (meaning "nothing") appeared several times.

The reverse side of the bill of lading included a series of preprinted clauses, one of which specified that English law would govern any disputes. The bill of lading also included language that the cargo was "to be delivered at the Port of Paulsboro, New Jersey, or, so near thereto as the vessel can safely get, always afloat . . . ." Ex. P-375.

Captain Markoutsis signed the bill of lading on November 19, 2004, but also issued two letters of protest dated the same day. One letter noted a discrepancy of 310.53 barrels

4

**JA-9**

between the vessel's records and the bill of lading, Ex. P-381,
and the other protested that the bill of lading did not record
the date of the Voyage Subcharter of November 12, 2004, which the
master requested that PDVSA Petroleo record on the original bills
of lading, Ex. P-380.  The *ATHOS I* left Puerto Miranda on
November 20, 2004.

<u>The Site of the Casualty</u>

At approximately 9:02 p.m. on November 26, 2004, the
Delaware River docking pilot was on board the *ATHOS I* and tug
boats were maneuvering into position when the ship began to list
to the port side and oil was observed in the water.  The *ATHOS I,*
although damaged, remained afloat; it did not run aground at any
point.  The cause of the disaster is uncontested to the extent
that all parties agree that the *ATHOS I* struck a submerged
object.  Although the object is always referred to as an anchor,
the shank had been removed at some point before the object was
deposited in the river, so that it could not be used as a ship's
anchor (and, because any identifying marks would have been on the
shank, its owner could not be traced).  No evidence as to how the
anchor came to rest in the river was proffered at trial, but
there is supposition that it may have been used as part of
dredging operations.  There is no evidence that any party to this
litigation – Frescati, CARCO, or the government – knew or had

reason to believe that the anchor was in the river, although it is well-known that all sorts of objects that present a potential danger to navigation lurk beneath the surface of the waters. The parties stipulated that the anchor had been in the river since at least 2001, as close examination of a sonar scan conducted that year by researchers from the University of Delaware reveals the anchor in approximately the same spot where the *ATHOS I* came to grief, in an area of the Delaware River known as Federal Anchorage No. 9 or the Mantua Creek Anchorage ("the Anchorage").[2]

By federal law, the United States Army Corps of Engineers bears the responsibility of keeping the Anchorage dredged to a depth of 40 feet, lest it become too shallow for commercial navigation. The testimony at trial was to the effect that the government does not regularly survey the Anchorage for possible hazards to navigation, but that if a hazard is brought to the government's attention it will be removed if feasible, or mariners will be notified of its location.

At trial, each side blamed the other for the casualty. The plaintiffs contend that CARCO is liable in tort under the theories of wharfinger negligence and misrepresentation, because CARCO failed to survey for obstructions into the Anchorage and because CARCO failed to notify the crew of the *ATHOS I* that CARCO

---

[2] The Anchorage is approximately 2.2 miles long from north to south. N.T. Nov. 10, 2010 at 68 (P. Myhre).

**JA-11**

recently had determined that the maximum draft (i.e., the distance from the bottom of the ship to the surface of the water) that would be accepted at its berth had been reduced from 38 feet to 36 feet.  The *ATHOS I* had a draft of at least 36 feet, six inches, and thus, according to the plaintiffs, had Captain Markoutsis known of the change, the *ATHOS I* either would not have attempted to reach the berth, would have attempted to decrease the ship's draft before moving upriver, or would have scheduled the passage to arrive at high tide.  Frescati also argues that CARCO is liable under the Charter Party and the bill of lading on various contract and warranty theories.

The defendants argue that the blame lies with Frescati (because the *ATHOS I* was in poor condition, its draft was significantly more than 36 feet, six inches, and its crew failed to engage in proper voyage planning that would have brought the ship in at the proper stage of the tide); with the government (because the Anchorage is solely its responsibility); or with the unknown former owner of the anchor (because the hazard to navigation was abandoned without notifying anyone).

