IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 11-2576

IN RE:  PETITION OF FRESCATI SHIPPING COMPANY, LTD., AS OWNER
OF THE M/T ATHOS I AND TSAKOS SHIPPING & TRADING, S.A., AS
MANAGER OF THE ATHOS I FOR EXONERATION FROM OR LIMITATION
OF LIABILITY

No. 11-2577

UNITED STATES OF AMERICA,

Appellant,

v.

CITGO ASPHALT REFINING COMPANY;
CITGO PETROLEUM CORPORATION;
CITGO EAST COAST OIL CORPORATION

Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Nos. 2-05-cv-00305/2-08-cv-02898

PETITION FOR REHEARING OR REHEARING EN BANC

| | |
|---|---|
| Derek A. Walker | Carter G. Phillips |
| J. Dwight LeBlanc, Jr. | Jacqueline G. Cooper |
| Douglas L. Grundmeyer | Richard E. Young |
| CHAFFE McCALL, L.L.P. | SIDLEY AUSTIN LLP |
| 2300 Energy Centre | 1501 K Street, N.W. |
| 1100 Poydras Street | Washington, D.C. 20005 |
| New Orleans, Louisiana 70163 | (202) 736-8000 |
| (504) 585-7000 | |

*Additional Counsel On Inside Cover*

| | |
|---|---|
| Richard Q. Whelan<br>Frank P. DeGiulio<br>PALMER, BIEZUP & HENDERSON LLP<br>190 N. Independence Mall West<br>Suite 401<br>Philadelphia, PA 19106<br>(215) 625-9900 | |

Attorneys for Appellees CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

REQUIRED STATEMENT FOR REHEARING EN BANC PURSUANT TO THIRD CIRCUIT RULE 35.1 ........................................................... v

INTRODUCTION ................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................. 1

REASONS FOR GRANTING THE PETITION ....................................................... 3

I.    THE PANEL'S HOLDING THAT FRESCATI IS A THIRD-PARTY BENEFICIARY IS CONTRARY TO DECISIONS OF THIS COURT AND OTHER FEDERAL COURTS ............................................................ 3

II.   THE PANEL'S HOLDING THAT A CHARTER CONTRACT'S SAFE BERTH CLAUSE IS A GUARANTEE CONFLICTS WITH THE RULING OF ANOTHER CIRCUIT ....................................................... 8

III.  THE PANEL'S HOLDING REGARDING THE SCOPE OF CARCO'S DUTY TO PROVIDE A SAFE APPROACH TO ITS BERTH PRESENTS A QUESTION OF EXCEPTIONAL IM-PORTANCE ........................................................................................ 12

CONCLUSION ...................................................................................... 15

CERTIFICATE OF SERVICE .............................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Asher v. Chase Bank USA, N.A.,*
  310 F. App'x 912 (7th Cir. 2009) ........................................................5

*Atl. & Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc.,*
  750 F.2d 457 (5th Cir. 1985) ..............................................................5

*Bariteau v. PNC Fin. Servs. Grp., Inc.,*
  285 F. App'x 218 (6th Cir. 2008) ........................................................5

*BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos De Ecuador (Petroecuador),*
  No. 04-20911, 2008 WL 162889 (5th Cir. Jan. 16, 2008) ...................5

*Cities Serv. Transp. Co. v. Gulf Ref. Co.,*
  79 F.2d 521 (2d Cir. 1935) .................................................................8

*Coca-Cola Bottling Co. v. Coca-Cola Co.,*
  988 F.2d 386 (3d Cir. 1993) ...............................................................6

*In re Complaint of Nautilus Motor Tanker Co.,*
  85 F.3d 105 (3d Cir. 1996) ...............................................................12

*In re Complaint of Nautilus Motor Tanker Co.,*
  862 F. Supp. 1260 (D.N.J. 1994), *aff'd,* 85 F.3d 105 (3d Cir. 1996) .................13

*Crumady v. The Joachim Hendrik Fisser,*
  358 U.S. 423 (1959)...........................................................................6

*Delta Mech., Inc. v. Garden City Grp., Inc.,*
  345 F. App'x 232 (9th Cir. 2009) ........................................................5

*Doe v. Pa. Bd. of Prob. & Parole,*
  513 F.3d 95 (3d Cir. 2008) .................................................................4

*Dravo Corp. v. Robert B. Kerris, Inc.,*
  655 F.2d 503 (3d Cir. 1981) ...............................................................4

*E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin*
  *Intermediates, S.A.S.*,
  269 F.3d 187 (3d Cir. 2001) ................................................................4

*Flexfab, L.L.C. v. United States*,
  424 F.3d 1254 (Fed. Cir. 2005) ..........................................................3

*In re Freschati Shipping Co.*,
  No. 05-305, 2011 WL 1436878 (E.D. Pa. Apr. 12, 2011) .......................9, 11, 13

*M.F. v. State Exec. Dep't Div. of Parole*,
  640 F.3d 491 (2d Cir. 2011) ................................................................5

*The Moorcock*,
  14 P.D. 64 (Eng. 1899) .....................................................................14

*Orduna S.A. v. Zen-Noh Grain Corp.*,
  913 F.2d 1149 (5th Cir. 1990) .......................................................9, 10

*Osprey Ship Mgmt., Inc. v. Jackson Cnty. Port Authority*,
  No. 05-390, 2007 WL 4287701 (S.D. Miss. Dec. 4, 2007), *aff'd sub.*
  *nom.* 387 F. App'x 425 (5th Cir. 2010) ..............................................14

*Paragon Oil Co. v. Republic Tankers, S.A.*,
  310 F.2d 169 (2d Cir. 1962) ..........................................................6, 8

*Park S.S. Co. v. Cities Serv. Oil Co.*,
  188 F.2d 804 (2d Cir.1951) ................................................................8

*Pierce Assocs., Inc. v. Nemours Found.*,
  865 F.2d 530 (3d Cir. 1988) ..............................................................5

*Retro Television Network, Inc. v. Luken Commc'ns, LLC*,
  696 F.3d 766 (8th Cir. 2012) ..............................................................5

*Robins Dry Dock & Repair Co. v. Flint*,
  275 U.S. 303 (1927)..........................................................................4

*Scindia Steam Navigation Co. v. De Los Santos*,
  451 U.S. 156 (1981)..........................................................................6

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.*,
  672 F.3d 1041 (Fed. Cir.), *cert. denied*, 133 S. Ct. 126 (2012)..........................4

iii

*Smith v. Burnett*,
    173 U.S. 430 (1899)...................................................................12

*Smith v. Cent. Ariz. Water Conservation Dist.*,
    418 F.3d 1028 (9th Cir. 2005) ..............................................3

*Sonat Marine Inc. v. Belcher Oil Co.*,
    629 F. Supp. 1319 (D.N.J. 1985), *aff'd*, 787 F.2d 583 (3d Cir. 1986) ..............12

*In re T.L. James & Co.*,
    33 F. App'x 703 (5th Cir. 2002) ...........................................5

*Venore Transp. Co. v. Oswego Shipping Corp.*,
    498 F.2d 469 (2d Cir. 1974) ................................................8

*Waterman S.S. Corp. v. Dugan & McNamara, Inc.*,
    364 U.S. 421 (1960)............................................................6

*W. Bulk Carriers, K.S. v. United States*,
    1999 A.M.C. 2818 (E.D. Cal. 1999)..................................14

**STATUTES AND RULE**

33 U.S.C. § 905(b) ..................................................................6

33 U.S.C. §§ 2701 *et seq.*......................................................2

Fed. R. App. P. 35(b)(1)(B) ....................................................8

**OTHER AUTHORITIES**

Julian Cooke et al., *Voyage Charters* (3d ed. 2007)................................11

P. Hartman, *Safe Port/Berth Clauses: Warranty or Due Diligence?*, 21 Tul.
    Mar. L. J. 537 (1997) .........................................................10

## <u>REQUIRED STATEMENT FOR REHEARING EN BANC</u>
## <u>PURSUANT TO THIRD CIRCUIT RULE 35.1</u>

I express a belief, based on a reasoned and studied professional judgment, that the Panel decision is contrary to decisions of this Court, and that consideration *en banc* is necessary to secure and maintain uniformity of decisions in this Court, *i.e.*, the Panel's decision on the third-party beneficiary issue is contrary to *Doe v. Pennsylvania Board of Probation & Parole*, 513 F.3d 95 (3d Cir. 2008). In addition, the Panel's decision involves questions of exceptional importance because it (1) widens an acknowledged circuit conflict on the question whether a safe berth provision in a voyage charter contract is a guarantee of the safety of the berth, rather than a duty of due diligence; (2) creates unprecedented tort liability in the maritime industry by construing a wharf owner's duty to provide a safe approach to its berth to extend to routes selected exclusively by a vessel's navigators in publicly maintained waters over which the wharf owner does not exercise dominion or control; and (3) creates chaos in maritime contracting and the orderly carriage of goods by sea by making non-contracting parties intended beneficiaries of contracts to which they were not signatories.

/s/ Carter G. Phillips
Carter G. Phillips
Counsel for Appellees

## INTRODUCTION

The Panel's decision upends decades of settled expectations in both contract and tort law concerning risk-allocation in the maritime setting. *First*, its ruling on the legal standard for third-party beneficiary status conflicts with decisions of this Court and other federal courts. *Second*, the Panel widened a circuit conflict on the scope of a commonly-used provision in charter contracts. *Third*, its ruling expanding a wharf owner's duty to provide a safe approach to its berth to the limitless navigational paths of vessels, rather than a finite geographical area controlled by the wharf owner, is unprecedented and will create substantial new liabilities, uncertainty, and confusion for wharf owners. Each ruling will have profound impact in and beyond the maritime industry, and independently warrants either panel rehearing or rehearing *en banc*. Collectively, they indisputably warrant rehearing.

## FACTUAL AND PROCEDURAL BACKGROUND

The Panel reversed the result of a 41-day bench trial that found CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation (collectively, "CARCO") not liable for damages arising from an oil spill caused when the oil tanker *Athos I* struck an uncharted anchor abandoned by an unknown party in the Delaware River. The incident occurred approximately 900 feet from CARCO's berth in Federal Anchorage No. 9, which is maintained exclusively by the federal government for public use. The ship owner, Frescati

Shipping Company, Ltd., and its manager Tsakos Shipping & Trading, S.A (collectively, "Frescati"), had chartered the ship to Star Tankers Inc. ("Star") in 2001 via a standard industry form contract known as a "time charter," which granted Star authority to subcharter the ship for specific voyages. Three years later, Star chartered the ship to CARCO for a single voyage under a "voyage charter" contract to which Frescati was not a party. That contract provided that CARCO would designate a "safe place or wharf" for the discharge of cargo.

As the "responsible party" under the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, Frescati paid $133 million in cleanup expenses, $88 million of which was reimbursed by a federal fund. Seeking to recoup its unreimbursed losses, Frescati asserted against CARCO (1) claims for alleged breach of its contract with Star (joined by the U.S., which had reimbursed the $88 million), and (2) negligence claims in its role as the wharf owner. The district court found CARCO not liable. The Panel reversed and remanded for further fact-finding, ruling that Frescati's contract claims are viable because (1) it is a third-party beneficiary of the contract between CARCO and Star; and (2) the "safe berth" clause in the voyage charter *guaranteed* the berth's safety. It also held that Frescati's negligence claim is viable because CARCO's duty as wharf owner to provide a safe approach to its berth extended to the route chosen by the vessel's navigators in an area of the

river that CARCO does not maintain or control. These unprecedented rulings create amorphous legal standards that will confound maritime commerce.

## REASONS FOR GRANTING THE PETITION

### I.     THE PANEL'S HOLDING THAT FRESCATI IS A THIRD-PARTY BENEFICIARY IS CONTRARY TO DECISIONS OF THIS COURT AND OTHER FEDERAL COURTS.

The Panel's holding that Frescati was a third-party beneficiary of the voyage contract between CARCO and Star conflicts with well-settled standards – including those of this Court – for proving intended beneficiary status. Unless reversed, it will expose contract parties to an array of claims by third parties to whom they never intended to extend enforceable rights.

The Panel's standards were fatally flawed. *First*, the Panel characterized the issue of whether the contract itself established a third-party beneficiary relationship as "a question of law." Op. at 23. As other Circuits have held, however, the issue of third-party beneficiary status is not a pure question of law, but rather a mixed question of law and fact that is reviewed *de novo*.[1]

*Second*, the Panel held that, "[a]s Frescati is not a party to CARCO's promise to Star Tankers to provide a safe berth, there must be *some showing* that it was nonetheless an intended beneficiary." *Id.* (emphasis added). That standard, however, falls woefully short of the "compelling evidence" standard adopted by this

---

[1] *See, e.g., Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005); *Smith v. Cent. Ariz. Water Cons. Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005).

Court in applying federal common law. *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 106-07 (3d Cir. 2008) (intended-beneficiary status not expressly provided by contract is "conferred *only* if circumstances *compel* [a court] to recognize such a status in order to effectuate" parties' intent; plaintiff was not intended third-party beneficiary because there was "no *compelling evidence* that" the contracting parties "implicitly intended to give legally enforceable rights") (emphases added).

The Panel's "some evidence" standard is also inconsistent with this Court's use of a more stringent standard for intended-beneficiary status when applying state law,[2] and with the holdings of the Supreme Court and other Circuits that third-party beneficiary status is an "exceptional privilege" that "should not be granted liberally." *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307 (1927); *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1056 (Fed. Cir.), *cert. denied,* 133 S. Ct. 126 (2012). The Panel's standard dramatically *easing* the evidentiary burden cannot be reconciled with those precedents.

In addition, the Panel's standard stands in stark contrast to the heightened standards for third-party beneficiary status applied by other Circuits in maritime and other federal common law cases that mirror *Doe*'s "compelling evidence"

---

[2] *See Dravo Corp. v. Robert B. Kerris, Inc.*, 655 F.2d 503, 511 (3d Cir. 1981) (requiring "*clear indication*" that parties intended plaintiff to benefit) (emphasis added); *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196 (3d Cir. 2001) (intent to benefit third party "must be *a material part of the parties' purpose*" in entering contract) (emphasis added).

4

standard.[3]    Indeed, some Circuits have held that there is a presumption that a stranger to a contract is *not* a third-party beneficiary, unless it clearly appears from the contract that such was the parties' intention.[4]   Here, the voyage charter was entirely devoid of any such evidence of intent.

The Panel also failed to follow this Court's holding that in resolving third-party beneficiary issues, a court must consider the *context* in which the contract was written – including the type of contract and industry involved.   *See Pierce Assocs., Inc. v. Nemours Found.,* 865 F.2d 530, 535 (3d Cir. 1988).   Here it is well-established that a vessel owner has no privity of contract with a subcharterer, and is not a third-party beneficiary of the voyage charter.   *See* Br. for Appellees at 68-70 (Apr. 2, 2012) ("Appellees' Br.").   The surrounding factual circumstances – including that Star and CARCO identified only Star as the "owner" in the voyage charter and Frescati's negotiation of a different safe berth clause in its own contract

---

[3] *See, e.g., M.F. v. State Exec. Dep't Div. of Parole,* 640 F.3d 491, 496 n.7 (2d Cir. 2011) (following *Doe*); *In re T.L. James & Co.,* 33 F. App'x 703 (5th Cir. 2002); *Atl. & Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc.,* 750 F.2d 457, 459 n.3 (5th Cir. 1985).   The Fifth Circuit rejected a third-party beneficiary claim under general maritime law because "there [was] no contractual language in either the bill of lading or the charter party evidencing a clear intent" to benefit the third party.   *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos De Ecuador (Petroecuador),* No. 04-20911, 2008 WL 162889, at *3 (5th Cir. Jan. 16, 2008).