After carefully considering all of the evidence, I conclude that CARCO is not liable in either tort or contract.

<u>The Tort Claims</u>

*Negligence*

The government maintains, correctly, that it has no statutory or regulatory duty to scan the Anchorage for hazards to navigation (although it may have assumed a duty through course of conduct, <u>see Japan Line, Ltd. v. United States</u>, 1976 AMC 355 (E.D. Pa. 1975), *aff'd* 1977 AMC 265 (3d Cir. 1976)).  The absence of a duty on the part of the government, however, does not mean that a duty then falls upon CARCO.

"It is well settled that a terminal operator such as [CARCO] does not guarantee the safety of vessels coming to its docks."  <u>In re Complaint of Nautilus Motor Tanker Co.</u>, 862 F. Supp. 1260, 1275 (D.N.J. 1994) (citation omitted), *aff'd,* 85 F.3d 105 (3d Cir. 1996).  CARCO does have the duty to furnish a safe berth, including determining whether there are hidden hazards that it could have located with the exercise of reasonable care and inspection.  <u>Id.</u>  CARCO did inspect its berth; beyond that

> "there is no duty on the part of the wharfinger to provide a berth with safe surroundings (other than an entrance and exit) or to warn that hazards exist in its vicinity . . . ." [<u>Trade Banner Line, Inc. v. Caribbean Steamship Co.</u>, 521 F.2d 229, 230 (5th Cir. 1975)].  The duty to provide a safe berth and approach does not create a duty to make safe "adjacent areas." [<u>Sonat Marine, Inc. v. Belcher Oil Co.</u>, 629 F. Supp. 1319, 1327 (D.N.J. 1985), *aff'd,* 787 F.2d 583)].

8

**JA-13**

Id.  Frescati argues that the location of the casualty was within
the approach to the berth because ships berthing at the CARCO
terminal naturally would traverse the area where the anchor was
found.  See P. Dougherty Co. v. Bader Coal Co., 244 F. 267, 270
(D. Mass. 1917) (a case in which the ship grounded five or six
feet from the dock).  But the definition of "approach" that
Frescati urges the Court to adopt is unreasonably expansive.
Although the docking pilot was aboard the ATHOS I, the ship was
in an area of the Anchorage open for the passage of all ships,
not an area used exclusively, or even primarily, by vessels
docking at the Paulsboro refinery.  From 2000 to 2004, a total of
673 vessels anchored in the Anchorage (including repeat visits
from the same vessel), and in 2004 alone, 121 different cargo
vessels anchored in the Anchorage.  N.T. Nov. 10, 2010 at 47, 53
(P. Myhre).  In 2004, 42 vessels docked at CARCO's terminal
(including repeat visits from the same vessel).  Ex. D-586.
Although not all of these ships would have passed through the
area that Frescati contends CARCO should have scanned, the volume
of traffic illustrates that CARCO had no control over the use of
the Anchorage.  To accept Frescati's argument would have the
effect of potentially expanding the definition of "approach" to
the entire Anchorage or to the entire Delaware River.  A more
reasonable definition of "approach" is the area "immediately
adjacent" to the berth or within "immediate access" to the berth.

Western Bulk Carriers, K.S. v. United States, Civ. S-97-2423,

1999 U.S. Dist. LEXIS 22371, at *19-21 (E.D. Cal. Sept. 14, 1999)

(citing cases).  Under these definitions, the Anchorage was not

within the approach to CARCO's berth, and CARCO did not have the

legal obligation to survey there.

Frescati also argues that CARCO could have scanned the

relevant area of the Anchorage for as little as $10,000, and that

such a scan would have detected the presence of the anchor that

posed a danger to the ATHOS I, a single-hulled tanker that CARCO

invited to its berth.  Frescati asks the Court to apply the

formula first stated by Judge Learned Hand in United States v.

Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947), by weighing

whether the burden of adequate precautions is less than the

gravity of the injury discounted by the probability that the

injury will occur.  See In re City of New York, 522 F.3d 279, 284

(2d Cir. 2008).  Judge Hand's formula does not seem to have been

accepted in this Circuit, but in any event I do not find it

useful here.  So far as the evidence at trial shows, neither

industry custom nor government regulation would have put CARCO on

notice that it should scan into the Anchorage.  I am not

convinced that had the area been scanned the anchor would

perforce have been detected, and although the gravity of the

injury is undoubtedly severe, I cannot find that the burden of

adequate precautions falls upon CARCO rather than upon the

government or upon whoever abandoned the anchor.  I thus conclude as a matter of law that CARCO had no duty to scan for hazards within the Anchorage and is not responsible for the harm caused by the anchor.[3]

### *Misrepresentation*

William Rankine, CARCO's Senior Port Captain at Paulsboro in 2004, made the decision to lower the acceptable draft at the berth from 38 feet to 36 feet on November 22, 2004. Frescati argues that the failure to notify the *ATHOS I* of this change constituted a material misrepresentation upon which the ship's captain relied to the plaintiffs' detriment, because the ship, with a draft of more than 36 feet, six inches, would not have attempted to reach the berth or would have traveled at a different stage of the tide.

The evidence shows that the decisions regarding the timing of the Delaware River passage were made by the *ATHOS I*, not CARCO.  The decision to change the draft at the berth was not made in anticipation of the arrival of the *ATHOS I* but because the refinery's "season" was ending (the *ATHOS I* was the last ship scheduled to arrive at Paulsboro until the following spring); the

---

[3]  In so holding, I find unpersuasive Frescati's citation to New Jersey law governing the liability of business owners.  This case is governed by maritime principles, and the cases cited are insufficiently analogous.

11

change was an internal one made in expectation of the end of the season, to allow the maintenance crew to perform dredging if necessary. N.T. Nov. 22, 2010 at 16-18, 39, 47 (W. Rankine).  The change of the controlling draft did not in any way affect the depth of the water at the berth; nor did it affect the berthing window (the stage of the tide at which ships could berth safely). More important, the decision was based on CARCO's concern over increased silting outside of the area where the ship would float when lying at the berth, an area also outside of the Anchorage. N.T. Nov. 22, 2010 at 42 (W. Rankine).  In other words, the area of concern was not the area where the casualty occurred and the draft at the berth was factually irrelevant to the casualty.

Accordingly, even if the change in draft and the non-communication of it to Frescati constituted a misrepresentation, which I do not find, it would not have been a material misrepresentation and it did not cause the loss.  See Nautilus Motor Tanker Co., 862 F. Supp. at 1270 ("Since there is no nexus between what did or did not happen in the ship berth and the accident, the shoaling [in the berth] and its cause are irrelevant.").  The same is true of any other information that Frescati claims should have been provided by CARCO.  To the extent that Frescati attempts to recast these claims as a breach of an express or implied warranty, I find that no warranty was breached, and that the berth was safe for the ATHOS I.

<u>The Contract Claims</u>

Frescati (and the government as its subrogee) also
claim that CARCO is liable under contract.  Both the Charter
Party and the bill of lading include what are commonly known as
safe port and safe berth warranties, where the designated port or
berth is one that the ship can reach, safely afloat.  Frescati,
which is not a party to the Charter Party, seeks to invoke the
safe port and safe berth clauses of that contract as an intended
third-party beneficiary.  In this case, there was no testimony
from representatives of either CARCO or Star Tankers that
Frescati was an intended third-party beneficiary of the contract.
Star Tankers, not Frescati, assumed the role of owner of the
*ATHOS I* for purposes of the voyage.  There was also testimony to
the effect that Frescati and Star Tankers are engaged in an
arbitration in London over Frescati's claims for damage to the
*ATHOS I*, persuasive evidence that Frescati has its own
contractual remedy, rather than status as a third-party
beneficiary.  Nor do I find persuasive Frescati's argument that
because the Charter Party included a provision that the master
would sign bills of lading in the form set forth in the Charter
Party (requiring that the shipment would be carried pursuant to
the terms of the Charter Party), Frescati became a beneficiary of
the Charter Party or can rely upon the bill of lading.