[4] *See, e.g., Retro Television Network, Inc. v. Luken Commc'ns, LLC,* 696 F.3d 766, 769 (8th Cir. 2012); *Delta Mech., Inc. v. Garden City Grp., Inc.,* 345 F. App'x 232, 233 (9th Cir. 2009); *Asher v. Chase Bank USA, N.A.,* 310 F. App'x 912, 921 (7th Cir. 2009); *Bariteau v. PNC Fin. Servs. Grp., Inc.,* 285 F. App'x 218, 220-21 (6th Cir. 2008).

with Star – confirm that Frescati was not an intended beneficiary of that contract.

The Panel's reasoning does not withstand scrutiny. *First*, its reliance on *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423 (1959), and *Waterman S.S. Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421 (1960), is misplaced. Op. at 24-25. Both decisions held only that if a shipowner pays damages to a longshoreman injured because the vessel was "unseaworthy," the shipowner may obtain indemnification from the longshoreman's employer (the stevedore) based on the stevedore's *implied* warranty to perform its services in a workmanlike manner. Here, there is an *express* written warranty, and CARCO did not contract with Frescati. Moreover, those cases are of dubious precedential value, since Congress subsequently *abolished* the shipowner's right of indemnification recognized therein.[5]

*Second*, the Panel incorrectly asserted that unless Frescati is a third-party beneficiary, Star would receive a "windfall" because it would "collect on CARCO's safe berth warranty but not be required to pass on those remedial dollars to the ship's ultimate owner." Op. at 26. Star, however, could not recover damages from CARCO without demonstrating loss, *see Coca-Cola Bottling Co. v. Coca-Cola Co.*, 988 F.2d 386, 409 (3d Cir. 1993), and is unlikely to be able to do so be-

---

[5] *See* 33 U.S.C. § 905(b); *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 164-65 & nn.11-12 (1981). Similarly, *Paragon Oil Co. v. Republic Tankers, S.A.,* 310 F.2d 169 (2d Cir. 1962), Op. at 24-25, was decided before Congress abolished the shipowner's right to indemnification. Moreover, the discussion cited by the Panel was *dicta*. The alleged third-party beneficiary's claim was dismissed by the district court, and the dismissal was not appealed. 310 F.2d at 171.

cause Star has not been required to pay damages to Frescati and has not been named a "responsible party" under OPA.[6]  Furthermore, Star's defenses and remedies are the subject of a pending (but stayed) London arbitration commenced by Frescati against Star pursuant to their time charter contract.  *See* Op. at 12.[7]

More fundamentally, the Panel opinion has serious ramifications for all contracts, maritime and otherwise, because a purported third-party beneficiary could invoke the Panel's diluted standard in *any* contract case.  By weakening the requirements for third-party beneficiary status, the opinion exposes all contract parties to unintended liability to non-parties.  In the maritime industry, which relies heavily on contracts, the Panel's opinion will cause substantial uncertainty and will disrupt commerce, to the detriment of the general public.  This issue therefore presents a question of exceptional importance that warrants rehearing.

---

[6] *See* Appellees' Br. at 5, 7-8.  Moreover, denying Frescati third-party beneficiary status does not leave it without a remedy: if Frescati is exonerated of fault for the oil spill, it can assert a claim to recover its uncompensated costs from the federal fund.  *See* Op. at 15 n.6.  By contrast, the Panel opinion would result in a windfall to Frescati, because the Panel's interpretation of the safe berth clause in the voyage charter is more favorable to Frescati than the due-diligence standard in the same clause in Frescati's time charter with Star.  Op. at 26 n.10.

[7] Given its meritless position, Frescati's likely motive in claiming third-party beneficiary status is to circumvent its arbitration with Star (where Star's safe berth clause promises only due diligence) and obtain a ruling from a U.S. court that the clause is a guarantee – thereby enabling it to obtain damages from CARCO, with which it has no contract.

## II.    THE PANEL'S HOLDING THAT A CHARTER CONTRACT'S SAFE BERTH CLAUSE IS A GUARANTEE CONFLICTS WITH THE RULING OF ANOTHER CIRCUIT.

The Panel acknowledged that the scope of a charterer's safe berth obligation presented "a question of first impression in [this] Circuit" and that its ruling on this question widened an existing circuit conflict because it rejected the view of the Fifth Circuit.  Op. at 27, 32-33.  This circumstance alone presents a "question of exceptional importance" that warrants rehearing *en banc*.  Fed. R. App. P. 35(b)(1)(B).  In addition, on a crucial issue of maritime law, the Panel erroneously imposed unprecedented liability on a charterer that bore no fault for the loss.

The charter contract between Star Tankers and CARCO contains the following "safe berth" language, *see* J.A. 1222, which is standard industry wording:

> "[t]he Vessel shall load and discharge at any safe place or wharf, . . . which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat. . . ."

The Second Circuit has long adhered to the view that such a clause guarantees the safety of the berth: "the charter party [is] itself an express assurance, on which the master [is] entitled to rely, that at the berth 'indicated' the ship would be able to lie 'always afloat.'"  *Cities Serv. Transp. Co. v. Gulf Ref. Co.*, 79 F.2d 521, 521 (2d Cir. 1935) (per curiam); *Park S.S. Co. v. Cities Serv. Oil Co.*, 188 F.2d 804, 805-06 (2d Cir. 1951); *Paragon Oil Co. v. Republic Tankers, S.A.*, 310 F.2d 169, 173 (2d Cir. 1962); *Venore Transp. Co. v. Oswego Shipping Corp.*, 498 F.2d 469, 472-73

(2d Cir. 1974) (voyage charterer "had an express obligation to provide a *completely safe berth*") (emphasis added).

The Fifth Circuit rejected this approach in *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1156-57 (5th Cir. 1990). After acknowledging the Second Circuit's position and discussing criticism of it, the Fifth Circuit found:

> [N]o legitimate legal or social policy is furthered by making the charterer warrant the safety of the berth it selects. Such a warranty could discourage the master on the scene from using his best judgment in determining the safety of the berth. Moreover, avoiding strict liability does not increase risks because the safe berth clause itself gives the master the freedom not to take his vessel into an unsafe port.

*Id.* at 1157. The Fifth Circuit therefore rejected the Second Circuit's view, which "impose[s] liability without fault on the charterer," and held instead that a safe berth clause merely "imposes upon the charterer a duty of due diligence to select a safe berth." *Id.* at 1156-57.

The district court adopted the Fifth Circuit's "due diligence" standard, reasoning that the Second Circuit's "unconditional guarantee" approach would "impos[e] strict liability" upon the charterer. 2011 WL 1436878, at *6. The Panel, however, expressly "part[ed] from th[e] holding" of the Fifth Circuit and the district court, and instead ruled that the safe berth clause "is an express assurance made without regard to the amount of diligence taken by the charterer." Op. at 27, 33; *id.* at 33 n.17 (emphasizing the "strict nature" of the warranty and rejecting the argument that it "applies only to known hazards").

9

The resulting conflict between the Fifth Circuit and this Circuit (and the Second Circuit before that) on this important issue of maritime law presents a question of "exceptional importance." The issue is a recurring one, since safe berth clauses are standard provisions in charter contracts. Commentators have noted that the uncertainty and unfairness of different legal regimes in different Circuits is particularly detrimental in an area where commercial activity "depend[s] on consistent application of law." P. Hartman, *Safe Port/Berth Clauses: Warranty or Due Diligence?*, 21 Tul. Mar. L. J. 537, 554 (1997) (arguing that charterers with identical clauses should not be subject to different legal standards and liability with respect to vessel damage, based on the "twist of fate" of where the litigation occurs).

The Panel's reasons for rejecting the "due diligence" approach are unsound, and ignore the onerous and unwarranted liability its ruling would impose upon charterers. The Panel's main rationale was that the charterer, as the party that selects the port, is "normally" in a "better position" than the ship master "to appraise a port's more subtle dangers." Op. at 31. Even if this premise were "normally" correct – a proposition that the Fifth Circuit found unconvincing, *Orduna*, 913 F.2d at 1156 – using it as the basis for imposing strict liability on charterers ignores the facts and circumstances of particular cases, and thereby reduces the incentives of masters and vessel owners to exercise due care, *id.* at 1157. It also ignores the

10

modern sources of information and sophisticated equipment available to navigators who ultimately determine whether a port is safe.

In addition, as this case starkly illustrates, the Panel's approach inevitably results in liability on wholly "innocent" charterers. Julian Cooke et al., *Voyage Charters* ¶ 5.129 (3d ed. 2007). CARCO had no knowledge of the abandoned ship anchor (in a publicly maintained waterway) that caused the casualty. *See* 2011 WL 1436878, at *2 (finding no evidence that CARCO "knew or had reason to believe that the anchor was in the river"). Yet under the Panel's ruling, it could be liable for millions in damages, even though it exercised due diligence and bears no fault for the oil spill. The due diligence standard avoids such manifestly unjust results.[8]

The Panel's holding that CARCO can be liable under the safe berth clause is also unprecedented and goes beyond even the Second Circuit's approach because it extended the charterer's safe berth obligation – which is typically invoked to address liability for vessel damage – to encompass OPA clean-up costs and damages. No previous court has interpreted a safe berth clause to render a charterer such as CARCO liable without fault for OPA removal costs and damages. Moreover, imposing this liability on CARCO cannot be squared with OPA because the party at fault for the casualty was the unknown anchor-dropper and, based on the sole fault

---

[8] The Panel's assertion that the fact that some safe berth clauses expressly adopt a due diligence standard "suggests that the understood default is to impose liability on the charterer without regard to the care taken," Op. at 32-33, ignores that parties often adopt contract terms that mirror – rather than change – the common law rule.

of a third-party, Frescati could recover 100% of its damages from the federal fund (not CARCO).  Rehearing *en banc* should be granted to address the Panel's unprecedented extension of the scope of a charterer's safe berth obligation.[9]

## III.  THE PANEL'S HOLDING REGARDING THE SCOPE OF CARCO'S DUTY TO PROVIDE A SAFE APPROACH TO ITS BERTH PRESENTS A QUESTION OF EXCEPTIONAL IMPORTANCE.

Frescati's negligence claim alleges that CARCO breached its duty as a wharf owner under maritime law to provide a safe approach to its berth.  Pursuant to this duty, a wharf owner "is not the guarantor of the vessel's safety," but only has a duty to exercise reasonable diligence to furnish a safe berth and "to maintain a safe approach" such that a vessel can "enter, use and exit a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by reasonably prudent navigation and seamanship."  *In re Complaint of Nautilus Motor Tanker Co.,* 85 F.3d 105, 116 (3d Cir. 1996); *see Smith v. Burnett,* 173 U.S. 430, 433 (1899).  The wharf owner's duty extends only to the berth and its approach, and not to "surrounding[]" areas or the general "vicinity."  85 F.3d at 116; *see also Sonat Marine Inc. v. Belcher Oil Co.,* 629 F. Supp. 1319, 1326-27 (D.N.J. 1985), *aff'd,* 787 F.2d 583 (3d Cir. 1986) (duty does not extend to "adjacent areas").

---

[9] There is no merit to the Panel's assertion that CARCO's counsel conceded at oral argument that the safe berth clause – if applicable – includes the federal anchorage. Op. at 28 n.11 and 33.  CARCO's counsel correctly acknowledged that "the port would encompass the anchorage," Oral Arg. Tr. at 63, but he did not say that the safe *berth* clause, which is the clause at issue here, extends to the anchorage.

The district court ruled that the anchorage where the accident occurred – which is maintained by the federal government and "open for the passage of all ships" – "was not within the approach to CARCO's berth."  2011 WL 1436878, at *4.  The Panel, however, held that the accident did occur within the "approach" by employing a new "moving target" definition of that term that is entirely dependent on the route to the berth chosen unilaterally by the vessel, through waters which the wharf owner does not maintain or control:

> [W]hen a ship transitions from its general voyage to a final, direct path to its destination, it is on an approach. . . .  [I]n most instances, the approach will begin where the ship makes its last significant turn from the channel toward its appointed destination following the usual path of ships docking at that terminal.

Op. at 44-45.  This unprecedented extension of a berth's "approach" to include publicly used and maintained waters warrants rehearing because it presents a question of exceptional importance under federal maritime law.

The Panel stated that the geographic scope of a wharf owner's duty has been "largely unaddressed" by courts and that the basis for its new standard was a "suggestion" in an amicus brief.  Op. at 42, 44.  The Panel's standard has no support in federal regulations or custom, and is contrary to decisions of courts that have refused to extend a wharf owner's duty to waters that they do not maintain or control, including a district court in this Circuit, in an opinion affirmed by this Court.  *In re Complaint of Nautilus Motor Tanker Co.*, 862 F. Supp. 1260, 1275-76 (D.N.J.

13

1994) (wharf owner did not violate duty where ship grounded approximately 125 feet from ship berth, because this was a "surrounding area for which [the wharf owner] was not responsible"), *aff'd*, 85 F.3d 105; *see also Osprey Ship Mgmt., Inc. v. Jackson County Port Auth.*, No. 05-390, 2007 WL 4287701, at *11 (S.D. Miss. Dec. 4, 2007), *aff'd sub. nom.* 387 F. App'x 425 (5th Cir. 2010) (wharf owner's duty did not extend to area of river over which it had "no jurisdiction"); *W. Bulk Carriers, K.S. v. United States*, 1999 A.M.C. 2818 (E.D. Cal. 1999) (approach did not include channel maintained by U.S., even though vessel had to cross it to reach berth).[10]

The Panel's newly-minted rule extending the wharf owner's duty to the "usual path" of navigation, including transit through federal project waters, imposes unprecedented liability and will give rise to confusion and litigation. The "path" to a wharf is a decision within the sole province of a vessel's navigators and local pilots, and it varies from ship to ship based on the tides, currents, winds and number of assisting tugboats. There is no "usual path," and a wharf owner cannot predict or control navigational decisions, including when a vessel takes its "last significant turn" or is "on an approach." By defining a wharf owner's duty in terms of

---

[10] The Panel's sole authority for the proposition that lack of control is not dispositive is the appeal decision in *The Moorcock*, L.R. 14 P.D. 64 (Eng. 1889), *see* Op. at 46-48, but that decision expressly disclaims that a wharf owner can be held liable for waters beyond its control. 14 P.D. at 70 ("I do not wish it to be understood that I at all consider this is a case of a duty on the part of the [owners of the jetty] to see that the access to the jetty is kept clear.").

third parties' navigational choices, rather than a fixed geographical area, the Panel's inherently uncertain approach puts wharf owners at the peril of trying to predict what a court will determine to be the "usual path." The Panel's acknowledgment that "there will be close and difficult cases" is a gross understatement. *See* Op. at 45. All cases will become close and difficult.

Moreover, by imposing on wharf owners an affirmative duty to locate and remove hidden obstructions in their now expansively-defined approaches, the Panel has placed a costly, onerous and amorphous burden on wharf owners. It is wholly unknowable what types of survey techniques and methods will satisfy a wharf owner's duty, how often surveys must be undertaken, or how wharf owners are supposed to coordinate their responsibilities in publicly-used waterways. In this case, for example, 31 other terminals operate along the river, and vessels arriving at other terminals sail through, and anchor in, the federal anchorage. The confusion and burdens created by the Panel's standard present a question of exceptional importance that warrants rehearing.