**JA-18**

In maritime cases, a bill of lading may function as a contract or simply as a receipt, depending upon the circumstances.  When the bill of lading is negotiated to a third party not subject to the terms of a charter party, the bill of lading may become a contract of carriage.  See Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 823-24 (2d Cir. 2006).  Here, the shipper was PDVSA Petroleo, which arguably negotiated the bill of lading to CARCO, but as CARCO was a party to the Charter Party, the bill of lading did not then become a contract.  Frescati also argues, however, that Captain Markoutsis signed the bill of lading and endorsed it with the ship's seal, manifesting an intent to sign on behalf the vessel's owners.  I do not find that the evidence, including the testimony of Captain Markoutsis, supports this argument.

Moreover, even if Frescati did have the benefit of the safe port and safe berth warranties, I find that CARCO did not breach any contractual warranties.[4]  I do not agree with the cases cited by Frescati that would interpret the warranties as an unconditional guarantee, in effect imposing strict liability upon the wharfinger.  Instead, I find more persuasive the view of the Court of Appeals for the Fifth Circuit that "a charter party's

---

[4]  The parties dispute whether English or U.S. law applies. I find that the choice of law does not affect the result, but for purposes of this discussion I have accepted Frescati's position that U.S. law applies.

14

safe berth clause does not make a charterer the warrantor of the safety of a berth.  Instead the safe berth clause imposes upon the charterer a duty of due diligence to select a safe berth." Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1156-57 (5th Cir. 1990).  CARCO fulfilled its duty of due diligence, and I also find that the port and berth were generally safe.  Hundreds of vessels anchored in the Anchorage during the time the anchor is known to have been in the river.  Although it is not possible to determine exactly how many ships passed over the anchor's location, nonetheless, the volume of commercial traffic that passed without incident through the Anchorage suggests that the port is safe.  With regard to the CARCO berth specifically, during 2004, vessels docked at Paulsboro 42 times. Ex. D-586.  On 25 occasions, vessels either arrived or departed from the CARCO berth with a draft of at least 36 feet, six inches, without incident.  N.T. Nov. 22, 2010 at 16 (W. Rankine).  One vessel, the *NEW RIVER*, arrived on November 16, 2004, just days before the *ATHOS I*, with a draft of 36 feet, 11 inches, and departed with a draft of 37 feet, three inches.  The *NEW RIVER* completed loading just before low water and sat at the berth through low water without any problem.  N.T. Nov. 22, 2010 at 44-45 (W. Rankine). Based on the evidence, I conclude as a matter of law that the port and the berth were safe for commercial tankers with a draft

of 36 feet, seven inches, which Frescati maintains was the draft

of the *ATHOS I.*

I am also persuaded by CARCO's argument that the named-

port exception precludes a finding of liability pursuant to the

warranties.  Under this doctrine, "[w]hen a charter names a port

[or berth] and the master proceeds there without protest, the

owner accepts the port [or berth] as a safe port, and is bound to

the conditions that exist there."  Bunge Corp. v. M/V FURNESS

BRIDGE, 558 F.2d 790 (5th Cir. 1977).  Frescati argues that the

existence of the anchor was not "reasonably foreseeable" and thus

the named port doctrine does not apply.  See Duferco Int'l Steel

Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 387 (2d Cir.

2003).

I conclude that Frescati was sufficiently familiar with

the port.  Between April 1, 1998 and December 9, 2004, 14 vessels

operated by Tsakos called at the Paulsboro refinery (including

the *ARAMIS*, sister ship to the *ATHOS I*)[5] and a total of 70

Tsakos-operated vessels came into the Delaware River.  N.T. Nov.