## CONCLUSION

The petition for rehearing or rehearing *en banc* should be granted.

Respectfully submitted,


/s/ Carter G. Phillips

| | |
|---|---|
| Derek A. Walker<br>J. Dwight LeBlanc, Jr.<br>Douglas L. Grundmeyer<br>CHAFFE McCALL, L.L.P.<br>2300 Energy Centre<br>1100 Poydras Street<br>New Orleans, Louisiana 70163<br>(504) 585-7000 | Carter G. Phillips<br>Jacqueline G. Cooper<br>Richard E. Young<br>SIDLEY AUSTIN LLP<br>1501 K Street, N.W.<br>Washington, D.C. 20005<br>(202) 736-8000 |
| Richard Q. Whelan<br>Frank P. DeGiulio<br>PALMER,  BIEZUP & HENDERSON<br>LLP<br>190 N. Independence Mall West<br>Suite 401<br>Philadelphia, PA 19106<br>(215) 625-9900 | |

Attorneys for Appellees CITGO Asphalt Refining Company, CITGO Petroleum
Corporation, and CITGO East Coast Oil Corporation

16

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below I electronically filed the foregoing with the Court using the CM/ECF system, which sent notification of such filing to the following counsel:

Jack A. Greenbaum
John D. Kimball
Blank Rome LLP
405 Lexington Avenue
The Chrysler Building
New York, NY 10174-0000
Email: jgreenbaum@blankrome.com
Email: jkimball@blankrome.com

Alfred J. Kuffler
Montgomery, McCracken, Walker
& Rhoads, LLC
123 South Broad Street, 28th Floor
Philadelphia, PA 19109-0000
Email: akuffler@mmwr.com

John J. Levy
Montgomery, McCracken, Walker
& Rhoads, LLC
457 Haddonfield Road
Liberty View, 6th Floor, Suite 600
Cherry Hill, NJ 08002-0000
Email: jlevy@mmwr.com

Matthew M. Collette
United States Department of Justice
Civil Division, Room 7212
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0000
Email: Matthew.Collette@usdoj.gov

Anne Murphy
United States Department of Justice
Appellate Section

Civil Division, Room 7644
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0000
Email: Anne.Murphy@usdoj.gov

William J. Honan
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
Email: william.honan@hklaw.com

George R. Zacharkow
Mattioni Limited
399 Market Street, Suite 200
Philadelphia, PA 19106
Email: gzacharkow@mattioni.com

In addition, the following counsel were served by the means indicated:

George M. Chalos (U.S. Mail)
Chalos & Co.
55 Hamilton Avenue
Oyster Bay, NY 11771

Eugene J. O'Connor (Email)
Chalos O'Connor
366 Main Street
Port Washington, NY 11050
Email: oconnor@codus-law.com

Timothy J. Bergere (Email)
Montgomery, McCracken, Walker
& Rhoads, LLC
123 South Broad Street, 28th Floor
Philadelphia, PA 19109-0000
Email: tbergere@mmwr.com

July 1, 2013

/s/ Carter G. Phillips
Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
(202) 736-8000

Counsel for Appellees

# ADDENDUM

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 11-2576

————————

IN RE: PETITION OF FRESCATI SHIPPING
COMPANY, LTD., AS OWNER OF THE M/T
ATHOS I AND TSAKOS SHIPPING & TRADING, S.A.,
AS MANAGER OF THE ATHOS I FOR EXONERATION
FROM OR LIMITATION OF LIABILITY

————————

No. 11-2577

————————

UNITED STATES OF AMERICA,

Appellant

v.

CITGO ASPHALT REFINING COMPANY; CITGO
PETROLEUM CORPORATION;
CITGO EAST COAST OIL CORPORATION

————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 2-05-cv-00305 / 2-08-cv-02898)

Trial District Judge: Honorable John P. Fullam
District Judge: Honorable Joel H. Slomsky[*]

———————————

Argued September 20, 2012


Before: AMBRO, GREENAWAY, Jr.,
and O'MALLEY,[**] Circuit Judges

(Opinion Filed: May 16, 2013)

Amelia Carolla, Esquire
Reisman, Carolla & Gran
19 Chestnut Street
Haddonfield, NJ   08033

Stacy A. Fols, Esquire
R. Monica Hennessy, Esquire
Melanie A. Leney, Esquire
John J. Levy, Esquire
Montgomery, McCracken, Walker & Rhoads
457 Haddonfield Road
Liberty View, 6th Floor, Suite 600
Cherry Hill, NJ   08002

———————————

[*] Judge Slomsky was assigned to this matter following the
retirement of Judge Fullam, who presided at trial and ruled on the
merits.

[**] Honorable Kathleen M. O'Malley, United States Court of
Appeals for the Federal Circuit, sitting by designation.

Leona John, Esquire
Alfred J. Kuffler, Esquire
John G. Papianou, Esquire
Tricia J. Sadd, Esquire
Timothy J. Bergere, Esquire
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street, 28th Floor
Philadelphia, PA   19109

Jack A. Greenbaum, Esquire (**Argued**)
John D. Kimball, Esquire
Blank Rome
405 Lexington Avenue
The Chrysler Building
New York, NY   10174

Eugene J. O'Connor, Esquire
George M. Chalos, Esquire
Chalos, O'Connor and Duffy
366 Main Street
Port Washington, NY   11050

      Counsel for Appellants
      Frescati Shipping Company, Ltd.
      Tsakos Shipping & Trading, S.A.

Tony West
 Assistant Attorney General
Zane David Memeger
United States Attorney
Matthew M. Collette, Esquire
Anne Murphy, Esquire (**Argued**)
United States Department of Justice

Appellate Section, Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC   20530

Stephen G. Flynn, Esquire
Sarah S. Keast, Esquire
Sharon Shutler, Esquire
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, DC   20044-4271

Counsel for Appellant
United States of America

Frank P. DeGiulio, Esquire
Charles P. Neely, Esquire
Kevin G. O'Donovan, Esquire
Richard Q. Whelan, Esquire (**Argued**)
Palmer, Biezup & Henderson
190 North Independence Mall West, Suite 401
Philadelphia, PA   19106

Michael B. McCauley, Esquire
Palmer, Biezup & Henderson
1223 Foulk Road
Wilmington, DE   19803

Robert B. Fisher, Jr., Esquire
Thomas D. Forbes, Esquire
Douglas L. Grundmeyer, Esquire
J. Dwight LeBlanc, Jr., Esquire
Jonathan C. McCall, Esquire

Ivan M. Rodriguez, Esquire
Derek A. Walker, Esquire
Charles P. Blanchard, Esquire
John L. Robert, III, Esquire
Daniel A. Tadros, Esquire
Chaffe McCall
1100 Poydras Street
2300 Energy Centre
New Orleans, LA   70163

      Counsel For Appellees
      Citgo Asphalt Refining Company
      Citgo Petroleum Corporation
      Citgo East Coast Oil Corporation

William J. Honan, Esquire
Chester D. Hooper, Esquire
Lissa D. Schaupp, Esquire
K. Blythe Daly, Esquire
F. Robert Denig, Esquire
Holland & Knight
31 West 52nd Street
New York, NY   10019

      Counsel for Amici Appellants

George R. Zacharkow, Esquire
Mattioni Limited
399 Market Street, Suite 200
Philadelphia, PA   19106

      Counsel for Amici Appellees

———————

## OPINION OF THE COURT

———————

AMBRO, <u>Circuit Judge</u>

## **Table of Contents**

I.   Factual and Procedural Background ........................................ 9
    A.   The Tanker and Its Charters .......................................... 9
    B.   The Accident.............................................................. 12
    C.   The Cost of the Accident ............................................ 14
    D.   Control of the Waters ................................................. 15
    E.   The District Court Proceedings.................................... 18
II.  Jurisdiction and Standard of Review ..................................... 20
III. Rule 52...................................................................... 21
IV.  The Contractual Safe Berth Warranty .................................. 22
    A.   Was Frescati a Third-Party Beneficiary of the Safe
        Berth Warranty? .......................................................... 23
    B.   The Scope of the Safe Berth Warranty ....................... 27
    C.   Was the Safe Berth Warranty Breached? .................. 33
    D.   The Named Port Exception......................................... 37
V.   The Tort Claims ................................................................ 40
    A.   Negligence ................................................................ 41
        i.    The Scope of the Approach .............................. 42
        ii.   Was the *Athos I* Within the Approach to
              CARCO's Terminal When the Accident
              Occurred?........................................................ 46
        iii.  Potential Breach of Duty to Maintain a Safe
              Approach......................................................... 48
        iv.   Causation ........................................................ 50
    B.   Negligent Misrepresentation ...................................... 52

VI.   Effect of the Government's Settlement With CARCO......... 54
VII.  Conclusion........................................................................ 56
      Appendix A........................................................................ 58

As the oil tanker *M/T Athos I* neared Paulsboro, New Jersey, after a journey from Venezuela, an abandoned ship anchor lay hidden on the bottom of the Delaware River squarely within the *Athos I*'s path and only 900 feet away from its berth. Although dozens of ships had docked since the anchor was deposited in the River, none had reported encountering it. The *Athos I* struck the anchor, which punctured the ship's hull and caused approximately 263,000 gallons of crude oil to spill into the River. The cleanup following the casualty was successful, but expensive.

This appeal is the result of three interested parties attempting to apportion the monetary liability. The first party (actually two entities consolidated as one for our purposes) includes the *Athos I*'s owner, Frescati Shipping Company, Ltd., and its manager, Tsakos Shipping & Trading, S.A. (jointly and severally, "Frescati"). Although Frescati states that the spill caused it to pay out $180 million in cleanup costs and ship damages, it was reimbursed for nearly $88 million of that amount by the United States (the "Government")—the second interested party—pursuant to the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*. In order to recoup the unreimbursed losses, Frescati made claims in contract and tort against the third interested party—a set of affiliates known as CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation (jointly and severally, "CARCO")—which requested the oil shipped on the *Athos I* and owned the marine terminal where it was to dock to unload its oil. Specifically, Frescati brought a contract claim for CARCO's alleged breach of the safe port/safe berth warranty (jointly and severally, "safe berth warranty") it made to an intermediary—Star Tankers, Inc.—responsible for chartering the *Athos I* to CARCO's port, and alleged negligence and negligent

misrepresentation against CARCO as the owner of the wharf the *Athos I* was nearing when it was holed.  The Government, as a statutory subrogee that stepped into Frescati's position for the $88 million it reimbursed to Frescati under the Oil Pollution Act, has limited its claim for reimbursement from CARCO to Frescati's contractual claim pursuant to a limited settlement agreement.

Following a 41-day bench trial, the District Court for the Eastern District of Pennsylvania held that CARCO was not liable for the accident under any of these theories.  The Court, however, made no separate findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a)(1).  That calls for a remand to set out these mandated matters.  However, for the sake of efficiency, we discuss—and, to the extent necessary, make holdings on—the legal issues appealed.

In regard to the contractual safe berth warranty, the Court determined that Frescati (and the Government as a subrogee) could not recover on their contractual claims.  First, Frescati was not a party to the agreement that contained the warranty between CARCO and Star Tankers, and was not an intended beneficiary of that agreement.  Furthermore, even if Frescati could claim the protection of the warranty, it was only a promise by CARCO to exercise due diligence and not an unconditional guarantee; moreover, sufficient diligence existed here.  In any event, the warranty was excused because CARCO specified the port ahead of the *Athos I*'s arrival, placing the burden on the *Athos I*'s captain to accept it as safe or reject it under what is called the "named port exception."

For reasons elaborated below, we disagree with all three of these rulings.  Instead, we hold that the *Athos I*—and by extension, its owner, Frescati—was an implied beneficiary of CARCO's safe berth warranty.  We conclude as well that the safe berth warranty is an express assurance of safety, and that the named port exception to that warranty does not apply to hazards that are unknown to the

parties and not reasonably foreseeable. We cannot be sure, however, that this warranty was actually breached, as the District Court made no finding as to the *Athos I*'s actual draft nor the amount of clearance actually provided.

If on remand the District Court rules in favor of Frescati on its contractual warranty claim, its negligence claim becomes unnecessary. If this issue is reached, we do not agree with the District Court's conclusion that CARCO cannot be liable in negligence because the anchor lay outside the approach to CARCO's terminal—the area in which CARCO had a duty to exercise reasonable care in proving a safe approach. As such, the District Court would need to resolve the appropriate standard of care required, whether CARCO breached that standard, and if so, whether any such breach caused the accident. Conversely, we find no error with the Court's holding that CARCO's alleged misrepresentation as to the depth of its berth was geographically (and hence factually) irrelevant to the ultimate accident. In addition, we conclude that the Government has waived reliance on a partial settlement agreement with CARCO that, the Government contends, precludes CARCO from making certain equitable defenses to the Government's subrogation claims. In this context, we affirm in part, and vacate and remand in part for additional factfinding on the contractual (and possibly negligence) claims.

## I.    Factual and Procedural Background

### A.    The Tanker and Its Charters

At the heart of this dispute is the *Athos I*, a single-hulled oil tanker measuring 748 feet long and more than 105 feet wide. It was owned by Frescati at all relevant times. At the time of the accident, however, the *Athos I* had been chartered into a tanker pool assembled by Star Tankers, who is not a party to this consolidated action. In order to transport a load of heavy crude oil

from Venezuela to its asphalt refinery in Paulsboro, New Jersey, CARCO sub-chartered the *Athos I* from the Star Tankers pool.

In admiralty, these contracts for service are known as "charter parties."[1]  In specific regard to Star Tankers, the *Athos I* was enlisted into the tanker pool in October of 2001 pursuant to a "*time* charter party."  "Under a time charter, the owner [Frescati] remains responsible for the navigation and operation of the vessel and the charterer [Star Tankers] assumes responsibility for arranging for the employment of the vessel, providing fuel and paying for certain cargo-related expenses."  Terence Coghlin *et al.*, *Time Charters* ¶ 1.59 (6th ed. 2008).  The time charter party gave Star Tankers, an intermediary or "middleman," the right to sub-charter the *Athos I* although Frescati remained responsible for keeping the vessel staffed and serviceable.

In contrast, CARCO's employment of the *Athos I* for the specific voyage was pursuant to a "*voyage* charter party" with Star Tankers.  Unlike a time charter party in which a "vessel's employment is put under the orders of . . . charterers" for a period of time, under a voyage charter party the ship is hired "to perform one or more designated voyages in return for the payment of freight."[2]  Julian Cooke *et al.*, *Voyage Charters* ¶ 1.1 (3d ed. 2007).

---

[1] The term "charter party" may be confusing in that it does not refer to an entity, but a document.  This is due to its historical genesis, deriving from the phrase "*charta partita*, *i.e.*, a deed of writing divided."  *Black's Law Dictionary* 268 (9th ed. 2009) (quoting Frank L. Maraist, *Admiralty in a Nutshell* 44–45 (3d ed. 1996)).  The *charta partita* was literally a divided document, the owner and the charterer each retaining one half of the agreement.  *Id.*

[2] It has been observed that

> [t]he fundamental difference between voyage and
> time charters is how the freight or "charter hire" is

CARCO's particular voyage charter party, based on a standard industry ASBATANKVOY form, contained what are customarily known as "safe port" and "safe berth" warranties (already defined, for convenience, as a "safe berth warranty"). It provided that

> [t]he vessel . . . shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named . . . , or so near thereunto as she may safely get (always afloat), . . . and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo.