10, 2010 at 45-46 (P. Myhre).  Although the anchor itself was not

known to Frescati, the existence in general of lost or abandoned

objects in the river was well disseminated through notices to

mariners.  Accordingly, even if Frescati can claim the benefit of

---

[5]   Other Tsakos ships referenced during the trial included
the *PORTHOS* and the *D'ARTAGNON*.

the safe port and safe berth warranties, CARCO did not breach the

warranties and neither Frescati nor the government can recover in

contract.


                    Notes on Other Evidence

        The parties devoted much time at trial to questions

that I have found unnecessary to my decision, including the

questions of whether the *ATHOS I* violated various laws and

regulations such that it was responsible for the casualty;

whether the *ATHOS I* had sufficient under-keel clearance (the

distance from the bottom of the ship to the riverbed), as

determined in part by whether the anchor was in a "flukes up" or

"flukes down" position, etc.  Because it may be of some use to

the parties, I add the following comments.  With regard to the

position of the anchor, I found most of the expert testimony,

particularly the evidence of computer "modeling", unpersuasive.

The most useful evidence regarding the anchor's position came

from Peter Traykovski, who analyzed sonar scans and concluded

that the anchor was lying with its flukes down both in 2001 and

after the casualty, which is persuasive evidence that the anchor

tended to remain in that position, rather than at a 65° angle

with the flukes up.  Although it is safe to say that the crew of

the *ATHOS I* did not devote the care and attention to preparation

of the voyage planning that might have been advisable, I am not

persuaded that these errors caused the ship to strike the anchor. After hearing all of the evidence, I am of the opinion that the fault for the casualty lies with the anchor's former owner, who abandoned it in the river without notifying anyone.  Finally, although I did not reach the issue of damages, I note that the testimony of the witnesses was compelling with regard to the complexity and difficulty of the oil spill response, and that costs were monitored to the best extent possible under the circumstances.

<u>Conclusion</u>

I have considered all of the arguments in favor of liability against CARCO raised by Frescati and the government, and to the extent that any are not addressed specifically in this adjudication they have been rejected.

Appropriate orders will be entered.


BY THE COURT:


/s/ John P. Fullam
John P. Fullam,      Sr. J.

**AFFIDAVIT OF SERVICE**

Case Nos.  11-2577 (L) and 11-2576 (CON)

In re: Petition of Frescati Shipping Company, Ltd., as Owner of the M/T Athos I and Tsakos Shipping and Trading, S.A., as Manager of the Athos I for Exoneration from or limitation of liability

------------------------------------------------------------------------*X*

       I, Kersuze Morancy, swear under the pain and penalty of perjury, that according to law and being over the age of 18, upon my oath depose and say that:

       on **March 29, 2012**

       I served the within **Brief for Appellants Frescati Shipping Co LTD and Tsakos Shipping and Trading SA** in the above captioned matter via Court's CM/ECF case filing system on the following registered users:

| | |
|---|---|
| **Palmer, Biezup & Henderson**<br>**190 North Independence Mall West**<br>**Suite 401**<br>**Philadelphia, PA 19106**<br>**215-625-9900** | **Chaffe McCall**<br>**1100 Poydras Street**<br>**2300 Energy Centre**<br>**New Orleans, LA 70163**<br>**504-585-7041** |

*Attorneys for Defendant-Appellee*

| | |
|---|---|
| **United States Department of Justice**<br>**Civil Division, Room 7535**<br>**950 Pennsylvania Avenue, N.W.**<br>**Washington, DC 20530**<br>**202-514-4825** | **United States Department of Justice**<br>**Torts Branch, Civil Division**<br>**P.O. Box 14271**<br>**Washington, DC 20044**<br>**202-616-4104** |

**United States Department of Justice**
**Appellate Section**
**950 Pennsylvania Avenue, N.W.**
**Washington, DC 20530**
**202-514-3688**

*Attorneys for Plaintiff-Appellant USA*

       In addition, ten (10)  copies have been filed by express mail to the U.S. Court of Appeals for the Third Circuit.

**s/**Mariana Braylovskaya           s/Kersuze Morancy
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2014        Job # 23927