J.A. at 1222 (Tanker Voyage Charter Party, Part II, ¶ 1). It further directed that "[t]he vessel shall load and discharge at any safe place or wharf, . . . which shall be designated and procured by the Charterer [CARCO], provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat . . . ." *Id.* at 1222 (Tanker Voyage Charter Party, Part II, ¶ 9). We note that, in the time charter party between Frescati and Star Tankers, the latter contracted to provide a similar safe berth warranty, but this warranty was qualified whereby Star Tankers obligated itself to exercise "due diligence to ensure that the vessel is only employed between and at safe places . . . ." *Id.* at 1157 (Time Charter Party

---

calculated. A voyage charterparty specifies the amount due for carrying a specified cargo on a specified voyage (or series of voyages), regardless of how long a particular voyage takes. A time charterparty specifies the amount due for each day that the vessel is "on hire," regardless of how many voyages are completed.

David W. Robertson *et al.*, *Admiralty and Maritime Law in the United States* 335 (2d ed. 2008).

¶ 4). Following the accident, Frescati began arbitration with Star Tankers regarding its claims for damage of the *Athos I*, but that proceeding has been stayed pending the outcome of this case. Oral Arg. Tr. 4:8–15, Sept. 20, 2012.

In preparation for the arrival in Paulsboro of the *Athos I*, its master[3] was provided with a copy of CARCO's Port Manual. This Manual indicated that the allowable maximum draft at the Paulsboro facility was 38 feet, but that this "may change from time to time and should be verified prior to the vessel's arrival." J.A. at 1095 (CITGO Terminal Regulations for Vessels ¶ 2). On November 22, 2004, four days before the *Athos I* arrived, CARCO reduced this maximum draft to 36 feet. The *Athos I* was not informed of this modification.

### B.    The Accident

On November 26, 2004, the *Athos I* was nearing its ultimate destination, CARCO's asphalt refinery in Paulsboro, New Jersey. When the *Athos I* reached the mouth of the Delaware River, only 80 miles remained of its 1,900-mile journey. Although Captain Iosif Markoutsis was the ship's master, the seven-hour upriver transit was aided by Delaware River Pilot Captain Howard Teal. At approximately 8:30 p.m., while the *Athos I* was still navigating up the River channel, Docking Pilot Captain Joseph Bethel boarded the vessel (Captain Bethel was employed by non-party Moran Towing of Pennsylvania). The Docking Pilot relieved the River Pilot at about 8:40 p.m.

CARCO's Paulsboro facility sits on a jetty on the New Jersey side of the Delaware River. Federal Anchorage Number Nine ("the Anchorage" or "Anchorage Number Nine") separates the River channel from CARCO's port waters. As pictured in

---

[3] A ship's master is its commander and captain. *Black's Law Dictionary*, *supra*, at 1065.

Appendix A to this opinion, the Anchorage's border runs diagonally to CARCO's waterfront, ranging between 130 and 670 feet from the face of its ship dock. Across the Anchorage, the River Channel begins less than 2,000 feet from CARCO's berth, a little more than two-and-a-half lengths of the *Athos I*. Customarily, a tanker of the *Athos I*'s size would come up the River, make a starboard (right) 180° turn into the Anchorage, and would then be pushed sideways by tugs (*i.e.*, parallel parked) into CARCO's pier. The *Athos I* was following this procedure when, at 9:02 p.m., it suddenly listed to the port (left) side, and oil became visible in the water. It was later determined that an abandoned anchor had punched two holes in the *Athos I*'s hull, causing (as already noted) roughly 263,000 gallons of crude oil to spill into the River. At the time of the allision,[4] the *Athos I* was only 900 feet from CARCO's berth, approximately halfway through the Anchorage. The tide was relatively low at the time of the accident after having reached its lowest point only 50 minutes prior. J.A. at 2102.

The anchor was eventually exhumed. Inspection revealed that it weighed roughly nine tons and measured 6′8″ long, 7′3″ wide, and 4′6″ high. J.A. at 2192 (United States Coast Guard Marine Casualty Investigation Report). The Coast Guard further reported that the anchor was ultimately found lying prone with its blade reaching 54 inches above the floor of the River. *Id.* at 2196. Although the District Court made no finding of fact as to the exact position of the anchor at the time of the allision, it found persuasive the testimony of oceanographer and ocean engineer Dr. Peter Traykovski, who opined that the anchor was lying horizontal at the time of the accident with a height of only 41 inches above the bottom of the River. Traykovski Test., 24:25–25:13, Nov. 4, 2010. The Court also did not make any finding as to the depth of the

---

[4] An allision is "[t]he contact of a vessel with a stationary object such as an anchored vessel or a pier." *Black's Law Dictionary*, *supra*, at 88.

13

Anchorage where the anchor lay, though the record before us seems to indicate that the depth was between 40.3 and 41.45 feet deep at low tide. *Id.* at 49:12–25; J.A. at 2196.

The District Court also did not make any finding as to the draft of the *Athos I*—that is, the distance between the lowest point of the ship and the waterline—but assumed, for purposes of analysis, that it was drafting at 36′7″ as represented by Frescati at the time of the accident. The Court also failed to resolve the anchor's depth or position, although it noted that there was "persuasive evidence" that the anchor was lying down at the time of the accident. *In re Frescati Shipping Co., Ltd.*, Nos. 05-CV-00305-JF, 08-cv-02898-JF, 2011 WL 1436878, at *7 (E.D. Pa. Apr. 12, 2011). The parties, however, stipulated that the anchor had been in the same approximate location for at least three years because it was detectable from a sonar scan performed by the University of Delaware in 2001 as part of an independent geophysical study.[5] The owner of the anchor has never been determined, but the Court speculated that the anchor likely was used for dredging operations at the time it was lost.

## C.    The Cost of the Accident

Frescati claims that the accident cost it, as the "responsible party" under the Oil Pollution Act, approximately $180 million in clean-up costs and damages to the ship. (The Act was passed in the wake of the Exxon Valdez accident in 1989, and was designed to facilitate oil spill cleanups by requiring "responsible parties" to pay initially for removal costs and damages. *See* 33 U.S.C. § 2702(a).) Because the Act sets liability limits for cooperative responsible

---

[5] The stipulation suggests that the anchor was not mentioned in the report ultimately issued by the University of Delaware professors. *See* J.A. at 1310–12. Instead, it seems that it was not until after this litigation began that the parties obtained the 2001 side scan sonar data and agreed that it revealed the anchor's presence.

parties, *see id.* at § 2704(a), an incentive exists for responsible parties to respond quickly and competently in order to limit the extent of their financial exposure. *See Unocal Corp. v. United States*, 222 F.3d 528, 535 (9th Cir. 2000) ("'The purpose of [the Oil Pollution Act] . . . was to encourage rapid private party responses.'" (quoting *In re Metlife Capital Corp.*, 132 F.3d 818, 822 (1st Cir. 1997))). Responsible parties in compliance with the Act may file a claim with the Oil Spill Liability Trust Fund, controlled by the United States Government, for reimbursement of costs beyond the liability limit. 33 U.S.C. § 2708(a)(2). Specifically, Frescati was able to limit its liability for cleanup to $45,474,000, thus allowing it to recover cleanup costs exceeding that amount from the Fund.[6] It was ultimately reimbursed for approximately $88,000,000 of its cleanup costs, and the Fund became subrogated as to that amount under 33 U.S.C. §§ 2712(f) and 2715(a).

### D.    Control of the Waters

The casualty here occurred squarely within Anchorage Number Nine. As the term implies, an anchorage ground is "a place where vessels anchor or a place suitable for anchoring." *Webster's Third New Int'l Dictionary* 79 (1971). Section 7 of the Rivers and Harbors Act of 1915 authorizes the establishment of "anchorage grounds for vessels in all harbors, rivers, bays, and other navigable waters of the United States whenever it is manifest . . . that the maritime or commercial interests of the United States require such anchorage grounds for safe

---

[6] In February 2007, Frescati applied to have its liability exonerated pursuant to 33 U.S.C. § 2703(a)(3). That subsection directs that a responsible party is not liable for the acts or omissions of a third party. In this case, that third party would have been the unknown anchor-dropper. It is unclear why Frescati withdrew this claim in 2008.

navigation . . . ." 33 U.S.C. § 471. By 1930, a "lack of adequate anchorage room" was creating a hazard on the Delaware River between navigating vessels and those "awaiting accommodation at the wharves, or awaiting cargo or orders." H. Doc. No. 71-304, 24 (1930). Anchorage Number Nine, also known as the Mantua Creek Anchorage, was established in 1930. Pub. L. No. 71-520, 46 Stat. 918, 921 (1930). Today it runs for approximately 2.2 miles along the Delaware River channel (*see* Appendix A) and provides a place for ships to anchor so long as they do not "interfere unreasonably with the passage of other vessels to and from Mantua Creek." 33 C.F.R. § 110.157(a)(10).

Anchorage Number Nine, though only a few hundred feet from CARCO's pier, is neither controlled nor maintained by CARCO. Instead, the federal Government's Army Corps of Engineers (the "Corps") conducts hydrographic surveys and dredges as necessary in an attempt to maintain the Anchorage's depth at 40 feet. The Corps also regulates any construction or excavation within the navigable waters, including the issuance of dredging permits, 33 U.S.C. § 403, and its regulatory jurisdiction "extend[s] laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark," 33 C.F.R. § 329.11. The National Oceanic and Atmospheric Administration conducts surveys on occasion for various federal projects. No Government entity, however, is responsible for preemptively searching all federal waters for obstructions, and the District Court found that the Government does not actually survey the Anchorage for hazards. If, however, the Government is alerted to the presence of a threat, the Corps will remove the obstruction if it is a hazard to navigation and, if not removable, the Coast Guard will chart it. Ultimately, the "[p]rimary responsibility for removal of wrecks or other obstructions lies with the [obstruction's] owner, lessee, or operator." 33 C.F.R. § 245.10(b).

CARCO maintains a self-described "area of responsibility" directly abutting its Paulsboro terminal, "a roughly triangular-shaped area . . . comprising the waters of the berth footprint and the immediate access area next to it where vessels enter and exit the footprint." CARCO's Br. at 19. This area, also set out in Appendix A to this opinion, runs essentially the length of CARCO's facility and extends offshore to the border of the Anchorage. It is based on a permit to dredge for maintenance purposes that was issued by the Corps to CARCO's predecessor in 1991. The scope of such a permit is derived from the initial request; put another way, it is self-defined subject to approval by the Corps. This area of responsibility is not large enough to rotate the 748 foot-long *Athos I*.

In maintaining its area of responsibility, CARCO retained a consulting engineering firm, S.T. Hudson Engineers, Inc., to perform hydrographic surveys. While CARCO had inspected that area for depth, it never specifically searched for debris or other hazards. Hudson interpolated the area's depth from a grid of pinpointed, single-beam sonar depth soundings at 50-foot intervals. This particular procedure is poor at detecting sunken objects because it is unlikely that any given hazard would fall within the exact spot measured, and if it did, it would not necessarily indicate that there was an object but only the depth of that object as indistinguishable from the bottom of the waterway. Long Test., 78:8–79:5, Nov. 17, 2010; Fish Test., 59:11–18, Sept. 29, 2010.

CARCO's Port Captain William Rankine estimated that approximately 250 ships with a draft of 36′6″ or greater either entered or departed CARCO's port between 1997 and 2005. Rankine Test., 22:25–23:15, Nov. 22, 2010. In specific regard to arriving vessels, from the time the anchor was spotted by the University of Delaware in August 2001 until the *Athos I* casualty, the record reflects that 61 ships with a draft of 36′6″ or greater arrived at CARCO's facility. J.A. at 1788–94. The record does not reflect at what time these ships docked, and high tide adds

approximately six feet of depth to the River. Moreover, Frescati points out that—unlike the *Athos I*—21 of these ships would have been required to dock within three hours prior to high-water due to their excessive drafts.[7] *Id.* at 1622–24.

### E.    The District Court Proceedings

In January 2005, Frescati filed in the District Court a Complaint for Exoneration From or Limitation of Liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.* (formerly 46 App. U.S.C. § 181 *et seq.*). In that Complaint, Frescati sought a declaration that it was not liable for any losses stemming from the accident or, in the alternative, a limitation of liability to the value of the *Athos I* and its pending freight. CARCO was among the parties who asserted claims in that action, seeking recovery against Frescati for its lost oil in an amount in excess of $259,217. Frescati then filed a counterclaim against CARCO for all costs incurred beyond those reimbursed by the Fund.

In June 2008, the Government filed a separate suit against CARCO seeking compensation on its subrogated right, pursuant to 33 U.S.C. §§ 2712(f) and 2715(a), to the approximately $88 million disbursed by the Fund. In a pretrial settlement agreement, the Government waived its negligence claims against CARCO in return for the latter's agreement not to pursue negligence claims against the United States. The Government, believing that CARCO

---

[7] The Docking Pilot Association ("DPA") Guidelines provide directives for the appropriate docking times for vessels of different sizes. The DPA Guidelines were developed after discussion with CARCO's previous Port Captain and were based in part on CARCO's desire to maximize the number of vessels that could dock at its berth. J.A. at 1104; Quillen Dep. 11:12–20, Sept. 2, 2010.

was advancing against it negligence theories in violation of the settlement agreement, moved for partial summary judgment against CARCO's counterclaim for equitable recoupment. That motion was denied.

As noted, these two actions were consolidated, and they were tried over 41 days before Judge Fullam. After trial, the Court issued an 18-page opinion holding that CARCO could not be held responsible under contract or tort for any of the losses stemming from the accident. *See In re Frescati,* 2011 WL 1436878.

On the contractual safe berth warranty, the Court determined that Frescati had no standing for relief, as it was not a third-party beneficiary to the voyage charter party between CARCO and Star Tankers, and that, in any event, CARCO did not breach those warranties because they are not unconditional guarantees but instead "'impose[] upon the charterer a duty of due diligence to select a safe berth,'" a duty satisfied here. *Id.* at *6 (quoting *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157 (5th Cir. 1990)). The Court further ruled that, even if a stricter warranty applied, the naming of the port in advance precluded recovery under the named port exception, which, as a general matter, protects a charterer when the port is named ahead of arrival and the master proceeds there without protest.

The Court also held that CARCO was not negligent in failing to search for or detect the abandoned anchor that lay within the Anchorage. As the Court deemed it outside the approach to CARCO's berth, detection and notification to others of its presence thus fell beyond CARCO's obligation to provide a safe entry to that berth. The Court also held that there was no negligent misrepresentation in CARCO's failure to alert the *Athos I* that—only four days prior to its arrival—the allowable maximum draft at CARCO's facility had been reduced from 38 feet to 36 feet. It reasoned that this was an internal determination pertaining to the

area at the berth and outside the Anchorage, and therefore was "factually irrelevant to the casualty." *Id.* at *5.

In sum, the District Court concluded that the anchor-dropper rather than any of the named parties was at fault, and rejected all of Frescati's and the Government's arguments as to CARCO's liability.

## II.    Jurisdiction and Standard of Review

The District Court had admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1).  We have jurisdiction over this appeal under 28 U.S.C. § 1291.

Findings of fact made during a bench trial are reviewed for clear error, and will stand unless "'completely devoid of minimum evidentiary support displaying some hue of credibility, or . . . bear no rational relationship to the supportive evidentiary data.'"  *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir. 1996) (alteration in original) (quoting *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 92 (3d Cir. 1992)).  Following a bench trial, we review *de novo* a district court's conclusions of law.  *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009) (citation omitted).  "[C]onstruction of an unambiguous contract is a matter of law and subject to plenary review."  *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006) (citing *U & W Indus. Supply, Inc. v. Martin Marietta Alumina, Inc.*, 34 F.3d 180, 185 (3d Cir. 1994)).  Similarly, we exercise "plenary review over the legal question of 'the nature and extent of the duty of due care . . . .'"  *Andrews v. United States*, 801 F.2d 644, 646 (3d Cir. 1986) (quoting *Redhead v. United States*, 686 F.2d 178, 182 (3d Cir. 1982)).

### III.    Rule 52

Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). This is a mandatory requirement. *H. Prang Trucking Co., Inc. v. Local Union No. 469*, 613 F.2d 1235, 1238 (3d Cir. 1980) (citing 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2574, at 690 (1st ed. 1971)); *Scalea v. Scalea's Airport Serv., Inc.*, 833 F.2d 500, 502 (3d Cir. 1987) (*per curiam*). Typically, a Rule 52 violation occurs when a district court's inadequate findings render impossible "'a clear understanding of the basis of the decision,'" *H. Prang Trucking*, 613 F.2d at 1238 (quoting Wright & Miller, *supra*, § 2577, at 697), and those "'findings are obviously necessary to the intelligent and orderly presentation and proper disposition of an appeal,'" *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (quoting *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 317 (1940)). *See also Berguido v. E. Air Lines, Inc.*, 369 F.2d 874, 877 (3d Cir. 1966) ("If a full understanding of the factual issues cannot be gleaned from the District Court's opinion, we would be obliged to remand for compliance with Rule 52(a)."). Although Rule 52 does not require hyper-literal adherence, *see Hazeltine Corp. v. Gen. Motors Corp.*, 131 F.2d 34, 37 (3d Cir. 1942), "an appellate court may vacate the judgment and remand the case for findings if the trial court has failed to make findings when they are required," *Giles v. Kearney*, 571 F.3d 318, 328 (3d Cir. 2009) (citing *H. Prang Trucking*, 613 F.2d at 1238–39).

Instead of presenting his findings in accord with Rule 52, the trial judge here elected to "set forth in narrative fashion [his] findings of fact . . . and conclusions of law." *In re Frescati*, 2011 WL 1436878, at *1. Unfortunately, what followed leaves us unable to discern what were his intended factual findings. Moreover, in arriving at his particular legal conclusions, the trial

judge held back making many of the factual findings that would
support those conclusions, in effect going from first base to third
across the pitcher's mound. While we do not endorse or require a
panoply of extraneous factual findings, the overall dearth of clear
factual findings, much less those pertaining to the heart of this
matter—such as the draft of the *Athos I*—falls below what is
required by Rule 52.

Because we cannot derive a full understanding of the core
facts from the District Court's opinion, this was a violation of Rule
52 and itself a basis for remand. *Giles*, 571 F.3d at 328. In light of
the legal determinations set out below, factual clarification is
required in any event.

## IV.    The Contractual Safe Berth Warranty

CARCO's promise to Star Tankers that the *Athos I* would be
directed to a location that "she may safely get (always afloat)" is a
provision known in context as either a safe port or safe berth
warranty (to repeat again, we use for shorthand "safe berth
warranty"). *See* Cooke *et al.*, *supra*, ¶ 5.121 (citation omitted).
This language triggers two separate protections: a contractual
excuse for a master who elects not to venture into an unsafe port,
and protection against damages to a ship incurred in an unsafe port
to which the warranty applies. *See* 2 Thomas J. Schoenbaum,
*Admiralty and Maritime Law* § 11-10, at 32–33 (5th ed. 2011). In
this case, only the second benefit of the safe berth warranty is at
issue, as the *Athos I* was damaged in an allegedly unsafe port.
Specifically at issue are the scope and applicability of this
warranty, topics we explore below.

## A.    Was Frescati a Third-Party Beneficiary of the Safe Berth Warranty?

"'Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must at least show that it was intended for his direct benefit.'"  *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307 (1927) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)).  As Frescati is not a party to CARCO's promise to Star Tankers to provide a safe berth, there must be some showing that it was nonetheless an intended beneficiary.  The District Court held that this was not the case because the testimony at trial failed to reveal any intent by CARCO to benefit Frescati.  The Court, however, failed to inquire whether the contract itself established a third-party beneficiary relationship, a question of law.  *See Pierce Assocs. v. Nemours Found.*, 865 F.2d 530, 535 (3d Cir. 1988).  We conclude that, although Frescati is not a named beneficiary to the safe berth warranty within the charter party between Star Tankers and CARCO, the *Athos I* benefits from this warranty, and Frescati, as the vessel's owner, is thus a third-party beneficiary.

Maritime contracts "must be construed like any other contracts:  by their terms and consistent with the intent of the parties."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004).  "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."  *Id.* at 22–23 (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).  We typically look to the Restatement of Contracts for the federal law on third-party beneficiaries.  *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 106 (3d Cir. 2008); *see* Restatement (Second) of Contracts § 302 (1981).  A third-party may be a beneficiary to a contract of others where it is "appropriate to effect[] the intention of the parties," and "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  Restatement, *supra*, §

23

302(1)(b); *see also Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993) (holding that a third-party beneficiary to a charter party "must show that 'the parties to that contract intended to confer a benefit on [it] when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to [it]'" (alterations in original) (quoting *McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 773 (2d Cir. 1992))).

In 1959, the Supreme Court held that vessels are automatic third-party beneficiaries of warranties of workmanlike service made to their charterers by stevedores who unload vessels at docks. *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 428 (1959). This is because "[t]he warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not." *Id.* This natural relationship between the entities was "enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries." *Id.* (citation omitted). A year later, the Supreme Court extended this rule a logical step further in holding that "[t]he owner, no less than the ship, is the beneficiary of the stevedore's warranty of workmanlike service." *Waterman S. S. Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 425 (1960).

Although these two Supreme Court cases aid Frescati's position, they do so only by analogy. As CARCO points out, the matter before us does not involve an implied warranty for workmanlike service, but an explicit assurance of safety in a document to which Frescati is not a party. The Court of Appeals for the Second Circuit, however, has applied *Crumady* and *Waterman* to a set of facts similar to the one before us. In *Paragon Oil Co. v. Republic Tankers, S.A.*, 310 F.2d 169, 171 (2d Cir. 1962) (Friendly, J.), a vessel owner (Paragon Oil Co., Inc.) and voyage charterer (Republic Tankers, S.A.) entered into a voyage charter with a safe berth warranty. Republic had executed a contract of

24

affreightment (essentially a sub-voyage charter) with a third-party that contained a safe berth warranty identical to the one it promised in the voyage charter. *Id.* From this, the Second Circuit concluded that Paragon (the owner) was "the true party in interest" to the safe berth assurance in the contract of affreightment even though it was not explicitly named in the contract between Republic (the voyage charterer) and the third-party. *Id.* at 175.

We agree that the Second Circuit's reasoning in *Crumady* and *Waterman* counsel in favor of Frescati's third-party beneficiary status. Specifically, we are convinced that a safe berth warranty necessarily benefits the vessel, and thus benefits its owner as a corollary beneficiary.[8]   "[T]he circumstances indicate" that the warranty is intended to endow the vessel with "the benefit of the promised performance." Restatement, *supra*, § 302(1)(b). Because the warranty explicitly covers the safety of the vessel, it would be nonsensical to deprive the vessel's owner the benefits of this

---

[8] Insofar as CARCO cites to *Bunge Corp. v. MV Furness Bridge*, 390 F. Supp. 603, 604 (E.D. La. 1974), it is unpersuasive, as its conclusion that the owner was not a third-party beneficiary of the sub-charterer's safe berth warranty is unsupported by any reasoning. Further, this issue was abandoned when the Court later resolved the merits of the claim and held that the sub-charterer had "violated a legal duty [in tort] whether or not it also had a contractual one." *Bunge Corp. v. MV Furness Bridge*, 396 F. Supp. 852, 858 (E.D. La. 1975), *rev'd*, 558 F.2d 790 (5th Cir. 1977). On appeal, the Court of Appeals for the Fifth Circuit agreed that the issue of contractual liability was "irrelevant" because none of the parties could have intended to warrant complete safety of an inadequately small wharf. 558 F.2d at 801–02.

promise, as the owner is ultimately the one most interested in the vessel's status and is obligated to maintain its condition.[9]

Moreover, it would work an odd windfall if Star Tankers were allowed to collect on CARCO's safe berth warranty but not be required to pass on those remedial dollars to the ship's ultimate owner.  That illogical result could occur where the owner (Frescati) received no safe berth warranty from the time charterer (Star Tankers), or where—as in the case before us—Frescati received a less comprehensive warranty from Star Tankers than Star Tankers received from the voyage charterer (CARCO).[10]  This would theoretically allow Star Tankers to collect for damages to the ship that were actually paid by Frescati.  While we are mindful of the parties' ability to contract differently, there is no indication that Star Tankers bargained for the potential of such an unearned windfall—profiting from the mishaps of the vessels within its tanker pool when it did not pay for the repair of those mishaps.  Instead, requiring warranties from voyage charterers like CARCO is a way to insure against claims asserted by vessel owners.  Per this path, the promise made to protect a vessel flows through the intermediary party(ies) to the ultimate party who bore the pain of an unsafe port, here the vessel's owner.

We discount CARCO's suggestion that it was unaware of Frescati's status as the true owner of the *Athos I*.  CARCO had

---

[9]  Under the time charter, Frescati remained responsible for insuring, maintaining, and restoring the *Athos I* throughout the term of the charter.  J.A. at 1447–48 (Time Charter Party ¶¶ 3, 6).

[10] Although we ultimately conclude that the full safe berth warranty from CARCO to Star Tankers is an express assurance made without regard to the amount of diligence taken by the charterer, *see infra* Part IV.B, Star Tankers only promised due diligence to Frescati, J.A. at 1448 (Time Charter Party ¶ 4).

completed an internal vetting of the *Athos I* in October of 2004 that
identified Frescati as its owner.   J.A. at 1318 (Citgo Vetting
Report).   Regardless, even if the ultimate owner had been
undisclosed, CARCO expressly warranted to provide a safe berth,
which is a promise made "plainly for the benefit of the vessel."
*Crumady*, 358 U.S. at 428.   Thus we see no reason why the *Athos
I*'s owner would be any less entitled to rely on this warranty,
whether it was identified or not.   Frescati, as the owner of the *Athos
I*, may therefore rely on CARCO's safe berth warranty as a third-
party beneficiary.

### B.    The Scope of the Safe Berth Warranty

That Frescati may benefit from CARCO's safe port/safe
berth warranty requires that we delineate its comprehensiveness, a
question of first impression in our Circuit.   Though the District
Court did not need to reach this legal issue after determining that
Frescati was not a third-party beneficiary, it nonetheless
concluded—as an alternate holding—that the safe berth warranty
was not breached because "CARCO fulfilled its duty of due
diligence . . . ."  *In re Frescati*, 2011 WL 1436878, at *6.  We part
from this holding, as we believe the Court incorrectly relied on
*Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157 (5th
Cir. 1990), which held that the safe berth provision was not a full
warranty but required only due diligence.

A port is deemed safe where "the particular chartered vessel
can proceed to it, use it, and depart from it without, in the absence
of abnormal weather or other occurrences, being exposed to
dangers which cannot be avoided by good navigation and
seamanship."   Cooke *et al.*, *supra*, ¶ 5.137; *Leeds Shipping v.
Societe Francaise Bunge (The Eastern City)*, [1958] 2 Lloyd's Rep.
127, 131 (same).  Whether a port is safe refers to the particular ship
at issue, Cooke *et al.*, *supra*, ¶ 5.68, and goes beyond "the
immediate area of the port itself" to the "adjacent areas the vessel
must traverse to either enter or leave," Coghlin *et al.*, *supra*,

¶ 10.124.  In other words, a port is unsafe—and in violation of the safe berth warranty—where the named ship cannot reach it without harm (absent abnormal conditions or those not avoidable by adequate navigation and seamanship).[11]

This formulation is deeply rooted.  In 1888, the Supreme Court held charterers liable for breach of a safe berth warranty in insisting that a ship sail to Aalborg, Denmark, a port that was impossible for the particular ship to reach due to a sand bar and the absence of any reasonably safe place to anchor or discharge.  *The Gazelle*, 128 U.S. 474, 485–86 (1888).  In a similar fashion, the Supreme Court held in 1902 that charterers failed to provide a safe dock where the ship in question could not reach it without damage.  *Mencke v. Cargo of Java Sugar*, 187 U.S. 248, 253 (1902).  Specifically, the charterers were aware that the ship's mast was too tall to clear the Brooklyn Bridge when they designated a discharge dock upriver from the Bridge.  *Id.* at 250.  The Court concluded that this was a warranty violation by analogizing the overhead obstacle to a submerged one:  "A ship could not be said to be afloat, whether the obstacle encountered was a shoal or bar in the port over which she could not proceed, or a bridge under or through which she could not pass, nor could she be said to have safely reached a dock if required to mutilate her hull or her permanent masts."  *Id.* at 253; *see also Carbon Slate Co. v. Ennis*, 114 F. 260, 261 (3d Cir. 1902) (concluding that safe berth warranty was violated where the ship "was directed to load at a berth where a full cargo, if taken aboard, would have made it impossible for her, at any stage of water or at any time, to pass out over the harbor bar").

---

[11] On the facts before us, we need not define the outer geographical bounds of the safe berth/safe port warranty.  At oral argument CARCO conceded that the warranty—if applicable—"would include the area in and around Paulsboro," including the Anchorage.  Oral Arg. Tr. 62:18–64:3, Sept. 20, 2012.

The Court of Appeals for the Second Circuit has long held that promising a safe berth effects an "express assurance" that the berth will be as represented.  *Cities Serv. Transp. Co. v. Gulf Ref. Co.*, 79 F.2d 521, 521 (2d Cir. 1935) (*per curiam*), recognized this principle in holding that a master was not liable for damages incurred in reliance on a charter party's safe berth warranty at a particular dock.   In *Park S.S. Co. v. Cities Serv. Oil Co.*, 188 F.2d 804, 806 (2d Cir. 1951) (Swan, J.), the same Court elaborated that the purpose of the warranty was to memorialize the relationship between the contracting entities:   "the charterer bargains for the privilege of selecting the precise place for discharge and the ship surrenders that privilege in return for the charterer's acceptance of the risk of its choice."   *Paragon* continued this tradition in contrasting the duty of a wharfinger (an admiralty term for an "owner or occupier of a wharf," *Black's Law Dictionary* 1733 (9th ed. 2009))—to exercise reasonable diligence in keeping its berth safe for incoming vessels—with that of a charterer who is contractually bound to provide "not only a place which he believes to be safe, but a place where the chartered vessel can discharge 'always afloat.'"   310 F.2d at 173 (citation and internal quotation marks omitted).  *See also Venore Transp. Co. v. Oswego Shipping Corp.* 498 F.2d 469, 472 (2d Cir. 1974) (citing *Park S.S. Co.*, 188 F.2d at 804) (sub-charterer had a non-delegable "obligation to provide a completely safe berth," which was breached when it permitted the ship to dock at a berth that it knew was unsafe).

Thus, prior to the Fifth Circuit's decision in *Orduna*, "the law concerning safe ports had a rather secure berth in maritime law and it was well settled that a safe port clause in a charter constituted a warranty given by a charterer to an owner."  Cooke *et al.*, *supra*, ¶ 5.124.  *Orduna* created quite a splash in veering from the view that a charterer warrants a ship's safety, and established instead for the Fifth Circuit that a safe berth warranty merely "imposes upon the charterer a duty of due diligence to select a safe berth."   913 F.2d at 1157.   While *Orduna* acknowledged the Second   Circuit's   contrary   perspective,   it   dismissed   that

interpretation in deference to critical commentators, namely Professors Grant Gilmore and Charles L. Black. *Id.* at 1156 (citing Grant Gilmore & Charles L. Black, *The Law of Admiralty* § 4-4, at 204–06 (2d ed. 1975)). We do not find their criticism so compelling.[12]

*Orduna* concluded that "no legitimate legal or social policy is furthered by making the charterer warrant the safety of the berth it selects." *Id.* at 1157. Primarily, the Court reasoned that it is more sensible to impose fault on the "master on the scene" rather than a far away merchant charterer.[13] *Id.* at 1156 (citing Gilmore &

---

[12] Gilmore's book has been described as being

> more adapted for the teacher than for the active lawyer or judge. As teachers, the authors are interested in controversy. Wherever they can find it, in the long past or in the nearer present, they stir it up, and frequently label it 'confusion.' . . . It is all very interesting; but in the various admiralty fields— except personal injury and death—most of the old controversies have long been settled. Therefore, our authors tend to give a picture which does not resemble the daily grist of today. Sometimes indeed, straining to keep old battle-fires ablaze, they sprinkle harsh words on the judges who settled the old disputes. . . . On the whole, this is a teaching book rather than an office and courtroom work of reference; and it must be read as such.

Arnold W. Knauth, Book Review, 58 Colum. L. Rev. 425, 426–28 (1958) (reviewing Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* (1957)).

[13] *Orduna* also noted that a due diligence standard would not upset a master's ability to rely on a safe berth warranty in rejecting an

Black, *supra*, § 4-4, at 204–06). The appeal of this construction here is illusory. While an owner is liable for its master's superseding negligence, *see* Cooke *et al.*, *supra*, ¶ 5.151, we see no policy reason why a master on board a ship would normally be in any better position to appraise a port's more subtle dangers than the party who actually selected that port. The "commercial reality [is] that it is the charterer rather than the owner who is selecting the port or berth," *id.* ¶ 5.126, and the charterer is more likely to have at least some familiarity with the port it selected. After all, charterers do not select ports without good reason (and, in the case before us, CARCO was directly on the scene, *as it had selected its own berth*). Messrs. Gilmore and Black (famous in other areas of law—Gilmore on commercial law, including secured transactions, and Black on constitutional law) acknowledged that their rationale is undermined in those instances where a charterer has more knowledge of a danger than the master (although they explain that these situations could be remedied through tort liability[14]). We

---

unsafe port. 913 F.3d at 1156. This goes only so far, as it addresses but half of the safe berth warranty's protection, which is both to provide a master with a contractual excuse for avoiding an unsafe port and to protect for damages actually sustained in unsafe ports. Additionally, to the extent *Orduna* relied on *Atkins v. Fibre Disintegrating Co.*, 2 F. Cas. 78 (E.D.N.Y. 1868), *aff'd sub nom. Atkins v. The Disintegrating Co.*, 85 U.S. 272, 299 (1873), we are similarly unpersuaded. While *Atkins* featured a safe berth warranty, *id.* at 79, it was essentially an application of the named port exception. *See infra* Part IV.D. As the ship's master made outside inquiries and was fully aware of the port's dangers and yet did not object, he waived his right to complain later for damage. *Id.* at 79–80.

[14] Specifically, Gilmore & Black would find an actionable wrong for charterers directing ships to ports with known dangers, and

disagree. To any extent a charterer, however distant, bargains to send a ship to a particular port and warrants that it shall be safe there, we see no basis to upset this contractual arrangement.

We are persuaded that the Second Circuit's longstanding formulation of the safe berth clause is the one we should follow.[15] *See* 2 Schoenbaum, *supra*, § 11-10, at 32–33 (citing *The Gazelle*, 128 U.S. 474 (1888)) ("[I]f the ship reasonably complies with the order and proceeds to port, the charterer is liable for any damage sustained."); Stewart C. Boyd *et al.*, *Scrutton on Charter Parties and Bills of Lading,* Section IX, art. 69, at 127 (20th ed. 1996) (same); 2A Michael F. Sturley, *Benedict on Admiralty* § 175, at 17–25 (7th ed. 2012) (same); Coghlin *et al.*, *supra*, ¶ 10.110 (same). *But see* Gilmore & Black, *supra*, § 4-4, at 204–06.

Beyond the near consensus of these authorities, we are also convinced that an "express assurance" warranty is most consistent with industry custom. *See Park S.S.*, 188 F.2d at 806; *Cities Serv.*, 79 F.2d at 521. Vessel charters are formalized via "highly standardized forms," 2 Schoenbaum, *supra*, § 11-1, at 4–5 (citation omitted). That some forms explicitly adopt a due diligence

---

suggest that a charterer may sometimes be "so situated as reasonably to be charged with a duty of inquiry, particularly as to berth." Gilmore & Black, *supra*, § 4-4, at 205.

[15] Though not dispositive, we also note that adhering to the Second Circuit's view on this issue promotes uniformity of maritime law along the mid-Atlantic seaboard. *See Sea-Land Serv., Inc. v. Dir., Office of Workers' Comp. Programs*, 552 F.2d 985, 995–96 n.18a (3d Cir. 1977) (noting deference pursuant to federal comity and uniformity in maritime law to the Second Circuit, "since [the Third Circuit] shares appellate review with the Second Circuit over the geographical area comprising one of the country's major east coast harbor complexes").

standard[16] suggests that the understood default is to impose liability on the charterer without regard to the care taken.  *See* Coghlin *et al.*, *supra*, ¶¶ 10.52, 10.54.  Reading these warranties as dappled with due diligence would make contractual language explicitly adopting a due diligence metric pointless, and we disfavor contract interpretation "that 'render[s] at least one clause superfluous or meaningless.'"  *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181 (3d Cir. 2011) (alteration in original) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)).  Moreover, the "always afloat" language plainly suggests an express assurance.  To the extent the Fifth Circuit in *Orduna* deviated from this well-established standard, we are not persuaded by its reasoning and decline to follow the course it charted.[17]  Hence we conclude that the safe berth warranty is an express assurance made without regard to the amount of diligence taken by the charterer.

## C.     Was the Safe Berth Warranty Breached?

As explained, a berth is deemed safe when a ship may "proceed to it, use it, and depart from it without . . . being exposed to dangers."  Coghlin *et al.*, *supra*, ¶ 10.123.  As noted above, *see supra* note 11, CARCO conceded at oral argument that the safe berth warranty—if applicable—"would include the area in and around Paulsboro," including the Anchorage, and we therefore need not delineate the geographic sweep of this warranty.  Thus having determined that Frescati was a beneficiary of CARCO's

---

[16] As already mentioned, the time charter party between Star Tankers and Frescati contains such a standard, as it is predicated on a Shelltime 4 form.  *See* Coghlin *et al.*, *supra*, ¶ 10.54.

[17] We are also unpersuaded that this warranty applies only to known hazards.  This would effectively undermine the more strict nature of the warranty by requiring some level of due diligence, which, for the reasons above, we do not believe is the case.

safe berth warranty and that this warranty applies irrespective of a charterer's diligence, we proceed to whether the warranty was actually breached by the anchor's presence. Specifically, we need to determine whether the anchor rendered CARCO's port unsafe for a ship of the *Athos I*'s agreed-upon dimensions and draft.

That the *Athos I* was injured by the anchor does not automatically indicate that the warranty was breached. CARCO's safe berth warranty was not a blank check; it did not warrant that any ship would be safe at its port, but instead assured that the port would be safe for the *Athos I*. Boyd *et al.*, *supra*, Section IX, art. 69, at 129–30 (citations omitted) ("Whether a port is a 'safe port' is in each case a question of fact and degree and must be determined with reference to the particular ship concerned . . . ."); *In re Lloyd's Leasing Ltd.*, 764 F. Supp. 1114, 1135 (S.D. Tex. 1990) ("The safety of a port is to be determined with reference to the vessel and the circumstances surrounding that vessel's use of the port."). In this regard, the District Court correctly framed the ultimate issue as whether it was possible for a ship of the *Athos I*'s purported dimensions to reach CARCO's berth safely. *In re Frescati*, 2011 WL 1436878, at *6.

The Court, however, neglected to make the necessary factual findings to resolve whether the warranty was actually breached. Instead, it concluded "that the port and berth were generally safe" due to "the volume of commercial traffic that passed without incident," notwithstanding that it was impossible to know how many of those ships had actually passed over the anchor. *Id.* That similar ships had successfully berthed at the port is irrelevant to whether the warranty was actually breached in this case, as "[a] dangerous place may often be stopped at or passed over in safety." *The Gazelle*, 128 U.S. at 485. Instead, the Court should have evaluated whether the port was safe based on the facts particular to the *Athos I* and its arrival.

From what we can glean from the record, it appears that CARCO warranted a safe berth with the understanding that the *Athos I* would be drafting as much as 37 feet of water upon its arrival. The Voyage Instructions indicate that the vessel would be filled with a quantity of crude oil "always . . . consistent with a 37 [foot] or less [fresh water] sailing draft at loadport," J.A. at 1242, and Captain Markoutsis confirmed this directive, Markoutsis Test. 199:5–9, Oct. 13, 2010. He testified, moreover, that he was "afraid of that draft," and opted to load the ship to only 36′6″.[18]  *Id.* at 200:7–25. This latter figure was confirmed by CARCO Port Captain William Rankine, who testified that the *Athos I* reported that it was drafting 36′6″, Rankine Test. 41:5–12, Nov. 22, 2010, and also by Steamship Agent Stephen Carroll, Carroll Test. 63:2–4, Oct. 7, 2010. In any event, the warranty made by CARCO appears to have covered the *Athos I* up to a draft of 37 feet.[19] Yet, as noted throughout this opinion, the District Court made no finding on the

---

[18] We note there is minor disagreement as to this particular figure. While the record suggests that the *Athos I* was represented as drafting 36′6″, Frescati explains that it was actually 36′7″. This one-inch difference is on its face irrelevant to our analysis, as both drafts are less than 37 feet.

[19] Of course, this is ultimately a factual matter for remand. As such, we also note that the Voyage Charter between CARCO and Star Tankers indicates that the "[l]oaded draft of Vessel on assigned summer freeboard [is] 12.423 meters [40.76 feet] . . . in salt water." J.A. at 1220 (Tanker Voyage Charter Party, Part I.A). While we understand this to mean that the *Athos I* could draft over 40 feet in salt water if filled to its summer capacity, the facts before us appear to indicate that it was directed to arrive at CARCO's port drafting 37 feet or less, and that this was the understood basis for the safe berth warranty.

vessel's actual draft at the time of the accident. This needs to be corrected on remand.[20]

If it is found that the *Athos I* was drafting 37 feet or less and absent a determination of bad navigation or seamanship,[21] that finding would indicate that the warranty had been breached because the ship sustained damage. What, if anything, under the water may have caused that margin to be diminished is therefore

---

[20] We note that there is record evidence suggesting that the promised 37 feet of clearance was indeed afforded, namely that Dr. Traykovski opined that there was—in his most conservative estimate—between 37.2 and 37.8 feet of water not only above the riverbed but the anchor itself (presumably at low tide). Traykovski Test. 49:12–50:24, Nov. 4, 2010.

[21] Although the warranty exception for abnormal weather conditions is not at issue here, CARCO argues that the exceptions for bad navigation and seamanship apply. CARCO's Br. at 77, 80; *see also* Coghlin *et al.*, *supra*, ¶¶ 10.148, 10.166 (citations omitted); Cooke *et al.*, *supra*, ¶ 5.151 (citation omitted); *Paragon*, 310 F.2d at 173–74 (quoting *Constantine & Pickering S.S. Co. v. W. India S.S. Co.*, 199 F. 964, 967–68 (S.D.N.Y. 1912)) ("It is true that one liable for violating a safe berth clause 'may lessen the amount of damages for which he is responsible by showing negligence, or even lack of diligence, on the part of the person wronged, in failing to take steps to lessen certain or even probable damages.'").

CARCO argues that the vessel's master and the navigation officer believed they were docking at high tide, and in fact were not (as the tide at the time of the accident was rising but an hour removed from low tide). However, we find no indication in the record that the *Athos I* was attempting to dock at an inappropriate time.

immaterial.  It could have been the remnants of a shipwreck, a range of rocks, a jutting reef, or a shoal.  In this case, it happened to be an abandoned anchor that protruded into the *Athos I*'s hull.  And by its safe berth warranty, CARCO assumes liability for that damage.

If the draft at the time of the accident cannot be determined, or if the *Athos I* is found to have been drafting more than 37 feet, it will be necessary to ascertain the amount of clearance that existed above the anchor to conclude whether the promised 37 feet of water depth was actually provided.[22]  Because it appears that Frescati assured a safe berth for a ship drafting 37 feet or less, our concern is whether 37 feet of clearance existed at the time of the accident.

## D.    The Named Port Exception

CARCO exposes one additional limitation to the broad protection generally afforded by the safe berth warranty—the named port exception.  In essence, "[w]hen a charter names a port

---

[22] If the vessel is found to have been drafting more than 37 feet, this could potentially reduce CARCO's liability even if it were determined that a safe berth was not provided.  In this circumstance, the commentators note a trend in which damages resulting from both a breach of a safe berth warranty and the master's negligence may appropriately be split between the parties. Cooke *et al.*, *supra*, ¶ 5.152; 2A Sturley, *supra*, § 175, at 17-26; *see also Ore Carriers of Liber., Inc. v. Navigen Co.*, 435 F.2d 549, 550–51 (2d Cir. 1970) (affirming an order dividing a ship's damages between the owner and charterer where the charterer had warranted a safe port, but the owner nonetheless proceeded "with full knowledge of the probable unavailability of tug assistance," which was hazardous).  In any event, these issues can also be resolved on remand.

and the master proceeds there without protest, the owner accepts the port as a safe port, and is bound to the conditions that exist there." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977) (internal quotation marks omitted) (quoting *Pan Cargo Shipping Corp. v. United States*, 234 F. Supp. 623, 638 (S.D.N.Y. 1964), *aff'd*, 373 F.2d 525 (2d Cir. 1967)). The purpose of the exception is to shift liability to the owner once a ship's master has had ample opportunity to discover a port's hazards.[23] As such, the exception may apply in instances in which a master— without lodging any objection—is charged "with full knowledge of local conditions which make it unsafe for that particular voyage." Coghlin *et al.*, *supra*, ¶ 10.158; *see also* Cooke *et al.*, *supra*, ¶ 5.130 ("[T]he master's conduct in entering a port he considers unsafe without raising a protest may result in a waiver of the safe port warranty.").

This formulation is essentially an application of the above-mentioned rule that negligent seamanship will nullify the safe port warranty:  once a particular risk becomes known, it is then the master's responsibility to avoid it through competent seamanship

---

[23] Although it never uses the term "named port exception," *Atkins v. Fibre Disintegrating Co.*, 2 F. Cas. 78 (E.D.N.Y. 1868), *aff'd sub nom. Atkins v. The Disintegrating Co.*, 85 U.S. 272, 299 (1873), is a paradigm for the exception. There, "the peril of the port was such that no vessel of [the ship's] size could get out without making her safety from the reefs dependent entirely upon the continuance of the breeze." *Id.* at 79. Predictably, the breeze failed, and the ship was damaged on the reef. *Id.* at 78. The trial court concluded, however, that the master could not rely on the agent's representation that the port was safe because he failed to object to the port after having "made inquiries . . . as to the character of the port, which was, moreover, fully described in the Coast Pilot [the official publication describing the coast]." *Id.* at 79–80.

or to declare the port unsafe.  This application of the exception does not apply to the case before us, however, as there is no suggestion that anyone—much less the master of the *Athos I*—had any inkling as to the anchor's existence in the River.

Instead, and more pertinent to the *Athos I*, the exception is also triggered when a particular port is named in the charter party.  *See* Cooke *et al.*, *supra*, ¶ 5.130 ("If the charter names the ports or berths the vessel will call at, the general rule is that the ports or berths will have been accepted by the owner as safe, such that the safe port/safe berth warranty is deemed to have been waived."); Coghlin *et al.*, *supra*, ¶ 10.164 (same) (citations omitted).  This particular application of the exception is very broad and would seem poised to swallow the rule, but frequently the voyage charter will specify a range of ports, and thus the "safe [berth] warranty continues to play a role in voyage charters."  Cooke *et al.*, *supra*, ¶ 5.123.  In fact, this is such a case; the voyage charterer (CARCO) did not specifically name the discharge port in the voyage charter party, but instead directed that the *Athos I* would transit to one or two safe ports located somewhere on the United States Atlantic Coast, Gulf Coast, or the Caribbean Sea.  J.A. at 1225 (Tanker Voyage Charter Party, Special Provision 2).  CARCO nonetheless maintains that this exception applies even where the port location is not specifically named in the charter so long as some advance notice of the designated port is given.  It is unclear how much notice would be required under CARCO's theory of the exception, although CARCO argues that it applies here because there is evidence that the master knew approximately two weeks before the accident that the *Athos I* would be headed to Paulsboro, New Jersey.

We need not address this issue of advance notice because we conclude that the hazard of the submerged anchor was not the sort contemplated by the exception.  As explained above, the purpose of the named port exception is to "relieve[] the charterer of liability for damage arising from conditions at that port so long as

those conditions were *reasonably foreseeable*." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 387 (2d Cir. 2003) (emphasis added) (citations omitted). Without at least an opportunity to discover a particular port's specific pitfalls, the identity of the port would be irrelevant. This would defeat the purpose of naming the port, which is to excuse charterers for the results of hazardous conditions known to the master, not to exonerate them completely from all resulting liability.

In sum, here the particular hazard—the submerged anchor— was unknown to the parties. As the naming of CARCO's port ahead of time did not provide the *Athos I* with an opportunity to accept this unknown hazard, the exception does not come into play.[24]

## V.    The Tort Claims

Should its claim regarding CARCO's contractual liability not succeed, Frescati argues in the alternative that CARCO is liable as the owner of the terminal receiving the *Athos I* under two tort theories: negligence and negligent misrepresentation. The District Court held both theories inapplicable. Although we agree that the negligent misrepresentation claim fails on these facts, we disagree

---

[24] The District Court determined that although underwater hazards are a well-known threat, none of the parties had any reason to believe that Anchorage Number Nine was likely to conceal such a menace. *In re Frescati*, 2011 WL 1436878, at *2. To the extent the Court later determined that knowledge "in general of lost or abandoned objects in the river" was sufficient to trigger this exception, *id.* at *7, that amounted to an error of law. This sort of general knowledge cannot be used to impute knowledge of a specific condition, and we see no evidence that the Delaware River was known to be particularly treacherous in this regard.

with the Court's conclusion that Frescati's negligence claim is necessarily precluded.

## A.    Negligence

Negligence in admiralty law is essentially coextensive with its common law counterpart, requiring: (1) "[t]he existence of a duty required by law which obliges the person to conform to a certain standard of conduct"; (2) "[a] breach of that duty by engaging in conduct that falls below the applicable standard or norm"; (3) a resulting loss or injury to the plaintiff; and (4) "[a] reasonably close causal connection between the offending conduct and the resulting injury."  1 Schoenbaum, *supra*, §§ 5-2, at 252; *Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001) (citation omitted) (same).

Because this accident resulted in a clear loss, we address the existence of a duty, the potential breach of that duty, and causation. As discussed above, the wharfinger in this case—CARCO— contracted to provide the *Athos I* a safe berth.  In the tort context, however, a wharfinger is not a guarantor of a visiting ship's safety, but is "'bound to use reasonable diligence in ascertaining whether the berths themselves and the approaches to them are in an ordinary condition of safety for vessels coming to and lying at the wharf.'" *Smith v. Burnett*, 173 U.S. 430, 436 (1899) (quoting, with approval, *The Calliope*, [1891] A.C. 11 (H.L.) 23 (appeal taken from Eng.)). This is not an unconstrained mandate to "ensure safe surroundings or warn of hazards merely in the vicinity."  *In re Nautilus,* 85 F.3d at 116 (citing *Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.*, 521 F.2d 229, 230 (5th Cir. 1975)).  Instead, a visiting ship may only expect that the owner of a wharf has afforded it a safe approach.  *Id.* (citations omitted).  In being invited to dock at a particular port, "a vessel should be able to enter, use and exit a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by reasonably prudent navigation and seamanship."  *Id.*

41

While CARCO has a duty to maintain a safe approach to its terminal, we must determine the geographic scope of that duty.

### i.    The Scope of the Approach

The geographic scope of a safe approach has been largely unaddressed by the courts. Frescati argues that the scope should be inferred as a matter of custom and practice, and CARCO counters that the approach should be a function of the wharfinger's exertion of control. The District Court, in attempting to adopt a workable method of analysis, was chiefly concerned about CARCO's lack of control in the Anchorage and the absence of a limiting principle if it were to define the approach as the waters that a ship "naturally would traverse." *In re Frescati*, 2011 WL 1436878, at *4. Accordingly, it opted to limit the approach to "the area 'immediately adjacent' to the berth or within 'immediate access' to the berth." *Id.* (quoting *Western Bulk Carriers v. United States*, No. S-97-2423, 1999 U.S. Dist. LEXIS 22371, at *20–21 (E.D. Cal. Sept. 14, 1999)). Such immediacy, we believe, sets too constricted a path to the berth. Instead, we hold that an approach should be understood by its ordinary terms, and that its scope is derived from custom and practice at the particular port in question.

*Bouchard Transportation Co. v. Tug Gillen Brothers*, 389 F. Supp. 77 (S.D.N.Y. 1975), is helpful in defining the geographic scope of an approach. It partially concerned a claim by a barge owner against the terminal owner for negligence in failing to maintain a safe approach and to warn of an unsafe condition. *Id.* at 79. The District Court there found that the approach began when the barge—traveling mid-channel up the Hudson River—altered its heading such that it was on a straight course to the terminal, which was the normal practice for ships docking there. *Id.* at 80. While executing this procedure, the barge grounded, its hull was

42

punctured, and oil was lost.[25]  *Id.* at 80–81.  *Bouchard* concluded that the terminal owner "was negligent in failing to maintain the approach to its terminal, in particular that area outside the river channel and within its dominion and control, normally utilized as the southerly approach to its ship dock, free of obstruction and safe for vessels approaching said terminal."[26]  *Id.* at 81.

Less instructive, but still worth exploring, is *P. Dougherty Co. v. Bader Coal Co.*, 244 F. 267 (D. Mass. 1917).  There, an invitation to use a particular dock in a charter party was construed to "extend[] to the approaches to the dock, and to the water which would naturally be traversed or used by a vessel discharging there." *Id.* at 270 (citing *Hartford & N.Y. Transp. Co. v. Hughes*, 125 F.

---

[25] The grounding in *Bouchard* occurred "immediately adjacent to the ballast dock," approximately 50 feet away.  389 F. Supp. at 81. This "immediately adjacent" language, however, does not refer to the beginning of the approach, but the location of the hazard within the approach.   The District Court in our case adopted this language—citing *Western Bulk Carriers*, 1999 U.S. Dist. LEXIS 22371, at *20—as a "reasonable definition of 'approach.'"  *In re Frescati*, 2011 WL 1436878, at *4.  We believe this interpreted *Bouchard* incorrectly.

[26] CARCO argues that this reference to "dominion and control" is a prerequisite to *Bouchard*'s holding.  We do not view control as a requirement, but as a fact of that case where the port was also deemed negligent for failing to warn of shallow waters in an area directly off its dock where it had previously dredged.  389 F. Supp. at 80, 83.   Instead, in relying primarily on *Smith v. Burnett*, *Bouchard* held that the terminal owner simply "had a duty to ascertain any imminent dangers to [the ship] as it approached."  *Id.* at 83.  Further, to any extent *Bouchard* does suggest that control is required, we disagree for the reasons explained below.

981 (S.D.N.Y. 1903)).    Although *P. Dougherty* is of limited usefulness on its facts (the Court was interpreting the parties' express agreement to use the dock), its conclusion that the wharfinger's obligation covered "individual approaches," distinguished from "the common channel," is nonetheless helpful. *Id.*   More recently, *MS Tabea Schiffahrtsgesellschaft mbH & Co. KG v. Bd. of Com'rs of the Port of New Orleans*, No. 08-3909, 2010 WL 3923168, at *2 (E.D. La. Sept. 29, 2010), *aff'd*, 434 F. App'x 337 (5th Cir. 2011), similarly defined the approach as "the area through which vessels travel in order to move from the main channel of the river to the berth."   *See also McCaldin v. Parke*, 37 N.E. 622, 624 (N.Y. 1894) (determining that a cluster of rocks "not in any channel which had to be used to approach the wharf," but potentially "in that part of the river used for general navigation," was not within the approach).

In light of these cases, we are persuaded by the suggestion in the maritime industry associations' *amici* brief that an approach should be afforded its plain meaning.   *See* Mar. Indus. Ass'ns *Amici* Br. at 20.   As a noun, "approach" is defined as "a drawing near in space or time," and "a way, passage, or avenue by which a place or a building can be approached." *Webster's Third New Int'l Dictionary* 106 (1971).   This suggestion is persuasively illustrated by *amici's* reference to an airplane on final approach or a golf ball approaching the green.    Both examples capture the intuitive meaning of the term as the beginning of a final, linear path to a fixed point.    In fact, *Webster's* specifically incorporates those examples into its definition, listing "a golfing stroke from the fairway for the green," "the steps and motion of a bowler before he delivers the ball," and the "descent of an airplane toward a landing strip."  *Id.*

What is an approach should be given its same plain meaning in the maritime context; when a ship transitions from its general voyage to a final, direct path to its destination, it is on an approach. This is the most logical construction, and it comports with those

cases suggesting that an approach should be gleaned from actual practice. *See, e.g.*, *Bouchard*, 389 F. Supp. at 80–81 (concluding that the approach began where vessels departed the channel on a direct course to the receiving dock and defined it pursuant to the area "normally utilized"). It also reflects the definition used in the maritime industry. For example, *The Mariner's Handbook* defines "approaches" as "[t]he waterways that give access or passage to harbours, channels, and similar areas." J.A. Petty, *The Mariner's Handbook* 226 (8th ed. 2004). Further, in most cases it will not result in a line-drawing problem, a concern raised by CARCO and shared by the District Court. Entire rivers, bays, and oceans will not be transformed into approaches. Instead, in most instances the approach will begin where the ship makes its last significant turn from the channel toward its appointed destination following the usual path of ships docking at that terminal. This analysis will necessarily vary on the characteristics of a particular port, and there will be close and difficult cases. Accordingly, we believe it may be useful to analogize the final approach of a vessel to a port to that of a driveway leading to a home from the public road.[27] It is the last

---

[27] In *Smith v. Burnett*, the United States Supreme Court quoted a Massachusetts Supreme Court case making a similar comparison where a defendant failed to warn a schooner of a rock it knew of adjacent to its wharf.

> This case cannot be distinguished in principle from that of the owner of land adjoining a highway, who, knowing that there was a large rock or a deep pit between the traveled part of the highway and his own gate, should tell a carrier, bringing goods to his house at night, to drive in, without warning him of the defect, and who would be equally liable for an injury sustained in acting upon his invitation, whether he did or did not own the soil under the highway.

segment of the voyage leading directly to the host's door.  Marine navigation is further complicated in that ships sometimes have the luxury of approaching through a variety of different courses across open water.  Yet, so long as a ship is not approaching in an illogical, unreasonable, or disallowed manner, it will be deemed within its approach when it is within this final phase of its journey.

### ii.    Was the *Athos I* Within the Approach to CARCO's Terminal When the Accident Occurred?

Fortunately, the case before us is not one of the difficult ones, for the facts indicate that the *Athos I* was within the approach when it struck the anchor.  First, the vessel was following the usual path for ships of its size docking at CARCO's terminal, having turned away from the channel at the usual point and was being pushed by two tugboats in a straight path toward CARCO's pier.  Moreover, there were other indicators that the *Athos I* had ceased navigating generally and was within the final phase of its travel, namely that it was rotated sideways and, as noted, assisted by tugs.  While not dispositive factors, these trappings indicate that the *Athos I* was no longer voyaging, but was configured solely for docking.

To the extent CARCO argues that the sphere of control exercised by it should be used to limit the scope of its duty,[28] we

---

173 U.S. at 434 (quoting *Carleton v. Franconia Iron & Steel Co.*, 99 Mass. 216, 219 (1868) (internal quotation marks omitted)).

[28] In further support of this position, CARCO cites to *Sonat Marine Inc. v. Belcher Oil Co.*, 629 F. Supp. 1319 (D.N.J. 1985), *aff'd*, 787 F.2d 583 (3d Cir. 1986) (table).  That case, however, does not apply on its facts, and uses a wharfinger's assumption of control to *expand*, rather than *limit*, the scope of its liability.  Specifically, that wharfinger took the initiative secretly to widen its approach

hold that a failure to exercise control over an area is not conclusive in this analysis. The appeal of *The Moorcock* long-ago dispatched this argument.[29]    [1889] 14 P.D. 64 (Eng.).    The steamship *Moorcock* was invited to be discharged and loaded at a particular wharf where it would be moored alongside the wharfingers' jetty. *Id.* at 64. Although the ship was expected to rest on the bottom of the River Thames at low tide, the particular section of riverbed was not actually under the wharfingers' control. *Id.* at 69. Even so, the Court explained that it "d[id] not follow that [the wharfingers] are relieved from all responsibility. They are on the spot." *Id.* at 70. It continued:

> No one can tell whether reasonable safety has been secured except themselves, and I think if they let out their jetty for use they at all events imply that they have taken reasonable care to see whether the berth, which is the essential part of the use of the jetty, is safe, and if it is not safe, and if they have not taken such reasonable care, it is their duty to warn persons

---

because "it recognized that larger vessels had problems entering the barge berth and required a greater margin of safety." *Id.* at 1322. Insofar as the terminal operator had "assumed sufficient control over that area to attempt to ensure a proper approach to the ship and barge terminal," *id.* at 1327, it was deemed negligent for "fail[ing] to use means adequate[, such as side scans or wire drags,] to ensure that the new area where it thought larger barges could safely go was free of obstructions," *id.* at 1325. Control aside, the District of New Jersey Court also noted that a "safe approach to the berth had to include the additional . . . area." *Id.* at 1326.

[29] That the appeal of *The Moorcock* was operating under a theory of an implied contractual warranty does not reduce its import for purposes of this analysis. [1889] 14 P.D. 64 at 68 (Eng.).

with whom they have dealings that they have not done so.

*Id.*; *see also The Cornell No. 20*, 8 F. Supp. 431, 433 (S.D.N.Y. 1934) ("However, it is clear that the obligation of the wharfinger is not limited to the area of the land under water actually owned by it. . . . It impliededly [sic] represents to the master of a vessel who is induced to bring his vessel to its wharf that the berth and immediate access to it are reasonably safe for the vessel.").

In addition, insofar as the sphere of responsibility exercised by CARCO is a voluntary assumption of duty, it cannot be relied on to restrict the scope of a port owner's duty as a matter of law. Limiting a wharfinger's responsibility to areas in which it has affirmatively assumed responsibility would allow it to define the scope of its own liability regardless of the port's actual approach. Such a construction plays poorly against a policy that places logic and common sense over self-serving limitations of liability in the tort context. Moreover, we are not convinced that CARCO was actually precluded from extending its area of responsibility into the Anchorage. The record reflects that permission to it was not required for sonar scans, for example, and the record lacks an indication that CARCO could not have obtained a dredging permit for the Anchorage if it desired to do so.

We conclude that the *Athos I* was well within the approach to CARCO's terminal when the casualty occurred, and that it therefore had a duty to exercise reasonable diligence in providing the *Athos I* with a safe approach.

### iii.    Potential Breach of Duty to Maintain a Safe Approach

Having determined that the *Athos I* was within its approach when it was damaged and that CARCO therefore owed it a safe approach, did CARCO satisfy that duty by exercising the standard

of care required of a reasonable wharfinger under the circumstances? Although the "the nature and extent of the duty of due care is a question of law," factual issues predominate here as they do in most negligence litigation. *Redhead v. United States*, 686 F.2d 178, 182 (3d Cir. 1982). Thus, we review findings of negligence as factual findings for clear error. *See In re Moran Towing Corp.*, 497 F.3d 375, 377–78 (3d Cir. 2007); *Andrews v. United States*, 801 F.2d 644, 646 (3d Cir. 1986). As noted, there were no findings.

Negligence exists where there was a "fail[ure] to exercise that caution and diligence which the circumstances demanded, and which prudent men ordinarily exercise." *Grand Trunk R.R. v. Richardson*, 91 U.S. 454, 469 (1875). The admiralty context is no different, requiring "reasonable care under the particular circumstances." 1 Schoenbaum, *supra*, § 5-2, at 253 (citation omitted); *see also Smith*, 173 U.S. at 436 (remarking that wharfingers are "bound to use reasonable diligence" (citation and quotation marks omitted)). In admiralty, the particular duty required under any given circumstance can be gleaned from statute, custom, or "the demands of reasonableness and prudence." 1 Schoenbaum, *supra*, § 5-2, at 253 (citing *Pennsylvania R.R. v. S.S. Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962), *aff'd*, 320 F.2d 262 (3d Cir. 1963)). Of course, "the degree of care which the law requires in order to guard against injury to others varies greatly according to the circumstances of the case." *Richardson*, 91 U.S. at 469–70.

On the facts before us, we are insufficiently informed to delineate the exact standard of care required by CARCO,[30] let

---

[30] In evaluating the specific nature of this duty, the parties point to no statute on point and our research reveals none. As to custom, it "is only evidence of a standard of care[,] and violation of custom or adherence to it does not necessarily constitute negligence or lack of

alone whether there was a breach of that standard (a.k.a. duty). That task rests with the District Court on remand should it need to reach the negligence claim.

### iv.    Causation

On remand, the District Court will also need to determine whether the failure, if any, to meet the standard of care proximately caused the accident. "Questions of causation in admiralty are

---

negligence." *In re J.E. Brenneman Co.*, 322 F.2d 846, 855 (3d Cir. 1963) (citations omitted); *Norton v. Ry. Express Agency, Inc.*, 412 F.2d 112, 114 (3d Cir. 1969) ("Although not controlling, custom and practice may be shown to establish the standard of care to which the party charged with the wrongful act may be required to conform.").

The District Court also determined that no industry custom would have "put CARCO on notice that it should scan into the Anchorage." *In re Frescati*, 2011 WL 1436878, at *4. It is unclear if this apparent factual finding refers to other River terminals not searching their full approaches, federal waters generally, or Anchorage Number Nine specifically. Unfortunately, a review of the record leaves us similarly adrift. While several trial witnesses testified that they did not know of any Delaware River terminal taking precautionary action within federal waters, the Chief of Operations Division for the U.S. Army Corps of Engineers suggested that at least one terminal had surveyed the federal waters preceding its berth. *See* DePasquale Test. 104:20–105:13, Oct. 6, 2010. Ultimately, the record is unhelpful on this point because we do not know if any of the terminals on the River had an approach that also traversed federal waters like CARCO's did. Of course, the only relevant consideration for custom would be similarly situated terminals, and we are unable to make any meaningful assessment of industry custom on these facts.

questions of fact." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367 (5th Cir. 2006); *see also In re Nautilus*, 85 F.3d at 116 (reviewing, in admiralty, a district court's determination as to causation for clear error).

The purpose of requiring proximate cause is "to limit the defendant's liability to the kinds of harms he risked by his negligent conduct." 1 Dan B. Dobbs *et al.*, *The Law of Torts* § 198, at 681 (2d ed. 2011) (citations omitted). Proximate cause is something of a misnomer in that it "is not about causation at all but about the appropriate scope of legal responsibility." *Id.* at 682. Instead, "proximate cause holds that a negligent defendant is liable for all the general kinds of harms he foreseeably risked by his negligent conduct and to the class of persons he put at risk by that conduct." *Id.* at 682–83; 1 Schoenbaum, *supra*, § 5-3, at 260–61 ("[T]he injury or damage must be a reasonably probable consequence of the defendant's act or omission.").

CARCO argues that proximate cause is lacking on these facts because the presence of an anchor in the anchorage was not foreseeable, especially by virtue of other ships arriving unharmed in the past. Once again, we decline to resolve this issue on the record before us. CARCO further argues that proximate cause is lacking on the basis that the anchor-dropper was the actual cause of the accident. It is clear, however, "'that there may be more than one proximate cause of an injury.'" *Serbin v. Bora Corp.*, 96 F.3d 66, 75 (3d Cir. 1996) (quoting *Davis v. Portline Transportes Mar. Internacional*, 16 F.3d 532, 544 (3d Cir. 1994)).

More crucially, the issue is whether the accident would have been prevented had CARCO exercised its duty to act as a prudent wharfinger within the approach. At a minimum, this requires "that the injury would not have occurred without the defendant's negligent act." 1 Schoenbaum, *supra*, § 5-3, at 259. Here, the causation inquiry turns on whether prudent behavior—had it been exercised, a factual inquiry—would have prevented the injury. *See*

Dobbs *et al.*, *supra*, § 184, at 620. In light of CARCO's invitation that the *Athos I* arrive drafting 37 feet or less, *see supra* Part IV.C, it may be that the anchor lay sufficiently deep such that it would not have been detected even if CARCO had acted as a prudent wharfinger. Conversely, it could be the case that—even if the 37 feet of contractual clearance were provided—CARCO's duty as a wharfinger required something more. Should this be put in issue, further inquiry must occur as to what diligence was required of a prudent wharfinger, and only then can the District Court determine whether a failure to implement those procedures proximately caused the accident.[31]

Therefore, because factual issues remain to be resolved if Frescati's negligence claim becomes relevant, we also remand for further proceedings, as necessary, on this claim.

### B.    Negligent Misrepresentation

Frescati argues that CARCO's failure to inform the *Athos I* of the reduction in maximum draft at its facility's ship dock prior to the vessel's arrival was a negligent misrepresentation. The District Court held otherwise, reasoning that "the area of concern was not the area where the casualty occurred and the draft at the berth was factually irrelevant to the casualty." *In re Frescati*, 2011 WL 1436878, at *5. We reach essentially the same result.

Negligent misrepresentation stems from a failure to exercise reasonable care in supplying incorrect information during the course of a business transaction. *Coastal (Berm.) Ltd. v. E.W.*

---

[31] We note that the District Court was "not convinced that had the area been scanned the anchor would perforce have been detected . . . ." *In re Frescati*, 2011 WL 1436878, at *4. We interpret the Court's remark as contemplating the effort required to detect the anchor absent an incident, as the anchor was in fact discovered with the use of side-scan technology.

*Saybolt & Co., Inc.*, 826 F.2d 424, 428 (5th Cir. 1987) (citing *Grass v. Credito Mexicano, S.A.*, 797 F.2d 220, 223 (5th Cir. 1986)).  The receiving party must rely on that false information and thereby suffer injury.  *Id.* at 428–29 (citing same).  This formulation, set out by § 552 of the Restatement (Second) of Torts, implicitly incorporates the standard elements of negligence:  duty of care, a breach of that duty, injury, and causation.  *See J.E. Mamiye & Sons, Inc. v. Fid. Bank*, 813 F.2d 610, 615 (3d Cir. 1987); 1 Schoenbaum, *supra*, § 5-2, at 252.

CARCO initially explained in its Port Manual that the allowable maximum draft at its Paulsboro facility was 38 feet, but this "may change from time to time and should be verified prior to the vessel's arrival."  J.A. at 1095 (CITGO Terminal Regulations for Vessels ¶ 2).  On November 22, 2004, four days before the *Athos I* arrived, CARCO's Port Captain Rankine announced internally that "the maximum draft at Paulsboro berth #1 (ship dock) has been reduced to 36-00 feet."  J.A. at 1702.  No one informed the *Athos I* of the change (and apparently its personnel did not inquire).  This meant that the *Athos I* would have to enter CARCO's port under an exception to the maximum draft, and in any event Port Captain Rankine was comfortable with this because the *Athos I* would not be lying in the shallower area next to its dock that motivated the draft reduction.[32]  Rankine Test. 41:22–42:3, Nov. 22, 2010.

---

[32] Rankine testified that such exceptions are common in the industry, and that he was not concerned for the *Athos I* because a ship drafting 37′3″ had sat through low water just ten days before without harm.  Rankine Test. 38:22-23, 41:22–42:9, Nov. 22, 2010.  When the trial judge inquired about the rationale for making regular exceptions, Rankine replied that he was required by the guidelines to make the reduction, but that he did not "have any

On its terms, the reduction was limited to CARCO's ship dock. Although Frescati argues that the *Athos I* would not have berthed at CARCO's facility (its actual ship dock, but not the approach to it through the Anchorage) so early in the rising tide if its crew had known of the reduction in maximum allowable draft, this is irrelevant to its decision to enter Anchorage Number Nine— the site of the submerged anchor.

In this context, any misrepresentation about the ship dock is factually irrelevant to the accident because it did not occur at the dock, but rather 900 feet out in the Anchorage. There was no injury sustained that resulted from the failure to note the draft reduction at or immediately adjacent to CARCO's dock. Frescati's negligent misrepresentation claim thus fails on its merits as a matter of law.

## VI.    Effect of the Government's Settlement With CARCO

In its limited settlement agreement with the Government, CARCO promised not to

> demand that the court reduce or offset the damages awarded to the United States against [CARCO] in the Lawsuit based on evidence that the negligence or fault of the United States in failing to detect, mark and/or remove underwater obstructions to navigation in the navigable waters of the Delaware River caused or contributed to the ATHOS I Incident.

J.A. at 95 (Release ¶ 3.1(b)). It thus asks us to preclude CARCO on remand from raising any equitable defense premised on the Government's regulation of the Anchorage. CARCO responds that it retained unspecified equitable defenses relevant to defending

---

worries about the depth of water in the area where the ship was going to sit." *Id.* at 45:18-25.

against, *inter alia*, the contractual claims, and that the Government conflates defenses to these claims with violations of CARCO's promise to forbear making claims against the Government sounding in tort to reduce or offset damages awarded to it.[33]

The Government also argues that the District Court mistakenly denied its earlier motion for summary judgment on CARCO's defense of equitable recoupment,[34] as that defense was really just a disguised attempt for indemnity or contribution payments. After hearing oral argument, the District Court denied the Government's pretrial motion on the ground "that the question of subrogation defenses [by CARCO] is better resolved with the benefit of a full trial record." J.A. at 101. CARCO claims that the Government failed to follow up at trial, and thus waived the issue. We agree, as we see no indication that the Government renewed its

---

[33] The Government argues that CARCO has attempted to circumvent this partial settlement agreement by presenting against it negligence claims couched as equitable defenses. CARCO explicitly retained "the right to raise affirmative defenses under any theory or doctrine of law or equity, the right to assert setoff or recoupment and the right to assert compulsory or non-compulsory counterclaims other than a Claim for Contribution or Indemnity . . . ." J.A. at 97 (Release ¶ 4.2). It was further agreed that the partial settlement would have no force as to CARCO's suit with Frescati. *Id.* at 97–98 (Release ¶ 4.3).

[34] Equitable recoupment is "[a] principle that diminishes a party's right to recover a debt to the extent that the party holds money or property of the debtor to which the party has no right." *Black's Law Dictionary*, *supra*, at 618. The competing claims must arise from the "same transaction." *Phila. & Reading Corp. v. United States*, 944 F.2d 1063, 1075 (3d Cir. 1991) (quoting *United States v. Dalm*, 494 U.S. 596, 608 (1990)).

argument at trial (or argued before us how the issue has not been waived).  Thus, we decline to preclude CARCO from revisiting any previously raised equitable defense to the Government's subrogation claims.

## VII.   Conclusion

Although remand is appropriate because the District Court failed to set out separate findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a)(1), our legal conclusions also make it necessary to remand for factual findings.

We conclude that the *Athos I*, and Frescati as its owner, are beneficiaries of CARCO's contractual safe berth warranty.  This was an express assurance that CARCO's port would be safe for the *Athos I* within the scope of its invitation—that is, drafting 37 feet or less.  Therefore, on remand it will need to be determined whether this amount of clearance was actually provided.  This analysis may require inquiries into the arriving draft of the *Athos I* and, if the vessel was drafting more than the agreed-upon depth of 37 feet, the depth and positioning of the anchor.

CARCO's assertion of the named port exception is unavailing.  Even if it were eligible on the type of notice given to the *Athos I*, its crew did not have an opportunity to accept a hazard (the anchor) that was unknown to the parties prior to the accident, and the exception is inapplicable.

We further conclude that, as this case is primarily a contractual one, analysis of Frescati's negligence claim is required only if the contractual safe berth warranty of CARCO is deemed satisfied.  In that event, because we conclude that the accident occurred within the approach to CARCO's terminal, the District Court would need to determine the appropriate standard of care, whether it was breached, and, if so, was that breach a cause of the spill.  The negligent misrepresentation claim, however, fails for

lack of factual causation because the alleged misrepresentation applied to an area unrelated to the accident.

Finally, we conclude that the Government has waived its reliance on its partial settlement agreement in challenging CARCO's defenses to liability.

We thus affirm in part, vacate in part the District Court's judgment orders of April 12, 2011 against Frescati and the Government, and remand for further proceedings consistent with this opinion.  Further appeals relating to this case will be referred to the current panel.

# Appendix A

